SAWYER & LABAR LLP
ADRIAN SAWYER, State Bar No. 203712
    *sawyer@sawyerlabar.com*
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820

ROLNICK KRAMER SADIGHI LLP
LAWRENCE M. ROLNICK (*pro hac vice forthcoming*)
    *lrolnick@rksllp.com*
MARC B. KRAMER (*pro hac vice forthcoming*)
STEVEN M. HECHT (*pro hac vice forthcoming*)
BRANDON FIERRO (*pro hac vice forthcoming*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: 212.597.2800

*Counsel for Proposed Lead Plaintiff*
*HBK Master Fund L.P. and*
*HBK Merger Strategies Master Fund L.P.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WATER ISLAND EVENT-DRIVEN FUND, on Behalf of Itself and All Others Similarly Situated,<br><br>       Plaintiff,<br><br>   v.<br><br>MAXLINEAR, INC., KISHORE SEENDRIPU, and STEVEN LITCHFIELD,<br><br><br>      Defendants. | Case No. 3:23-cv-01607-LAB-MMP<br><br>CLASS ACTION<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES OF HBK MASTER FUND L.P. AND HBK MERGER STRATEGIES MASTER FUND L.P. IN OPPOSITION TO THE INSTITUTIONAL INVESTOR GROUP'S MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF LEAD COUNSEL SELECTION**<br><br>Date: January 8, 2024<br>Time: 11:15 A.M.<br>Judge: Hon. Larry Alan Burns, U.S.D.J.<br>Courtroom: 14A |

# **TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT ................................................................ 1

II. ARGUMENT ........................................................................................ 5

    A.   The Investor Group is Not the Most Adequate to Serve as Lead
         Plaintiff Because its Members are Unrelated, It Has Not Carried
         Its Burden to Demonstrate How it Would Manage the Litigation
         or Resolve Disputes ................................................................... 6

    B.   Each Member of the Investor Group Has Trading Patterns that
         Will Subject it to Unique Defenses ........................................... 14

    C.   The HBK Funds Should be Appointed Lead Plaintiff Because
         they Have the Greatest Financial Interest in the Relief Sought by
         the Class and Otherwise Satisfy Rule 23 ................................... 20

III. CONCLUSION ..................................................................................... 22

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

Page

**Cases**

*Bodri v. GoPro, Inc.*,
  2016 WL 1718217 (N.D. Cal. Apr. 28, 2016)...........................................6

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
  2012 WL 78780 (N.D. Cal. Jan. 9, 2012) ...............................................21

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) ...........................................................................19

*Eichenholtz v. Verifone Holdings, Inc.*,
  2008 WL 3925289 (N.D. Cal. Aug. 22, 2008)........................6, 7, 10, 14

*Fialkov v. Celladon Corp.*,
  2015 WL 11658717 (S.D. Cal. Dec. 9, 2015)..................................passim

*Frias v. Dendreon Corp.*,
  835 F. Supp. 2d 1067 (W.D. Wash. 2011) ........................................7, 9, 11

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ..............................................................14

*In re Baan Co. Sec. Litig.*,
  186 F.R.D. 214, 224 (D.D.C. 1999) .......................................................9

*In re Bridgestone Inv. Corp. Ltd.*,
  789 F. App'x 13 (9th Cir. 2019).................................................14, 16, 18

*In re Cloudera, Inc. Sec. Litig.*,
  2019 WL 6842021 (N.D. Cal. Dec. 16, 2019) .................................7, 10, 21

*In re InterClous Sys., Inc. Sec. Litig.*,
  2014 WL 12774917 (D.N.J. Nov. 5, 2014) ............................................18

*In re Jones Soda Co. Sec. Litig.*,
  2008 WL 418002 (W.D. Wash. Feb. 12, 2008) ........................................11

*In re Mersho*,

Case No. 3:23-cv-01607

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

6 F. 4th 891 (9th Cir. 2021) ................................................................. passim

*In re Network Assocs., Inc. Sec. Litig.*,

    76 F. Supp. 2d 1017 (N.D. Cal. 1999) ................................................. 6

*In re Olsten Corp. Sec. Litig.*,

    3 F. Supp 2d 286 (E.D.N.Y. 1998) ..................................................... 21

*In re Stitch Fix, Inc. Sec. Litig.*,

    393 F. Supp. 3d 833 (N.D. Cal. 2019) ................................................ 9

*In re Vivendi Universal, S.A. Sec. Litig.*,

    183 F. Supp. 3d 458 (S.D.N.Y. 2016) ............................................... 17

*Isaacs v. Musk*,

    2018 WL 6182753 (N.D. Cal. Nov. 27, 2018) ........................... passim

*Koffsman v. Green Dot Corp.*,

    2022 WL 170636 (C.D. Cal. Jan. 22, 2022) ............................. 6, 7, 14

*Lax v. First Merchants Acceptance Corp.*,

    1997 WL 461036 (N.D. Ill. Aug. 11, 1997) ..................................... 20

*Meluci v. Corcept Therapeutics Inc.*,

    2019 WL 4933611 (N.D. Cal. Oct. 7, 2019) ............................... 20, 21

*Micholle v. Opthotech Corp.*,

    2018 WL 1307285 (S.D.N.Y Mar. 13, 2018) ..................................... 7

*Perlmutter v. Intuitive Surgical, Inc.*,

    2011 WL 566814 (N.D. Cal. Feb. 15, 2011) ................................... 19

*Wasa Medical Holdings v. Sorrento Therapeutics, Inc.*,

    2021 WL 533518 (S.D. Cal. Feb. 12, 2021) ............................. passim

*Xu v. FibroGen, Inc.*,

    2021 WL 3861454 (N.D. Cal. Aug. 30, 2021) ............................. 10, 11

**Statutes**

15 U.S.C. § 78u-4 ................................................................................. 5

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

The HBK Funds[1] respectfully submit this memorandum of points and authorities in opposition to the Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel filed by the self-described Institutional Investors (the "Investor Group" or "Group").

## I.    PRELIMINARY STATEMENT

Congress passed the PSLRA in 1995 to combat perceived abuses of securities fraud class actions by taking control out of the hands of lawyers and giving it to the investor with the largest financial interest in the relief sought by the class. To give effect to this legislative intent, Congress created a straightforward process for investors to seek and secure appointment as the "lead plaintiff," the party empowered by the statute who is best situated to act on behalf of absent class members and most incentivized to prosecute the case vigorously on the class's behalf. The most adequate plaintiff then selects counsel to represent the class, subject to the approval of the class.

With the PSLRA nearing thirty years old, a troubling trend has emerged in which class action lawyers have tried to wrest control of these cases back from the hands of investors. Specifically, attorneys seeking appointment as lead counsel bring together collections of unrelated plaintiffs and seek appointment as a lead plaintiff "group," and have done so here. By throwing together a "group," lawyers try to combine the losses of each of the collective's constituent members to present the court with the "largest financial interest" in the relief sought. In this way, rather than the investor seeking out and managing its counsel, the attorneys seek out and manage the

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the HBK Funds' Motion For Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (ECF No. 14) (the "HBK Funds' Motion"). Citations to "Ex." are to the Exhibits appended to the Declaration of Steven M. Hecht in Support of the HBK Funds' Motion (ECF No. 14-1). Citations to "Group Ex." are to the Exhibits appended to the Declaration of David Kaplan in Support of the Investor Group's Motion (ECF No. 15-2). Citations to "Joint Decl." are to the Joint Declaration in Support of the Investor Group's Motion (ECF No. 15-5).

investors – thereby turning the very purpose of the PSLRA on its head.

Here, the HBK Funds have the largest financial interest in the outcome of the litigation over any other fund. Whether measured on a LIFO basis or a FIFO basis they have greater losses than any other commonly-managed fund. However, by aggregating the losses of four unrelated funds, the Investor Group seeks to thwart the HBK Funds' entitlement to be deemed the presumptive lead.

The four investment funds – Westchester, Alpine, Atlas, and Kryger – have no meaningful pre-existing relationship. As their Joint Declaration in support of their Motion demonstrates (*see* ECF No. 15-5), the Investor Group's members are from New York, Florida, Chicago, and London and have different and sometimes conflicting trading strategies. Although their declarations in support of appointment as lead counsel are required to detail how they came to be a group, how they will make decisions governing the litigation and how they will resolve disputes, the Group's declarations contain none of this information. Instead, the declarations reveal only that the Investor Group "convened a conference call" – speaking just one time, at an unknown time and for an undisclosed duration – before seeking appointment as Lead Plaintiff. It is not even revealed whether the conference call was organized by counsel or by the funds themselves.

In such circumstances, courts in this Circuit have "uniformly refused to appoint as lead plaintiff groups of unrelated individuals, brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff." *Wasa Medical Holdings v. Sorrento Therapeutics, Inc.*, 2021 WL 533518, at *5 (S.D. Cal. Feb. 12, 2021). They do so for good reason. The entire purpose of placing the litigation in the hands of the most adequate plaintiff is defeated when the lead plaintiff is simply a lawyer-driven collection of previously unrelated investors. Such a group will not be able to cohesively and effectively manage the lawsuit and instead control will rest with counsel who created the group.

Moreover, these problems will be exacerbated because each member of the

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

group has unique trading patterns that will subject them to unique defenses.  By way of example, two of the funds in the Investor Group did not purchase any SIMO ADSs until the *final day of the class period* and only *after* approval had been obtained from Chinese regulators.  Such funds will be subject to the unique defense that they did not rely on Defendants' alleged misrepresentations at all but instead purchased the stock solely because the merger was approved by the Chinese regulators.  Another investor, Atlas, actually *sold* SIMO ADSs after approval by Chinese regulators and appears to have engaged solely in quantitative trading and market-making activities in which trading decisions are made by mathematical algorithms and are not tied to the statements Defendants made to investors.  In other words, the Group consists not only of unrelated investors, but investors with divergent trading strategies that will be subject to unique defenses.   It would be patently unfair to the Class to appoint such a group as Lead Plaintiff.

***First***, the Investor Group fails the multi-factor test that courts in the Ninth Circuit utilize to evaluate whether a lead plaintiff "group" is proper.   That test considers, among other things, "a pre-litigation relationship [among the group's members] along with other factors" such as "how the members found their counsel[] and the prosecution procedures set out in their filings."  *In re Mersho*, 6 F. 4th 891, 901-02 (9th Cir. 2021).  The members of the Investor Group here appear to lack any pre-litigation relationship whatsoever, their work together on the case consists of a single conference call, and they offer no explanation for how that call was organized. They likewise offer no detailed procedures for prosecuting the case.  There is no articulated decision-making process, the Investor Group has not provided any detail about how disagreements over litigation strategy or case-related decisions will be resolved, and there has been no information provided – none – about how the Investor Group will vote or otherwise work together to decide material issues or disputes. Indeed, the Investor Group fails to report whether there is even any voting mechanism in place to begin with.  This is precisely the type of incoherent and artificial group

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

that courts routinely reject under the PSLRA. To further complicate matters, the Investor Group proposes appointing two different groups of attorneys as co-lead counsel, further increasing the risk that the lawyers – and not SIMO investors – manage the case.

**Second**, the trading patterns of each member of the Group subject them to unique defenses. As noted above, the Westchester Funds (who suffered the largest loss among the investors in the Investor Group) and the Kryger Funds (who suffered the smallest loss) did not purchase one share of SIMO ADSs throughout the entire class period and did not purchase one share of SIMO ADSs after any of the alleged misrepresentations and omissions that are at the heart of the case. Instead, they waited until the very last day of the Class Period – and after Chinese regulators announced approval of the deal – to purchase. Defendants will surely assert that they were opportunistic arbitrageurs who jumped in at the last moment in reliance on approval from Chinese regulators. Similarly, Atlas's trading pattern suggests quantitative trading algorithms – and not reliance on the alleged misstatements and omissions – drove trading decisions. Indeed, it is unclear whether Atlas' trading was based on any fundamental information about MaxLinear or SIMO. Moreover, Atlas *sold* shares in SIMO after the Chinese regulators approved the transaction – at the same time that Westchester and Kryger were *purchasing* SIMO ADSs. This likely subjects Atlas to unique reliance defenses – like rebutting the fraud-on-the-market presumption of reliance.

**Third**, the HBK Funds are the movant with the largest financial interest in the case and also satisfy the typicality and adequacy requirements of Rule 23. They purchased SIMO shares throughout the Class Period, were not quantitative traders or market makers, and suffered the largest loss. Because the Investor Group has not established that it is a proper group, the HBK Funds are the presumptive most adequate plaintiffs under the PSLRA and should be appointed Lead Plaintiff here. The HBK Funds are the largest by a wide margin when compared to any member of

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

the Investor Group. The HBK Funds' approximate losses – $36 million under the first-in, first-out "FIFO" share-matching methodology and $29 million under the last-in, first-out "LIFO" methodology – are at least approximately $4 million more than the largest member of the Investor Group, Westchester, which has disclosed losses of $25.7 million. The HBK Funds' losses dwarf those of the other Group members, which disclose losses of between $7.5 million (Kryger), $8 million (Alpine) and $16 million (Atlas). Moreover, the trading patterns of the members of the Investor Group subject them to unique defenses. The HBK Funds are sophisticated institutional investors who bought SIMO ADSs throughout the entire Class Period, are not subject to any unique defenses, and are precisely the type of motivated Lead Plaintiff Congress envisioned to lead securities class actions and manage counsel in the process. They satisfy the PSLRA's requirements and best comport with the legislative intent behind the statute.

For these reasons and as detailed below, the Court should deny the Investor Group's Motion for appointment as Lead Plaintiff and appoint the HBK Funds – the movant with the largest financial interest in the case that otherwise satisfies Rule 23 – as Lead Plaintiff.

## II. ARGUMENT

Under the PSLRA, movants seeking to be appointed lead plaintiff are required to demonstrate that they have the "largest financial interest in the relief sought by the class" and "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Here, the HBK Funds are the movants who suffered the greatest financial loss as a result of MaxLinear's fraud who also satisfy the requirements of Rule 23. As such, they are the presumptive lead plaintiff. *See Mersho*, 6 F.4th at 899. The other competing movant, the Investor Group, is an amalgamation of otherwise unrelated class members attempting to join together solely to aggregate their losses in an attempt to be named lead plaintiff. The majority of courts in this Circuit decline to appoint such "groups" as lead plaintiff.

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

This Court should follow suit. Furthermore, each member of the "Group" has trading patterns that subject them to unique defense and make their claim insufficiently "typical" of those in the class.

### A. The Investor Group is Not the Most Adequate to Serve as Lead Plaintiff Because its Members are Unrelated, It Has Not Carried Its Burden to Demonstrate How it Would Manage the Litigation or Resolve Disputes

Courts in this Circuit have "uniformly refused to appoint as lead plaintiff groups of unrelated individuals, brought together for the sole purpose of aggregating their claims in an effort to become the presumptive lead plaintiff." *Wasa Medical*, 2021 WL 533518, at *5; *Fialkov v. Celladon Corp.*, 2015 WL 11658717, at *4 (S.D. Cal. Dec. 9, 2015) (same); *Bodri v. GoPro, Inc.*, 2016 WL 1718217, at *4 (N.D. Cal. Apr. 28, 2016) (same (quoting *Eichenholtz v. Verifone Holdings, Inc.*, 2008 WL 3925289, at *7 (N.D. Cal. Aug. 22, 2008))); *see also Koffsman v. Green Dot Corp.*, 2022 WL 170636, at *1 (C.D. Cal. Jan. 22, 2022) ("[T]he majority of courts in this circuit . . . have refused to appoint as lead plaintiffs groups of unrelated individuals" (quotation and marks omitted)). These courts recognize that to "allow lawyers to designate unrelated plaintiffs as a 'group' and aggregate their financial stakes would allow and encourage lawyers to direct the litigation." *In re Network Assocs., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1023 (N.D. Cal. 1999). The Ninth Circuit has not addressed the question of "whether a group can satisfy the 'largest financial interest' requirement [of the PSLRA] by aggregating losses[.]" *Koffsman*, 2022 WL 170636, at *1.

As Judge Battaglia has aptly summarized when recently rejecting a group, "[w]hen unrelated investors are cobbled together, the clear implication is that counsel, rather than the parties, are steering the litigation." *Wasa Medical*, 2021 WL 533518, at *5. Courts reject these lead plaintiff "groups" because they fail "to meet the adequacy prong of Rule 23 or . . . [their construction] makes the group unfit to be appointed lead plaintiff because it is contrary to legislative intent." *Eichenholtz*, 2008

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

WL 3925289, at *7; *Fialkov*, 2015 WL 11658717, at *4 (declining to appoint group in light of the "policy underlying the PSLRA").

To determine whether a group has carried its burden to demonstrate that its losses can be aggregated, "[d]istrict courts often consider a pre-litigation relationship along with other factors such as the size of the group, how the members found their counsel, and the prosecution procedures set out in their filings." *Koffsman*, 2022 WL 170636, at *2 (quoting *Mersho*, 6 F.4th at 901-02); *Wasa Medical*, 2021 WL at *5 (rejecting group, focusing on lack of "pre-existing relationship between the group members"). These factors are important because they show that the group can "function cohesively to monitor counsel and make critical litigation decisions as a group." *In re Cloudera, Inc. Sec. Litig.*, 2019 WL 6842021, at *6 (N.D. Cal. Dec. 16, 2019). In addition, courts reject groups where the joint declaration in support of their application contain only "conclusory statements" and "generalizations" and where the group has requested "to appoint multiple law firms as lead counsel." *Eichenholtz*, 2008 WL 3925289, at *9; *Frias v. Dendreon Corp.*, 835 F. Supp. 2d 1067, 1074-75 (W.D. Wash. 2011).

The Investor Group fails under each of these tests. The Group is comprised of unaffiliated institutional investors located in New York (Westchester) Florida (Alpine), Chicago (Atlas), and London (Kryger). Its members have no pre-litigation relationship but for a single conference call organized by an undisclosed party and convened prior to seeking appointment as lead plaintiffs. (*See* Joint Decl. ¶ 18); *Isaacs v. Musk*, 2018 WL 6182753, at *3 (N.D. Cal. Nov. 27, 2018) (declining to appoint group that only participated in one phone call before filing); *Michelle v. Opthotech Corp.*, 2018 WL 1307285, at *8 (S.D.N.Y Mar. 13, 2018) (rejecting group where the "only evidence of cooperative efforts taken thus far is a conference call");

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

*Fialkov*, 2015 WL 11658717, at *4 (declining to appoint group that had "no pre-existing relationship" between members).[2]

Indeed, because two members of the group apply similar "event-driven" and "merger arbitrage" strategies (*e.g.*, ECF No. 15-4 at 4 ("Virtus Westchester Event-Driven Fund"), 28 ("Kryger Event Fund Ltd.")),[3] they may be business competitors of one another and not well suited to act jointly. The Group's Joint Declaration is utterly silent as to how each of its members found its proposed counsel, only that the members of the Group have "close working relationships" with counsel and that they are "aware" of those firms' reputations. (Joint Decl. ¶¶ 20-21).[4]

Moreover, and critically, the Investor Group says next to nothing about how it intends to prosecute this case and make litigation decisions, further demonstrating its inadequacy. There is no apparent group decision-making process, and no information or detail about how disagreements over litigation strategy, settlement or case-related decisions will be resolved. The Joint Declaration has no detail whatsoever about how the Group members will vote on decisions – or if there is even a voting mechanism

---

[2] Notably, the Joint Declaration does not say when the conference call was held, how long it lasted, or if counsel were involved in the call, including by either setting up the call or participating in it.

[3] "Event driven" strategies are equity-oriented investment strategies that involve long or short investments in the securities of corporations that are undergoing significant changes, like mergers, spin-offs, or liquidations. "Merger arbitrage" is a type of event-driven investing that, at least in part, aims to profit off of the securities of the target company in a corporate merger – like SIMO – by benefitting from the change in the target's share price once the merger is consummated.

[4] In an apparent effort to *manufacture* a relationship, the Joint Declaration states that two group members, Westchester and Alpine, are serving together as co-lead plaintiffs in another case. (Joint Decl. ¶ 6). Serving as lead plaintiff in another securities fraud case only shows that a movant is a serial litigant, and does not create a cognizable pre-litigation relationship between just those two funds that would suggest the four-fund Investor Group here can work cohesively together. In any event, the Declaration is silent as to any pre-litigation relationship between and among all four of the Group's members, including Atlas and Kryger.

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

Case No. 3:23-cv-01607

contemplated at all. It only says that the Group considers "joint decision-making" important and that each member will stay in contact to make "timely decisions." (*Id.* at ¶ 19). The PSLRA demands more on behalf of the putative class, and courts frequently reject groups on the basis that their disclosed "decision[-]making structure does not appear to be robust." *See Isaacs*, 2018 WL 6182753, at *3. The reason for this is obvious – if there is no clear and well-structure decision-making apparatus, it is likely to be counsel, and not the named lead plaintiff, calling the shots during litigation, which is precisely what Congress sought to avoid through the PSLRA. *See In re Baan Co. Sec. Litig.*, 186 F.R.D. 214, 224 (D.D.C. 1999) ("The net result will be that while the 'group' nominally has a large stake in the litigation, the lawyers will dominate decisionmaking."). Moreover, if there is no one leader of the group – and all members of the group have only minority voting power – the likelihood of gridlock is self-evident. Because no member of this proposed group has more than 50% of the total alleged losses of the group, deadlocks will likely prevail (unless counsel controls the decision-making).

Indeed, the fact that the Joint Declaration is itself generic and conclusory is another independent reason that this Court should find the Investor Group inadequate. *See Dendreon*, 835 F. Supp. 2d at 1074-75 (declining to aggregate member losses, explaining that a joint declaration that "contains myriad conclusory statements and generalizations" that have "little or no substance" "does not alleviate concerns regarding the group's adequacy under Rule 23"); *In re Stitch Fix, Inc. Sec. Litig.*, 393 F. Supp. 3d 833, 836 (N.D. Cal. 2019) ("The declaration allegations are conclusory and cursory, and indicate only that the group members – who reside in Texas, Virginia and Pennsylvania – have exchanged a few calls and emails with each other since being introduced by their common lawyer.").

The rulings in *Eichenholtz* and *Isaacs v. Musk* are instructive. In both cases, the court found that "ignoring the basis of the group formation and appointing a group of unrelated investors undercuts the primary purpose of the PSLRA: to eliminate

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

1   lawyer-driven litigation." *Eichenholtz*, 2008 WL 3925289, at *8; *see also Isaacs*,

2   2018 WL 6182753, at *2. In assessing the validity of each group's appointment, the

3   courts found that the groups' joint declarations did not cure their apparent deficiencies

4   where the groups claimed (for instance) that (i) they "'affirmatively decided that it

5   would be a benefit to ourselves and the Class we seek to represent if we, together, as

6   five sophisticated investors, sought appointment as Lead Plaintiff as a part of a small,

7   cohesive group[,]'" *Eichenholtz*, 2008 WL 3925289, at *9; (ii) "we will exercise joint

8   decision-making and work together in this litigation to actively monitor the activities

9   of counsel[,]" *Isaacs*, 2018 WL 6182753, at *3; and (iii) the groups' members

10  "intend[ed] to communicate regularly" and "exercise joint decision-making[.]"

11  *Eichenholtz*, 2008 WL 3925289, at *9. The members of the Investor Group make

12  nearly identical (and generic) pronouncements here, (Joint Decl. ¶¶ 15-17,19), but

13  these statements – as in *Eichenholtz* and *Isaacs* – fail to "clarif[y] how [the members

14  of the Group] will resolve their differences" or "how the [G]roup will tackle the

15  massive coordination and strategic issues that are certain to arise in this litigation."

16  *Eichenholtz*, 2008 WL 3925289, at *9; *Isaacs*, 2018 WL 6182753, at *3 ("[A]lthough

17  the members suggest they will be able to work together well, efficiently, and so forth,

18  there is nothing concrete to back that up.").[5]

19      This lack of any meaningful pre-filing relationship is in sharp contrast to the

20  few cases in which courts have allowed investor groups whose members "*did* have a

21  'pre-litigation relationship with one another[.]'" *See, e.g., Xu v. FibroGen, Inc.*, 2021

22  WL 3861454, at *9-10 (N.D. Cal. Aug. 30, 2021) (emphasis in original). For

23  example, in *FibroGen* the court emphasized that the members of the movant

24  "Retirement Systems" group had a longstanding prior relationship through their

25

26  _____
    [5] *See also Cloudera*, 2019 WL 6842021, at *6-8 (rejecting appointment of two-
27  member "Boston Group" made up of unrelated pension funds located in Boston and
    Mineola, New York that held single phone call before moving and submitted a
28  declaration providing "no detail whatsoever about any decisionmaking process").

OPPOSITION TO INVESTOR GROUP'S MOTION                    Case No. 3:23-cv-01607
FOR APPOINTMENT AS LEAD PLAINTIFF

"membership in the National Conference for Public Employee Retirement Systems" and "Mid-Atlantic Plan Sponsors" association. *See id.* at *9. No such pre-filing relationship has (or can be) shown here. Moreover, the Retirement Systems declared under oath that they would resolve disagreements over case management and litigation strategy by "majority vote," *id.* at *9-10, which while "vague" is still far more substantive than what the Investor Group put forth, given the lack of any meaningful case management strategy set forth in the Joint Declaration. (Joint Decl. ¶ 18). Consequently, there is no basis here for the Court to conclude that "the benefits that the [Investor G]roup would bring to the class amply outweigh any deficiencies" with regards to managing the litigation and making decisions on behalf of the Class. *See FibroGen*, 2021 WL 3861454, at *10. Rather, weighty concerns over "cohesiveness and group decision making" militate against appointing the Group. *See Wasa Medical*, 2021 WL 533518, at *6.

The Court should also be concerned about the Investor Group – beyond the lack of a pre-filing relationship or coherent decision-making and case management plan – because the Group has requested to appoint more than one law firm as co-lead counsel. (Joint Decl. ¶¶ 20-22). This "raises the potential that their handling of the litigation could strip the lead plaintiff of control over the litigation, which is an occurrence the PSLRA intended to foreclose." *Dendreon*, 835 F. Supp. 2d at 1075. This is true regardless of whether co-counsel handles the litigation in a "coordinated" manner or devolves into "fractious infighting (assuming the worst)," *In re Jones Soda Co. Sec. Litig.*, 2008 WL 418002, at *3 (W.D. Wash. Feb. 12, 2008). Here, the presence of two law firms means not only that minority-voting investment funds will have to somehow resolve their disputes, but that the law firms will then have to do so as well. Moreover, the Investor Group has not explained why it needs or wants two separate firms, particularly where its own Joint Declaration *undermines* such a need by representing that both proposed firms "are accomplished law firms with a history of achieving significant monetary recoveries" as well as "experience" and

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

1  "resources." (Joint Decl. ¶ 21). The only thing that adding multiple firms will

2  accomplish here is to increase the risks that the Investor Group will not be able to

3  effectively reach consensus and manage the case.

4        Finally, the Court should reject any argument advanced by the Investor Group

5  that the Ninth Circuit's decision in *In re Mersho* somehow strengthens their case for

6  Lead Plaintiff. It does not. On the contrary, it only validates the HBK Funds'

7  application. *Mersho* concerned a writ of mandamus from a district court decision in

8  which the lower court "changed its mind" based solely on "misgivings," rather than

9  any new evidence, as to why it ultimately declined to appoint a group of investors as

10  lead plaintiff after having initially made a prima facie determination that the group

11  was adequate. The problem with the district court's ruling was not the substance of

12  its finding but the manner in which its decision was made: its failure to shift to the

13  competing movant the burden of proving the presumptive lead plaintiff's inadequacy,

14  and the reversal of its initial finding without any new proof of inadequacy being

15  proffered.[6]

16  _____

17  [6] In *Mersho*, the Ninth Circuit broke down the three-step process for the selection of
18  lead plaintiff: (i) posting notice of the action by the parties; (ii) determining which
   movant is the "most adequate plaintiff," who thus becomes the presumptively most
19  adequate plaintiff; and then (iii) shifting the burden to competing movants to rebut
   that presumption by showing inadequacy. The district court in *Mersho* initially
20  determined that the investor group was the presumptive lead plaintiff (in step two)
   because it had made a prima facie showing of typicality and adequacy. *See* 6 F. 4th
21  at 899-900. Only later (in step three) did the district court conclude, without reference
   to any new record evidence, that the presumption of adequacy had been rebutted. *Id.*
22  at 901. The Ninth Circuit found that once the district court made its prima facie
   determination at step two that the group in question was adequate, it was prohibited
23  from "chang[ing] its mind" merely based on doubts arising from the lack of the group
24  members' pre-litigation relationship. *Id.* The Ninth Circuit found that this
   determination was in error because it did not give effect to the statutory presumption
25  (step two) and instead wrongly placed the burden in step three on the movant group
   to prove their adequacy, rather than on competing movants to prove inadequacy. *Id.*
26  The mandamus was granted to ensure strict adherence to these procedural protocols,
27  nothing more.
28

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

As is the case here, the investors in *Mersho* had no prior relationship and it appeared the group had come together for the sole purpose of aggregating the amount of their claims to secure their selection as lead plaintiff. *See* 6 F.4th at 897-99. The district court thus expressed doubts about the proposed group's formation, ability to control the litigation, and cohesiveness. *See id.* The Ninth Circuit expressly recognized the validity of those considerations in the "step two" phase of the proceedings: "[m]any district courts have considered the lack of a pre-litigation relationship as part of their adequacy analysis at step two because it may indicate that members may not work together well to vigorously prosecute the litigation or they might not be able to control counsel." *Id.* at 901-02. The Ninth Circuit held that once the prima facie determination was made, that determination could not be reversed by mere "misgivings" but required proofs put forward by competing movants. In all events, the Ninth Circuit affirmed that district courts "have latitude as to what information [they] will consider in determining typicality and adequacy," "are not precluded from considering pre-litigation relationships or cohesion," and in fact "often consider a pre-litigation relationship along with" factors like "how the members found their counsel[] and the prosecution procedures set out in their filings." *See id.* at 900-02.

As this analysis makes clear, the Ninth Circuit was not giving blanket authorization to the use of groups in the lead plaintiff selection process or stating that the burden is on competing movants in the first instance to show the group is inadequate. Rather, the Court of Appeals merely held that once any movant (including a group) is determined to be the "presumptive" lead plaintiff, competing movants must rebut that showing with evidence. *Id*. at 901. That holding is not relevant in this case, where the Investor Group is prima facie inadequate, and therefore is not entitled to any statutory presumption. Indeed, to the extent *Mersho* is instructive here at all, it is to reinforce that district courts can and should analyze the bases for and the showing made by a proposed movant group and, in appropriate circumstances

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

Case No. 3:23-cv-01607

like this one, reject incohesive groups that have no relationship beyond the aggregation of their members' claims. For this reason, courts have not hesitated to reject proposed groups following the *Mersho* decision. *See Koffsman*, 2022 WL 170636, at *2-3 (court declining to reconsider in light of *Mersho* its decision rejecting proposed lead plaintiff group).

The Investor Group's motion for appointment as Lead Plaintiff should be denied because the Group is an artificial amalgamation of unrelated entities and, as a matter of adequacy under Rule 23 and the legislative intent behind the PSLRA, cannot demonstrate it is the presumptive lead plaintiff. Courts "uniformly" reject such movants, *Wasa Medical*, 2021 WL 533518, at *5, and this Court should follow suit.

## B. Each Member of the Investor Group Has Trading Patterns that Will Subject it to Unique Defenses

Another reason groups are disfavored is that they are "likely to have different investment strategies and may be subject to unique defenses." *See Eichenholtz*, 2008 WL 3925289, at *9. That is certainly the case here. Each member of the group has different (and sometimes conflicting) trading patterns that will subject them to unique defenses. *In re Bridgestone Inv. Corp. Ltd.*, 789 F. App'x 13, 15-16 (9th Cir. 2019) ("[At the lead plaintiff] stage, the question is whether [the movant] must 'prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class.'" (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992))).[7] Such individualized issues and potential defenses create further concerns "regarding cohesiveness and group decision making" that weigh against appointing the Investor Group here. *Wasa Medical*, 2021 WL 533518, at *6.

**Westchester and Kryger**: The Westchester Funds have the largest losses of

---

[7] *Bridgestone* concerned a petition for a writ of mandamus following the district court's decision in *Isaacs v. Musk*, 2018 WL 6182753, which is cited throughout this Memorandum. *Bridgestone* denied the writ after the Ninth Circuit explained why the analysis set forth in *Isaacs* was not wrong. 789 F. App'x at 15-16.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

1    the group ($25.7 million), and the Kryger Funds have the smallest ($7.5 million).

2    However, their trading patterns are unique and not at all typical of the Class. As

3    detailed in the HBK Funds' Motion, this case involves false and misleading

4    statements about the prospects and likelihood of MaxLinear's acquisition of SIMO

5    pursuant to a merger agreement dated May 5, 2022. (*See* Mov. Br. 2-3). The proposed

6    Class Period begins on June 6, 2023 and ends on July 26, 2023 – the day the Chinese

7    regulator approved the merger and MaxLinear then announced it was terminating the

8    proposed merger. (*See id.* at 1). Yet Westchester and Kryger did not purchase one

9    share of SIMO ADSs throughout the entire Class Period when Defendants were

10   making their statements. Instead, they made their very first purchase of SIMO ADSs

11   on the very last day of the Class Period *and only after the China Administrator*

12   *granted regulatory approval for the Merger.* (Group Ex. B at 1-6). Accordingly,

13   Defendants will surely argue that Westchester and Kryger did not purchase based

14   upon anything that Defendants said, but instead purchased solely in reliance on

15   Chinese regulatory approval (and not because of any alleged misrepresentations).

16   Defendants will argue that because such approval was neither a "misrepresentation"

17   nor an "omission," purchases made in reliance thereon are not actionable. Indeed,

18   they will argue that the misrepresentations that predate July 26, 2023 are largely

19   irrelevant to Westchester's and Kryger's claims. Put differently, while the case

20   involves more than six weeks' worth of misleading statements and omissions about

21   the Merger and MaxLinear misleading investors about whether MaxLinear would

22   close if it obtained regulatory approvals, Westchester's and Kryger's claims are

23   myopically focused on a tiny slice – a single day – on which the China Administrator

24   approved the Merger. (Mov. Br. 6). Their claims are not typical of other Class

25   members who purchased throughout the Class Period.

26       These arguments likely to be raised by Defendants will distract from the

27   primary objective of the litigation to the detriment of the class. *See Bridgestone*, 789

28   F. App'x at 15-16 (no error to deny lead plaintiff application where movant was

15

"entangled with a unique [reliance] defense" that "is likely to be vigorously challenged by defendants").  This sideshow can be avoided by selecting the HBK Funds as Lead Plaintiff, as their trading in SIMO ADSs is not limited in the same respect as that of Westchester and Kryger.

To make matters worse, Westchester and Kryger are part of a group that includes Atlas, and Atlas actually *sold* SIMO ADSs after the Chinese regulators gave approval.  Accordingly, on the only day that Westchester and Kryger *purchased* SIMO ADSs – after Chinese regulatory approval – its co-group-member *sold*.  Such conflicting trading patterns will be fodder for defense arguments that such purchases on July 26 were unreasonable.

This trading pattern also raises serious concerns about the Investor Group's adequacy and typicality.  *See Isaacs*, 2018 WL 6182753, at *2.  What happens before July 26 is essentially irrelevant to Westchester's and Kryger's losses, and accordingly each will be less motivated – than, for instance, the HBK Funds, who began purchasing SIMO ADSs on the first day of the Class Period (ECF No. 14-2 at 3) – to generate proofs about that part of the case.  Moreover, because Westchester and Kryger together represent more than 50% of the Group's total losses, they may have de facto control over the group. In sum, Westchester and Kryger are not typical because they only purchased on the last day of the class period and even that limited amount of trading is in conflict with another member of their group.  As a result, they are subject to unique defenses that make them inadequate to serve as Lead Plaintiff here.

**Atlas**:  Atlas also has a unique trading pattern that subjects it to unique defenses.  It appears that Atlas was engaged in market-making activities that are unrelated to the misstatements and omissions at issue in this case.  Market-making activity is solely intended to create liquidity in the ADS market and is not reliant on any statements made in connection with a security.  A clear example of this activity is on July 25, 2023, the day before the Merger is approved.  (*See* Group Decl. Ex. B

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

at 26). Atlas shows hundreds of trades where the number of shares purchased and the amount of purchase price identically match the number of shares sold and the sales price. (*Compare id.* at 26 line 15 of "Purchase" column (2,570 shares bought at $52.2000 per share), *with id.* at 26 line 12 of "Sale" column (2,570 shares sold at $52.2000 per share)), which purchase and sale occurred in exactly the same amount, $134,154. These trades appear to have nothing to do with the fundamentals of SIMO securities.[8]

Indeed, Atlas appears to have transacted in **381** such trades during the class period, buying and selling identical blocks of same-priced shares on the same day. A listing of such trades is attached as Exhibit A to the Declaration of Steven M. Hecht in Opposition to the Group's Motion, accompanying this brief. Because Atlas apparently traded in SIMO securities in a manner unrelated to any statements made about the Company, it is exposed to a unique reliance defense. *E.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 183 F. Supp. 3d 458, 466 (S.D.N.Y. 2016) (finding that the rebuttable presumption of reliance from *Basic v. Levinson*, 485 U.S. 224, 247 (1988), was defeated where evidence showed investor was "indifferent to the fraud").

The manner and frequency of Atlas's trading is also consistent with "quantitative" or high-frequency trading strategies to invest in SIMO that are not driven by fundamental information about the Company or the misstatements and omissions at issue in this case. Again using July 25, 2023 as an example, Atlas purchased 268,200 SIMO ADSs across 28 different purchases while selling 214,904 total ADSs across 26 different sales, for a total of 54 separate transactions in a single day. (*See* Group Decl. Ex. B at 26). This type of trading is consistent with the use of mathematical algorithms that rely on macro-economic information and will also likely

---

[8] This is just one of many such examples infecting Atlas' trading. Thus, for instance, also on July 25, 2023, Atlas purchased and sold 57,848 shares at $52.37; 55,287 shares at $52.20; and 56,316 shares at $52.20, thereby repeatedly trading in and out of SIMO with identical blocks of shares at identical prices on the same day.

expose Atlas to unique reliance defenses, including that because Atlas is making trades other than on the information generally available to the investing public and other shareholders, it may be unable to invoke the fraud-on-the-market class-wide presumption of reliance. And indeed, courts have flat-out rejected lead plaintiff candidates like Atlas in light of their "unique trading strateg[ies]," including "mechanisms and methodologies that do not rely . . . , on information made available to the public intended to influence investor decisionmaking." *See, e.g.*, *In re InterClous Sys., Inc. Sec. Litig.*, 2014 WL 12774917, at *1 (D.N.J. Nov. 5, 2014) (explaining that such strategies "render[] [the movant] susceptible to unique defenses that may threaten to become the focus of the litigation, thereby rendering [the movant] atypical of the class").

Atlas also sold SIMO ADSs after Chinese regulators approved the merger. It is the only fund – including the three other members of its group and the HBK Funds – who *sold* ADSs on July 26th after Chinese approval but before MaxLinear announced it was pulling out of the deal.[9] Defendants will likely seize on this evidence to argue that *purchases* during that intraday period (after Chinese approval but before MaxLinear pulled out) were not reasonable. Atlas' trading pattern is not typical of other members of the Class and is not even typical of every other fund competing for Lead Plaintiff (including within its own Group). As with the other funds in the Investor Group, these arguments likely to be raised by Defendants will distract from the primary objective of the litigation to the detriment of the class. *See Bridgestone*, 789 F. App'x at 15-16. Selecting the HBK Funds as Lead Plaintiff would avoid this unnecessary distraction.

As an investor with a trading pattern that appears to include market-making activity, quantitative trading and sales during an intraday period in which everyone

_____

[9] Thus, on July 26, 2023, Atlas made three sales – of 988 shares, 10,793 shares, and 20,475 shares – at prices ranging from $92-$94 (*i.e.*, before MaxLinear's announcement) (Group Ex. B at 26).

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

else was buying, Atlas is not typical and will be subject to unique defenses. As a result, this unique and largely contrary trading strategy will potentially subject Atlas and the Investor Group to defenses "that may well become the focus of the litigation to the detriment of the" Class. *See Isaacs*, 2018 WL 6182753, at \*2.

**Alpine**: Like the HBK Funds, Alpine purchased during the Class Period, including on the last day. Alpine, however, has only $8 million of losses and will have only a small voice in the Investor Group. Indeed, it has only about 13% of the Investor Group's total losses. But even those alleged losses are inflated because they include losses for shares that were bought and sold before any curative disclosure. For example, Alpine purchased 2,500 ADSs for $72.16 on June 30, 2023 and then sold them for $57.17 on July 19, 2023. Alpine included the loss on such in-and-out purchases even though under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), a plaintiff cannot recover for economic losses that are not caused by a defendants' misrepresentations. *Id.* at 342-43. In conformity with *Dura*, a majority of district courts, including those in the Ninth Circuit, choose "not to consider losses resulting from stock trades that occurred prior to any disclosure of the defendants' fraud" when evaluating a lead plaintiff motion. *Perlmutter v. Intuitive Surgical, Inc.*, 2011 WL 566814, at \*4 (N.D. Cal. Feb. 15, 2011); *see also Isaacs*, 2018 WL 6182753, at \*2 (declining to appoint as lead plaintiff investor that "overstated its loss" by counting losses that "may not be causally related to the fraud"). In other words, if a prospective lead plaintiff bought and sold a security before any alleged disclosure of the fraud, it cannot include losses on such a security when calculating its loss.

Here, the first alleged curative disclosure occurred on July 26, 2023, when MaxLinear disclosed toward the end of the trading day that it was unilaterally terminating the Merger despite having received approval from the China Administrator. (*See* Mov. Br. 6). Alpine, however, has taken credit for losses attributable to more than 116,000 shares that were bought *and sold* prior to July 26, 2023. (Group Ex. B at 7-15). This materially overstates Alpine's losses. For

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

example, as to one fund, Alpine Heritage, L.P., the losses are inflated by more than $879,000, or greater than one-quarter of that fund's $3.332 million claimed loss. (See id. at 12).[10] This is wholly inappropriate under *Dura* and substantial authority in the Ninth Circuit, and makes Alpine, and the Investor Group as a whole, an inappropriate lead plaintiff candidate. *See Isaacs*, 2018 WL 6182753, at *2.

### C. The HBK Funds Should be Appointed Lead Plaintiff Because they Have the Greatest Financial Interest in the Relief Sought by the Class and Otherwise Satisfy Rule 23

Because the Investor Group is not adequate to serve as a PSLRA lead plaintiff, it is clear that the HBK Funds have the largest financial interest in the relief sought by the Class. Because they do not suffer from the debilitating typicality and adequacy problems afflicting the Investor Group and its constituent members, the HBK Funds are the presumptive most adequate plaintiff under the PSLRA and should be appointed Lead Plaintiff here. As Judge Battaglia aptly summarized when recently resolving the identical issue, "appointment of an individual [plaintiff] as lead plaintiff [as opposed to a group] alleviates any concerns regarding cohesiveness and group decision making." *See Wasa Medical*, 2021 WL 533518, at *6 (quoting *Fialkov*, 2015 WL 11668717, at *4).

Courts in the Ninth Circuit determine which movant has the greatest financial interest under the PSLRA by applying the four factor "*Olsten-Lax*" test. *See Meluci v. Corcept Therapeutics Inc.*, 2019 WL 4933611, at *3 (N.D. Cal. Oct. 7, 2019) (citing *Lax v. First Merchants Acceptance Corp.*, 1997 WL 461036 (N.D. Ill. Aug. 11, 1997); *In re Olsen Corp. Sec. Litig.*, 3 F. Supp 2d 286 (E.D.N.Y. 1998)); *Fialkov*, 2015 WL 11658717, at *5 (citing *Olsten-Lax* test with approval). Under this test, courts

---

[10] This figure is derived from matching on a LIFO basis the 49,900 ADSs that Alpine Heritage, L.P. states that it sold on July 19 and July 21, 2023 (before the disclosure of the fraud) and removing that same number of shares from the stated purchases on June 27, June 23, June 21, and June 14 (*i.e.*, the last prior purchases). (Group Decl. Ex. B at 12).

SAWYER & LABAR LLP
1700 MONTGOMERY ST. STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

consider (1) "the number of shares purchased during the class period"; (2) "the number of net shares purchased during the class period"; (3) "the total net funds expended during the class period"; and (4) "the approximate losses suffered during the class period." *Corcept*, 2019 WL 4933611, at *3. As each factor highlights, it is focused on activity *within* the class period. While courts consider "the factors together as a whole" to determine losses, they "generally place the greatest emphasis" on the "approximate losses suffered" factor. *E.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 2012 WL 78780, at *4 (N.D. Cal. Jan. 9, 2012).

Here, the HBK Funds have disclosed approximate losses on a first-in, first-out "FIFO" matching methodology of more than $36 million, and approximate losses on a last-in, first-out "LIFO" methodology of more than $29 million within the class period. (See Ex. A at 3-4).[11] Each of these figures is substantially larger than any of the members of the Investor Group on an individual basis (all of which are calculated using LIFO):

- Westchester ($25,764,602.98 (Group B Ex. at 6),
- Alpine ($8,004,765 (id. at 15)),
- Atlas ($16,877,366.13 (*id.* at 27)), and
- Kryger ($7,501,579.76 (*id.* at 29)).

With respect to Westchester in particular – the Investor Group member that has the next highest asserted class-period loss – the HBK Funds have a greater financial interest as a matter of "number of ADSs purchased" (HBK Funds: 866,790; Westchester: 690,761), "net ADSs purchased" (HBK Funds: 704,290 (on a LIFO basis); Westchester: 690, 761), and total funds expended on class period purchases

---

[11] As the names imply, LIFO assumes the most recent (last) securities purchased are the first sold, while FIFO assumes that the first securities purchased (the oldest) are the first sold. While both methodologies are and have been recognized, LIFO is more frequently used in determining the loss amounts of competing lead plaintiffs. *See, e.g.*, *Cloudera*, 2019 WL 6842021, at *4.

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

(HBK Funds: $107,878,662.20, Westchester: $64,338,159.01), and because all entities suffered the same "loss" *within* the class period – the one July 26th corrective event, which affected all class members equally at the time – the net ADSs purchased is a direct proxy for that loss as well. This should end the inquiry.

There is simply no debate that the HBK Funds bought and retained more shares within the Class Period, expended more funds on affected shares during the class period, and lost more money during the class period on its investments in SIMO ADSs than any of the individual members of the Group. The Funds have the largest financial interest in this case, satisfy Rule 23 in all respects, and should be appointed Lead Plaintiff here.

## III. CONCLUSION

For the foregoing reasons, the HBK Funds respectfully request that the Court issue an order: (1) denying the Investor Group's motion in its entirety; (2) appointing the HBK Funds as Lead Plaintiff and approving their choice of Lead Counsel for the Class; and (3) granting such other relief as the Court may deem to be just and proper.

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE 415.262.3820
www.sawyerlabar.com

SAWYER & LABAR LLP
1700 MONTGOMERY ST, STE 108
SAN FRANCISCO, CA 94111
TELEPHONE: 415.262.3820
www.sawyerlabar.com

DATED: November 15, 2023

Respectfully submitted,

**SAWYER & LABAR LLP**


By:      /s/ *Adrian Sawyer*
         Adrian Sawyer
         1700 Montgomery Street, Suite 108
         San Francisco, California 94111
         Telephone: 415.262.3820


         Lawrence M. Rolnick (*pro hac vice forthcoming*)
         Marc B. Kramer (*pro hac vice forthcoming*)
         Steven M. Hecht (*pro hac vice forthcoming*)
         Brandon Fierro (*pro hac vice forthcoming*)
         ROLNICK KRAMER SADIGHI LLP
         1251 Avenue of the Americas
         New York, New York 10020
         Telephone: 212.597.2800
         lrolnick@rksllp.com
         mkramer@rksllp.com
         shecht@rksllp.com
         bfierro@rksllp.com


         *Counsel for Proposed Lead Plaintiff*
         *HBK Master Fund L.P. and*
         *HBK Merger Strategies Master Fund L.P.*

OPPOSITION TO INVESTOR GROUP'S MOTION
FOR APPOINTMENT AS LEAD PLAINTIFF