SAXENA WHITE P.A.
David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com

ENTWISTLE & CAPPUCCI LLP
Vincent R. Cappucci
(*pro hac vice*)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

*[Additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WATER ISLAND EVENT-DRIVEN FUND, on Behalf of Itself and All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>MAXLINEAR, INC., KISHORE SEENDRIPU and STEVEN LITCHFIELD,<br><br>                              Defendants. | Case No. 3:23-cv-01607-LAB-MMP<br><br>CLASS ACTION<br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ........................................................ 2

II.    JURISDICTION AND VENUE ..................................................... 8

III.   PARTIES ........................................................................................ 8

IV.    OVERVIEW OF THE FRAUD ..................................................... 12

       A.   MaxLinear's Business And Growth-By-Acquisitions Strategy ........ 12

       B.   MaxLinear Announces A "Transformative" $3.8 Billion Acquisition of Silicon Motion, The Largest In Company History ........................................................................................ 13

       C.   The Market Understood That The Only Remaining Condition Facing The Merger's Completion Was Whether MaxLinear And Silicon Motion Would Gain Regulatory Approval Of The Deal By SAMR ..................................................................... 15

       D.   The Merger Agreement Provided That MaxLinear Could Not Simply Walk Away From The Deal ...................................... 18

       E.   Leading Up To The Class Period, MaxLinear Repeatedly Assured Investors That It Was Committed To The Merger And Regulatory Approval For The Deal Was On Track ........................... 20

       F.   During The Class Period, Defendants Falsely Assured Investors That Silicon Motion Was Still A "*Strategic Asset*" And That MaxLinear Was Still "*Very Bullish*" On The Merger Even Though Defendants Had Already Decided To Abandon The Deal ........................................................................................ 21

       G.   In Reality, And Directly Contradicting Their Repeated Public Representations, Defendants Had Secretly Determined By No Later Than The Start Of The Class Period That MaxLinear Would Abandon The Merger ........................................ 25

       H.   The Truth is Revealed: SAMR Approves The Merger, And Just Hours Later, MaxLinear Unilaterally Terminates The Deal, Causing Silicon Motion ADSs To Lose Nearly Half Their Value ....................................................................................... 28

       I.   Post-Class Period Developments Further Confirm The Fraud .......... 32

       J.   The Accounts Of Multiple High-Ranking Former Employees Of The Company Confirm That, Throughout The Class Period, Defendants Had No Intention Of Closing The Merger, And Had Determined To Simply "Walk Away" From The Transaction .......... 34

V.     MATERIALLY FALSE AND MISLEADING STATEMENTS ................ 40

VI.    ADDITIONAL SCIENTER ALLEGATIONS ............................... 44

i

VII.   APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ............................................................... 50

VIII.  LOSS CAUSATION ......................................................... 51

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ............................... 52

X.     CLASS ACTION ALLEGATIONS ..................................... 53

XI.    CLAIMS FOR RELIEF ..................................................... 55

       COUNT I ......................................................................... 55

       COUNT II ........................................................................ 58

XII.   PRAYER FOR RELIEF ..................................................... 60

XIII.  JURY DEMAND ............................................................... 60

1    Lead Plaintiffs the Westchester Funds, the Alpine Funds, the Atlas Fund and
2    the Kryger Funds (collectively, "Lead Plaintiffs"), by their undersigned counsel,
3    bring this action for violations of Sections 10(b) and 20(a) of the Securities
4    Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and
5    Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5,
6    against MaxLinear, Inc. ("MaxLinear" or the "Company"), Kishore Seendripu
7    ("Seendripu"), and Steven Litchfield ("Litchfield") (collectively, "Defendants").
8    Lead Plaintiffs bring these claims on behalf of a class of investors who purchased or
9    otherwise acquired the American Depositary Shares ("ADSs") of Silicon Motion
10   Technology Corporation ("Silicon Motion" or "SIMO") from June 6, 2023 through
11   July 26, 2023, inclusive (the "Class Period") and were damaged thereby
12   (collectively, the "Class").

13   Lead Plaintiffs allege the following based upon personal knowledge as to
14   themselves and their own acts, and upon information and belief as to all other matters
15   based on the investigation conducted by and through counsel, which included,
16   among other things, review and analysis of: (a) MaxLinear's and Silicon Motion's
17   public filings with the SEC; (b) company press releases, reports, and postings on
18   MaxLinear's and Silicon Motion's websites; (c) investor communications,
19   conference calls, and investor presentations by MaxLinear and Silicon Motion; (d)
20   research reports concerning MaxLinear and Silicon Motion by securities, financial,
21   and semiconductor industry analysts; (e) news articles and media reports concerning
22   MaxLinear and Silicon Motion, including their failed merger (the "Merger"); (f) data
23   reflecting the prices of MaxLinear's and Silicon Motion's equity securities; (g)
24   interviews with former MaxLinear employees; (h) consultation with financial
25   experts; and (i) additional material and data concerning Defendants, Silicon Motion,
26   and the global semiconductor markets.

27   Lead Plaintiffs' investigation is ongoing, and many of the relevant facts are
28   known only by Defendants or are exclusively within their custody or control.  Lead

Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

**I.    SUMMARY OF THE ACTION**

1.    This is a securities class action in which MaxLinear, a United States-based provider of microchips for the telecom industry, made a series of material misrepresentations and omissions concerning its commitment to the single biggest transaction in its history.  Specifically, on May 5, 2022, MaxLinear and Silicon Motion, a Taiwan-based chip manufacturer, announced the "transformative" Merger, whereby MaxLinear would acquire Silicon Motion for $3.8 billion in cash and stock.  At the time, the Merger consideration represented a nearly 50% premium for Silicon Motion investors.  Upon announcing the deal, Defendants emphasized it would be "immediately and materially accretive" to MaxLinear's operating income, allow for "increased capacity" for the Company's "expansive and diverse technology" and offer "an opportunity to really expand" MaxLinear's geographic reach, particularly in Asia.  According to Defendants, the Merger would catapult the combined entity into the upper echelons of the semiconductor supply industry, increasing the "total addressable market opportunity to $15 billion"—"roughly double[]" MaxLinear's market as a standalone company.

2.    Before and throughout the Class Period, Defendants repeatedly represented to investors that MaxLinear was fully committed to the Merger, and that as soon as approval was obtained from the State Administration for Market Regulation ("SAMR")—China's main antitrust regulator—the Merger would close.  Accordingly, investors were laser focused on whether SAMR would grant approval of the Merger—a concern that only heightened as U.S.-China trade relations deteriorated in late 2022 and early 2023—and SAMR's review of the Merger sat pending for nearly a year.  Meanwhile, Defendants continued to tout the synergies and other expected benefits of the Merger and emphasized that MaxLinear would complete the Merger once SAMR approved the deal.  For example, when the

Company reported earnings in April 2023, Defendant Seendripu, MaxLinear's Chief Executive Officer ("CEO"), assured investors that, even though MaxLinear's financial results, forecasts and stock price had declined while China's regulatory review was delayed, the Company was still "*looking forward to a pending acquisition of Silicon Motion*," and that "*things are moving as expected on the SAMR front*." Similarly, Defendant Litchfield, MaxLinear's Chief Financial Officer ("CFO"), emphasized that Defendants "*remain[ed] confident of a mid-2023 close*" and that the Company "*look[ed] forward to bringing our technology-focused cultures together very soon*."

3. Moreover, on May 3, 2023, MaxLinear held a call with analysts to discuss the Merger. During the call, an analyst from Alliance Global Partners Merger Arbitrage Group asked about the progress of the Merger, and specifically, SAMR approval. In response, Leslie Green ("Green"), MaxLinear's Investor Relations point person, assured the market that all was well with respect to the Merger's progress and the prospects for regulatory approval within the anticipated mid-2023 timeframe, stating: "*we continue to actively work to get the deal closed by mid-year, which was always the time frame that we expected.*" When the analyst asked a follow-up question regarding whether MaxLinear "remain[ed] committed to acquiring [Silicon Motion]" and whether "[n]othing's changed there," Green, on behalf of the Company, unequivocally confirmed that MaxLinear remained committed to completing the Merger once SAMR approved the deal, stating: "*No, nothing's changed there.*"

4. The Class Period begins on June 6, 2023, when, at a large and important investor conference held by Stifel, Nicolaus & Company, Inc. ("Stifel" or "Stifel Conference"), Defendants again strongly reaffirmed MaxLinear's commitment to consummating the Merger. During the Stifel Conference—the transcript of which MaxLinear filed with the SEC—Defendant Seendripu assuaged investors during a "fireside chat" that "*the basic rationale [for the Merger] has not changed at all*";

that Silicon Motion remained "*a very strategic asset for [MaxLinear]*"; and MaxLinear was still "*very, very, . . . bullish*" that the Merger would provide all of the "*synergies that we told you all about.*"  As late as June 28, 2023, MaxLinear continued to insist that the Merger would close, filing a Form 8-K with the SEC that reaffirmed that the Company was taking affirmative steps to obtain necessary regulatory approval for the Merger.  Specifically, the Company announced that MaxLinear (and Silicon Motion) had refiled their application for U.S. antitrust approval under the Hart-Scott-Rodino Antitrust Improvements Act (the "HSR Act") since the Merger had not yet been consummated and "clearance under the HSR Act has expired"—which, again, reassured investors that MaxLinear was fully committed to completing the deal.

5.    Defendants' statements to investors were utterly false.  As Defendants have now admitted, on or before May 5, 2023—more than one month before the start of the Class Period—MaxLinear determined that Silicon Motion suffered an incurable material adverse event ("MAE") under the terms of the operative merger agreement ("Merger Agreement"), and also decided that Silicon Motion was in material breach of the Merger Agreement.  Both of those events rendered the Merger Agreement a nullity as of that date—yet Defendants never disclosed these highly material facts to investors or Silicon Motion.  Indeed, it is now clear that, by the beginning of the Class Period, Defendants had decided to abandon the Merger because of (a) the significant decline in MaxLinear's financial performance, forecast, and stock price in the time between the announcement of the Merger and the beginning of the Class Period, and (b) changing macroeconomic conditions during the same period that were adverse to closing the Merger, including a downturn in the semiconductor market and soaring interest rates that dramatically increased the $3.1 billion cash component of the deal.

6.    Although Defendants internally determined that Silicon Motion had experienced an MAE and committed other material breaches long before the start of

the Class Period, they did not want to terminate the Merger at that time because doing so would undoubtedly subject MaxLinear to litigation with express remedies under the Merger Agreement including specific performance—*i.e.,* being forced to go through with the deal that they no longer wanted—plus uncapped money damages.  If, however, SAMR denied approval, or delayed its decision past the Merger Agreement's deadline, as Defendants hoped and expected, MaxLinear had an "easy out" and could not be forced to complete the transaction.  So rather than disclose the MAE and their decision to terminate the Merger—as they were obligated to do—Defendants decided to hold their pre-Class Period determination of Silicon Motion's material breach, the MAE, and other issues preventing closing in their "back pocket" as an alternative method of terminating the transaction in the event SAMR greenlighted the deal.  As the Company's Investor Relations point person, Green, candidly admitted during an August 2023 interview, Defendants determined well before SAMR made its final decision that the Company would abandon the deal, after much "***thoughtful consideration***," "***data analysis***" and "***discussion***" that "***the board undertook over a period of time***."

7.  In addition to Defendants' own admissions, multiple high-ranking former employees of MaxLinear confirm that Defendants decided to "***walk away***" from the deal due to changed economic circumstances prior to the Class Period. These former employees,[1] which include the Company's former Director of Global Trade Compliance and its former Director of Product Marketing, have also made clear that, among other things, ***as late as mid-July 2023***, Defendants had not taken even the most basic and rudimentary steps to prepare for a Merger of the two companies—an impending multi-billion-dollar transaction that was to be the largest

---

[1]  The terms "Former Employees" and "FE" refer to the former employees of MaxLinear whose reports are discussed in this Complaint.  In order to preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "she," "her," and "hers" in connection with all of the Former Employees, regardless of their gender.

acquisition in MaxLinear's history.  These senior FEs reported that, contrary to standard industry practice, the Company did not have any checklists, plans or milestones prepared for the Merger; indeed, "***there was no definitive action plan or timeline***" and there was "***no action team in place***" for integrating Silicon Motion. These deficiencies were a clear "***red flag***" regarding the Company's intentions with respect to the Merger and were "***very bothersome***" because the concerns had been repeatedly raised with the Company's senior executives, including MaxLinear's General Counsel, ***for months***.

8.    The truth was disclosed through a remarkable turn of events on July 26, 2023.  Before the market opened that day, SAMR approved the Merger, thereby paving the way for the deal to close.  Given Defendants' repeated statements affirming MaxLinear's commitment to closing the Merger, investors flooded the market on unusually high trading volume, causing the price of Silicon Motion ADSs to surge by over 82% from the prior day's close of $52.20 to an intraday high of $95.33, as analysts widely concluded that the transaction would be completed before the upcoming August 7, 2023 deal deadline.  However, at 3:10 PM the very same day—less than ten hours after SAMR approved the Merger—MaxLinear stunned the market by unilaterally ***terminating*** the deal.  MaxLinear informed the market of its decision in a terse press release which made clear that Silicon Motion had been in material breach of the Agreement ***a full month before the start of the Class Period***, stating that "certain conditions in Article 6 of the Merger Agreement were not satisfied or waived ***as of May 5, 2023***," and therefore the Merger Agreement was wholly ineffective as of that date.

9.    MaxLinear's unexpected termination of the transaction caused the immediate collapse of the price of Silicon Motion's ADSs, which fell from an intra-day high of $95.33 on July 26, 2023 to a close of just $65.35 per ADS—***a decline of nearly $30 per ADS in less than one hour, on unprecedented trading volume of 17,771,620 ADSs***.  The next day, Silicon Motion's ADS price continued its freefall,

declining an additional $12.84 per ADS, on significant trading volume of 9,116,569 ADSs, to close at just $52.51 on July 27, 2023—a two-day drop of over **44%**, or nearly ***$43 per ADS*** from the July 26 intra-day high.

10.    Analysts excoriated Defendants for terminating the deal given their Class Period statements assuaging investors that MaxLinear was fully committed to complete the Merger upon obtaining regulatory approval.  For example, in a July 27, 2023 report, Wedbush analysts highlighted the highly suspicious "***timing of the announcement (post the resolution of a final roadblock preventing a deal), the lack of any prior apparent action by MXL to terminate the deal around May 5th (the first extended outside date)***, *and in particular the two companies' application for HSR on June 28th (implying everything was still on track as of that date)*."  FBN Securities ("FBN") also issued a report on July 27 lambasting MaxLinear for misleading investors, querying that "***if the agreement was not in force as of [May 5], why did MXL continue to perform under the agreement by refiling HSR on [June 28] . . . or continue to describe the agreement in its releases and filings as still in force[?]***"  FBN then provided the answer: "***MXL recognized that its cleanest way out in . . . a deal it no longer wanted was SAMR***."  When SAMR approved the Merger, MaxLinear was forced to immediately break the deal, in what FBN described as a classic case of "***buyer's remorse***."  Months later, Focus Capital concurred that MaxLinear internally suffered "***buyer's remorse,***" and when SAMR failed to provide Defendants with an easy out, Defendants were left with no choice but to "***just take a Hail Mary and try and get out of this thing***."

11.    As a result of Defendants' blatant misrepresentations and omissions, Silicon Motion investors purchasing ADSs during the Class Period, both before and immediately following regulatory approval of the Merger, suffered substantial losses.  This action seeks redress on their behalf.

## II.    JURISDICTION AND VENUE

12.    Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

13.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because MaxLinear conducts business and resides in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

14.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiffs

15.    Lead Plaintiff "Westchester Funds" are six related private investment funds: JNL/Westchester Capital Event Driven Fund; The Merger Fund®; The Merger Fund® VL; Virtus Westchester Event-Driven Fund, a series of Virtus Event Opportunities Trust; Westchester Capital Master Trust; and The Westchester Merger Arbitrage Strategy Sleeve of the JNL Multi-Manager Alternative Fund.

16.    Lead Plaintiff "Alpine Funds" are nine related private investment funds: Alpine Associates, A Limited Partnership; Alpine Dedicated, L.P.; Alpine Heritage II, L.P.; Alpine Heritage Japan Trust; Alpine Heritage Offshore Fund Ltd.; Alpine Heritage, L.P.; Alpine Institutional, L.P.; Alpine Merger Growth, L.P.; and Alpine Partners, L.P.

17.    Lead Plaintiff "Atlas Fund" is Atlas Diversified Master Fund, Ltd., a private investment fund.

18.    Lead Plaintiff "Kryger Funds" are two related private investment funds: Kryger Capital Ltd. – Event Fund, and Kryger Capital Ltd. – Enhanced Fund.

19.    The Westchester Funds, the Alpine Funds, the Atlas Fund, and the Kryger Funds are collectively referred to herein as "Lead Plaintiffs."  As set forth in the previously filed certifications in this Action (ECF No. 15-3), Lead Plaintiffs purchased Silicon Motion ADSs during the Class Period and have been damaged thereby.

**B.    Defendants**

20.    Defendant MaxLinear is a Delaware corporation with its principal executive offices located in Carlsbad, California.  MaxLinear common stock is listed and publicly traded on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MXL."  MaxLinear is a provider of radio frequency ("RF"), analog, and mixed-signal integrated circuits – sometimes referred to as chips, microchips, or semiconductors – for the connected home, wired and wireless communications infrastructure, and industrial and multi-market applications.

21.    Defendant Kishore Seendripu is a co-founder of MaxLinear and has served as its Chairman, President, and Chief Executive Officer since the Company's inception in 2003.  Seendripu is also a member of MaxLinear's Board of Directors (the "Board").  Seendripu made, approved, or adopted false statements that caused or maintained artificial inflation in the price of Silicon Motion's ADSs, including statements at the Stifel Cross Sector Insight Conference held on June 6, 2023, and in a Form 8-K filed by MaxLinear on June 28, 2023 that he approved.

22.    Defendant Steven Litchfield has served as Chief Financial Officer and Chief Corporate Strategy Officer of MaxLinear since July 2018.  Litchfield made, approved, or adopted false statements that caused or maintained artificial inflation

in the price of Silicon Motion's ADSs, including statements in a Form 8-K filed by MaxLinear on June 28, 2023 that he signed.

23.    Defendants referenced above in ¶¶ 21 to 22 are referred to herein as the "Individual Defendants." The Individual Defendants and MaxLinear are referred to collectively herein as "Defendants."

24.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of MaxLinear, were privy to confidential, proprietary and material adverse non-public information concerning MaxLinear, its operations, finances, financial condition, and present and future business prospects, including in relation to the proposed Merger with Silicon Motion, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

25.    The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause MaxLinear to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of MaxLinear's business.

26.    The Individual Defendants, because of their positions with MaxLinear, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts, and through them, to the investing public. The misrepresentations alleged herein were disseminated to the public,

including Silicon Motion investors, in a medium upon which a reasonable investor would rely, and were material when disseminated.  The Individual Defendants were provided with copies of MaxLinear's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

27.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to MaxLinear's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, present and future business prospects, and information regarding the Merger with Silicon Motion to correct any previously issued statements that had become materially misleading or untrue.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

**C.    Relevant Non-Party**

28.    Silicon Motion is a relevant non-party to this Action.  Silicon Motion is a Cayman Islands company with its global headquarters in Zhubei, Taiwan.  The company was founded in Silicon Valley, California in 1995, and currently operates in Taiwan, the United States, Korea, China, Malaysia, Singapore and other locations internationally.  Its ADSs are listed and traded on the NASDAQ, with each ADS representing four ordinary shares of Silicon Motion.

# IV.    OVERVIEW OF THE FRAUD

## A.    MaxLinear's Business And Growth-By-Acquisitions Strategy

29.    MaxLinear provides communications microchips used in broadband, mobile and wireline infrastructure, data center, and multimarket applications.  In particular, the Company's RF receiver products enable the display of broadband video and data content in a range of electronic devices.

30.    Founded in 2003 by Defendant Seendripu, MaxLinear went public in 2010 and soon embarked on a growth-by-acquisitions strategy.  Given the limited size of its markets, MaxLinear needed to expand its product offerings to achieve substantial revenue growth.  Between 2015 and 2020, MaxLinear acquired five companies, with deal sizes ranging from approximately $21 million to $472 million.  In 2020, MaxLinear completed its most significant acquisition to-date, acquiring Intel Corporation's Home Gateway Platform Division, which doubled MaxLinear's addressable market and accounted for nearly half of the Company's $890 million annual revenue in 2021.

31.    MaxLinear's growth-by-acquisitions strategy required significant expertise in integration planning, preparation, and execution.  In this regard, the Company has long held itself out as adept at integrating acquired companies.  For example, during a November 7, 2016 earnings call, MaxLinear's CFO hailed the Company's "progress in integrating newly acquired growth vehicles," which enabled the Company to "realize revenue increases year-over-year."  Similarly, during a February 8, 2017 earnings call, MaxLinear's CFO boasted that "[o]ur progress in acquiring and integrating new growth initiatives and diversifying our product portfolio and end-market exposure have enabled us to deliver significant revenue growth expansion in both gross and operating margins and more than the doubling of our annual cash flow from operations."

32.    Given its successful history acquiring and integrating companies, MaxLinear reaffirmed its growth-by-acquisitions strategy in early 2022.  For

example, in response to analysts' questions during the Company's Q1 2022 earnings call on April 27, 2022, Defendant Litchfield, MaxLinear's CFO, told investors that because MaxLinear was "generating a lot of cash" it would "continue to look at acquisitions." Defendant Seendripu reiterated that, given the Company's "strong" and "accelerating" performance, "we got a lot of momentum [on] our ability to execute on acquisitions" and "this is going to be a story [that] continues."

**B.    MaxLinear Announces A "Transformative" $3.8 Billion Acquisition of Silicon Motion, The Largest In Company History**

33.    On May 5, 2022, MaxLinear announced it had agreed to acquire Silicon Motion in a cash and stock deal valued at $3.8 billion. MaxLinear's acquisition of Silicon Motion would be, by far, the largest and most significant acquisition in the Company's history. To ensure Silicon Motion investors would approve the deal, the Merger provided Silicon Motion ADS holders a premium of nearly 50% for their ADSs. Specifically, the Merger consideration was valued at $114.34 per ADS at the time, which included $93.54 in cash and 0.388 shares of MaxLinear common stock for each Silicon Motion ADS. This amount equated to an approximately 48% premium to the $77.09 closing price for Silicon Motion ADSs on April 22, 2022 – the last trading day before it was reported that Silicon Motion was exploring a sale.[2]

34.    Like MaxLinear, Silicon Motion is a microchip maker, but its chips are mainly used in consumer products such as personal computers, smartphones, flash memory cards, and flash drives used in expandable storage. Thus, the concept behind the Merger was that Silicon Motion's popular NAND flash controller technology and extensive customer relationships would be complementary to MaxLinear's traditional broadband, connectivity, and infrastructure business—

---

[2] The Merger consideration also included $23.385 in cash and 0.097 shares of MaxLinear common stock for each Silicon Motion ordinary share not represented by an ADS, for total per ordinary share consideration of $28.59.

thereby greatly expanding MaxLinear's market and fueling the Company's steep growth trajectory, while being immediately accretive to its bottom line.

35.    Defendants touted the considerable expected benefits of the Merger to investors.  For example, in a press release announcing the deal, MaxLinear stated that the Merger would provide the Company "transformative scale" as it "roughly doubles MaxLinear's total addressable market opportunity to $15 billion"; that it would be "immediately and materially accretive" to MaxLinear's operating income, operating margins, earnings per share, and cash flow; and it was poised to catapult MaxLinear into a "top-ten fabless semiconductor supplier." During an accompanying investor call, Defendant Seendripu explained that the combined company was expected to "capture end-to-end platform functionality," especially in the critical enterprise data center market, and that the scale created by the Merger would allow for "increased capacity" via its manufacturing partners.  Defendant Litchfield similarly underscored that the acquisition provided MaxLinear "an opportunity to really expand" MaxLinear's geographic reach, including in Asia.

36.    Silicon Motion's stock price soared on news that Silicon Motion was exploring a sale, and continued to rise after the Merger Agreement was announced. After reports of a possible sale circulated on April 22, 2022, the price of Silicon Motion ADSs climbed from a close of $77.09 per ADS on Friday, April 22, 2022, to a close of $87.02 on Monday, April 25, 2022—an increase of more than 12% per ADS.  Following the Merger's public announcement on May 5, 2022, Silicon Motion ADSs continued to soar, rising from a close of $81.20 per ADS on May 4, 2022, to a close of $95.16 per ADS on May 5, 2022—an increase of more than 17%.

37.    Analysts covering both MaxLinear and Silicon Motion were enthusiastic about the Merger and issued reports extolling its expected benefits.  For example, on May 5, 2022, shortly after the deal was publicly announced, CFRA Research analysts noted they were "encouraged by the combined entity as it doubles MXL's total addressable market opportunity to $15B" and would "be immediately

and materially accretive to operating margins, EPS, and cash flow."  Analysts at Roth MKM were similarly "encouraged by the acquisition" and praised the "combined product platform opportunity and fabless manufacturing synergies," and highlighted that the Merger would allow MaxLinear to "compete[] with larger market players."  Needham & Co. analysts underlined in a May 5, 2022 report: "we believe scale matters" in the semiconductor industry.

38.     Analysts covering Silicon Motion were similarly enthusiastic about the deal.  J.P. Morgan reported on May 6, 2022 that the "combination could help SIMO break into enterprise SSD controller markets more easily, securing some continuation of long term growth."  Roth MKM opined that "MXL can leverage its larger corporate and customer footprint to drive broader adoption of SIMO's enterprise storage products in particular."  Analysts at investment banking firm Craig-Hallum also described on May 5, 2022, how Silicon Motion "is an attractive acquisition target" and noted that certain deal terms were "not overly aggressive" and could provide the basis for a potential "bidding war" further driving up Silicon Motion's ADSs.

**C.     The Market Understood That The Only Remaining Condition Facing The Merger's Completion Was Whether MaxLinear And Silicon Motion Would Gain Regulatory Approval Of The Deal By SAMR**

39.     The Merger required regulatory approval from governmental authorities in the United States and China.  In the United States, the Merger had to be approved by the Antitrust Division of the U.S. Department of Justice, and by the Federal Trade Commission under the HSR Act.  In China, the Merger needed the approval of the Chinese antitrust regulator, SAMR.  Under the Merger Agreement, approval by all of these regulatory authorities was required by no later than August 7, 2023.

40.     In contrast, financing the deal was not an issue.  MaxLinear had secured committed financing for the cash portion of the deal with Wells Fargo, in addition to the combined companies' $277 million in cash on hand.

41.     On August 31, 2022, Silicon Motion investors approved the Merger at an extraordinary general meeting.  According to MaxLinear's press release announcing investor approval, "[t]he remaining requirements for closure of the transaction are customary closing conditions set forth in the Merger Agreement, including approval from the State Administration for Market Regulation (SAMR) of the People's Republic of China."

42.     Investors appreciated that the key risk facing the Merger was obtaining SAMR's authorization.  Indeed, on the same day that Silicon Motion investors approved the Merger, SAMR informed MaxLinear and Silicon Motion that it would not approve the deal under an expedited review and that the parties needed to submit a regular application for regulatory approval (which the parties did).  In contrast, the Merger swiftly obtained U.S. approval.  According to MaxLinear's SEC filings, the Merger was authorized to proceed under U.S. law on June 27, 2022, after expiration of the HSR Act's ordinary statutory waiting period.

43.     Investor concern regarding SAMR approval was heightened as 2022 progressed due to deteriorating China-United States trade relations.  On October 7, 2022, just five weeks after Silicon Motion investors approved the Merger, the U.S. Government announced sweeping new limits on the sale of certain semiconductor technology to China.  According to an article published in *The New York Times* on October 7, 2022, the trade restrictions were "aimed at crippling Beijing's access to critical technologies that are needed for everything from supercomputing to guiding weapons."  U.S. companies were no longer allowed to supply certain advanced computing chips, chip-making equipment, and other products to China unless they received a special license.

44.    Chinese regulators, in turn, retaliated against Washington's curbs on China's tech industry by slowing down its merger reviews of several proposed acquisitions by U.S. companies.  As *The Wall Street Journal* reported on April 4, 2023 in an article titled "China's New Tech Weapon: Dragging Its Feet on Global Merger Approvals," MaxLinear's proposed acquisition of Silicon Motion was among the deals being slow-tracked by Beijing.  Another prominent example included Intel Corp.'s $5.2 billion takeover of Tower Semiconductor.  In each case, SAMR asked the companies involved to make available in China products they sold in other countries in a bid to counter U.S. export controls on China, *The Wall Street Journal* reported, citing people close to the process.  *The Wall Street Journal* specifically highlighted the delay in the MaxLinear Merger as part of China's "expanding toolbox of economic coercion," and was a way to "pressure foreign companies, and by extension, their governments."

45.    Analysts seized on the rising political tensions between Beijing and Washington as creating substantial uncertainty about whether the Merger would move forward, specifically noting that Chinese regulatory approval was the "last step" remaining before the Merger could be completed.  For example, Wedbush commented on November 1, 2022 that "the tension between US and China certainly creates uncertainty around SAMR approval."  Wells Fargo also emphasized in a February 1, 2023 report that "the proposed acq[uisition] of SIMO remains a key focus area for investors," noting that the "***last step is China SAMR approval***."  On February 2, 2023, Needham & Co. similarly warned that the "uncertainty around the SIMO acquisition remains the biggest overhang on the [MXL] stock," and explained that both MaxLinear's and Silicon Motion's "shares may be range bound" as "***the two parties wait in purgatory for a deal resolution***."  On February 9, 2023, J.P. Morgan opined that "the prolonged process of approval in China could indicate that there may be potential accommodations and concessions required to secure approval

1    for the deal."  And, on March 16, 2023, Wells Fargo reiterated that uncertainty

2    around the Merger was a "***key focus area***" for investors.

3      **D.**  **The Merger Agreement Provided That MaxLinear Could Not Simply Walk Away From The Deal**

4

5      46.  Importantly, the Merger Agreement made it crystal clear that

6    MaxLinear could not simply back out of the deal ahead of SAMR's decision, for

7    example, because of a change in business strategy or declining market for the

8    companies' products.  Indeed, the Merger Agreement permitted a party to terminate

9    only in narrow, prescribed circumstances, required specific processes to be

10   followed—***including providing prompt notice of any claimed material breaches or***

11   ***MAEs***—and imposed steep penalties for improper termination.

12     47.  *First*, if the Merger failed to gain regulatory approval, either through a

13   regulatory denial or because regulatory approvals were delayed beyond the agreed-

14   upon closing deadline, MaxLinear would have an "easy out" and could ***not*** be forced

15   to complete the deal under any circumstances.  If this occurred, MaxLinear could

16   cap its liabilities at the $160 million break-up fee (and potentially avoid paying any

17   break-up fee at all if it also established that Silicon Motion was "in material breach

18   of any representation, warranty [or] covenant" of the Agreement and the breach was

19   the "primary cause" preventing any condition to closing).

20     48.  Under the Merger Agreement, the "Original Outside Date" for closing

21   was February 6, 2023, but, assuming no party breached the Merger Agreement and

22   all that remained pending was the necessary regulatory approvals, the date would be

23   ***automatically extended twice***: the "First Extended Outside Date" expired on May 5,

24   2023, and the "Second Extended Outside Date" was August 7, 2023.  After all the

25   Outside Dates passed (*i.e.*, if regulatory approval was still not received by August 7,

26   2023, or if a denial was received by that time), MaxLinear had the right to terminate

27   the deal.

28

49. *Second*, MaxLinear could validly terminate the Merger if Silicon Motion was in breach of its "representations, warranties or covenants" under the Merger Agreement. However, before effectuating a termination for a prior breach, MaxLinear was required to deliver "***written notice of such breach***" and provide Silicon Motion the ability to cure the specified breach within ***thirty days***, or by the next applicable Outside Date, whichever occurred first.

50. Similarly, MaxLinear could validly terminate the deal if an unexpected development had a "Material Adverse Effect," or an "MAE," on Silicon Motion's "business, financial condition, assets, liabilities or results of operations." Significantly, however, MaxLinear was required to give Silicon Motion "***prompt notice***" of the MAE if the issue was expected to prevent or delay the transaction from closing. Moreover, both the Merger Agreement and Delaware law (which under the Merger Agreement governed the determination of an MAE) greatly limited what conditions could constitute an MAE that could warrant termination. Mere business or economic deterioration was ***expressly excluded*** from the definition of an MAE, and therefore could never be a valid basis of termination. Specifically, the Merger Agreement expressly excluded from an MAE: (a) changes in economic or regulatory conditions, including changes in interest rates or customer demand for MaxLinear or Silicon Motion's products, (b) changes in "global or national political conditions," (c) changes in the trading price for Silicon Motion's ADSs, and (d) "any failure by [Silicon Motion] . . . to meet any revenue, earnings or other financial projections or forecasts."

51. Accordingly, the Merger Agreement provided no circumstances allowing MaxLinear to walk away from the deal if the Merger no longer made economic sense or became a poor deal for MaxLinear. In fact, terminating the deal to escape adverse business or financial consequences would amount to a "Willful and Material Breach" by MaxLinear under the terms of the Merger Agreement, and subject MaxLinear to express remedies including specific performance—*i.e.*,

forcing MaxLinear to proceed with the Merger—as well as uncapped money damages.

### E. Leading Up To The Class Period, MaxLinear Repeatedly Assured Investors That It Was Committed To The Merger And Regulatory Approval For The Deal Was On Track

52.     In the months following the Merger announcement, the investing public repeatedly questioned Defendants regarding the progress of the Merger and the anticipated timeline in which MaxLinear was expected to receive regulatory approval.  In response, Defendants consistently provided the market the exact assurance for which it was clamoring: that the Merger was progressing as expected, that SAMR approval remained on track, and once MaxLinear and Silicon Motion obtained that approval, MaxLinear would close the Merger.

53.     For example, in an April 26, 2023 press release announcing the Company's results for Q1 2023, Defendant Seendripu reaffirmed that MaxLinear remained "excited" by the "pending acquisition" as it provided MaxLinear "future growth prospects" due to the "comprehensive combined product portfolio."  During the accompanying first quarter earnings call held the same day, Seendripu reiterated that MaxLinear was "looking forward to a pending acquisition of Silicon Motion" and that "things are moving as expected on the SAMR front."  Similarly, during the earnings call, Defendant Litchfield added that MaxLinear "continue[d] to progress through the SAMR approval process," "remain[ed] confident of a mid-2023 close," and "look[ed] forward to bringing our technology-focused cultures together very soon."

54.     The market credited Defendants' assurances.  For example, after the call, Deutsche Bank reported that MaxLinear's "Management noted that the SIMO acquisition remains on track for completion in mid-'23," and Wells Fargo highlighted how "MXL reiterated that the acq[uisition] is progressing and they expect it to close by mid-CY23."  The next day, April 27, 2023, Benchmark similarly

1  reported that the "SIMO acquisition is tracking to expectations" and Needham &
2  Co. declared that "[t]he pending acquisition of Silicon Motion . . . remains on track,
3  is progressing well, and is expected to close by 2Q23 or 3Q23."

4      55.     On May 3, 2023—just **two days** before MaxLinear would later claim
5  that Silicon Motion was in material breach of the Merger Agreement—MaxLinear
6  participated in an interview with analysts to discuss the Merger.  During the
7  interview, an analyst from Alliance Global Partners Merger Arbitrage Group asked
8  about the progress of the Merger, and specifically, SAMR approval.  In response,
9  Leslie Green, MaxLinear's Investor Relations point person, assured investors that
10 all was well with respect to the Merger's progress and the prospects for regulatory
11 approval within the anticipated mid-2023 timeframe, stating: "we continue to
12 actively work to get the deal closed by mid-year, which was always the time frame
13 that we expected."  When the analyst asked a follow-up question regarding whether
14 MaxLinear "remain[ed] committed to acquiring [Silicon Motion]" and whether
15 "[n]othing's changed there," Green, on behalf of the Company, unequivocally
16 confirmed that MaxLinear remained committed to completing the Merger once
17 SAMR approved the deal, stating: "No, nothing's changed there."

18     56.     SAMR did not approve the Merger by the First Extended Outside Date,
19 May 5, 2023.  Accordingly, investor focus on the Merger intensified as the market
20 questioned whether the deal would close prior to the now final August 7, 2023
21 deadline, the "Second Extended Outside Date."

22     **F.     During The Class Period, Defendants Falsely Assured Investors
23            That Silicon Motion Was Still A "*Strategic Asset*" And That
              MaxLinear Was Still "*Very Bullish*" On The Merger Even
24            Though Defendants Had Already Decided To Abandon The Deal**

25     57.     As of May 5, 2023, MaxLinear determined that Silicon Motion was in
26 breach of the Merger Agreement.  Specifically, in the Company's own words,
27 "certain conditions in Article 6 of the Merger Agreement were not satisfied or
28 waived **as of May 5, 2023**," and therefore the First Outside Date was "***not***

*automatically extended*" to August 7, 2023, rendering the Merger Agreement null and void.  Importantly, the conditions of Article 6 of the Merger Agreement were broad and expressly included (i) Silicon Motion's representations and warranties; (ii) that Silicon Motion "performed and complied" with all its obligations under the Merger Agreement; and (iii) the absence of an MAE.  Thus, in MaxLinear's view, by not satisfying the conditions of Article 6, Silicon Motion's actions rendered the Merger Agreement unenforceable well before the Class Period.  Despite having come to this conclusion, Defendants did not disclose this extraordinarily material fact to either investors or to Silicon Motion.  Instead, they continued to falsely reassure the market that MaxLinear was fully committed to the Merger and was actively taking steps necessary for it to be completed by the August 7, 2023 deadline.

58.    On June 6, 2023, MaxLinear, Defendant Seendripu, and Leslie Green, the Company's Investor Relations representative, participated in the Stifel Cross Sector Insight Conference in Boston, Massachusetts. The Stifel Conference is Stifel's "signature event" of the year and in 2023 was attended in-person by over 300 companies and 1,600 investors, with additional participants on-line.  The goal of the Stifel Conference was "to provide institutional investors with high-level access to senior management" of the presenting companies.  The 2023 Stifel Conference was attended by company representatives, institutional investors, and private equity/venture capital investors from a variety of sectors, including business services, consumer and retail services, internet, materials, media, and technology. Prior to the conference, MaxLinear issued a press release publicizing its participation at the conference and providing a link for interested investors to view the presentation via a webcast.

59.    At the Stifel Conference, Defendant Seendripu participated in a "fireside chat" with Stifel's Managing Director of the Technology Group, Tore Svanberg. Early in the interview, Svanberg declared that the Silicon Motion Merger was "one of the topics investors want to hear most about" and that he would be

setting aside time specifically to discuss the Merger.  After discussing MaxLinear's business segments, Svanberg "of course" returned to the issue that was top of mind for investors—the Merger—and asked Seendripu for an "update" on the Merger and whether MaxLinear was "still" "interested in acquiring" Silicon Motion:

> Okay.  And the – and the last topic of course, is SIMO,  I know there's a limitation to what you can say, but at least give us an update on the asset strategically, you talked obviously about storage and data center, right?  So I *still believe this is an asset that you're very interested in acquiring*?

60.    Despite Defendants' internal conclusion that MaxLinear would not complete the Merger because Silicon Motion had already breached the Merger Agreement *a full month* before the Stifel Conference, thereby rendering the Merger null and void, Defendant Seendripu spoke at great length and in great detail about the Merger and its many expected benefits.  Seendripu punctuated the discussion by emphasizing that Silicon Motion remained a "*very strategic asset*" for MaxLinear and that management remained "*very, very bullish*" on combining the companies:

> Look, we have some conviction [in] what we do.  And I don't think we touch anything where our core technology platform doesn't expand us into the adjacent markets, right?  And storage is not an adjacent market.  Our primary focus [has been] the enterprise market and the data center market, and Silicon Motion is the number one merchant [] controller – storage controller supply in the world.  And, I don't look at controllers at storage.  I look at [it] as data traffic.  I look at [it] as how do you improve latency and speed of access and the amount of the memory[.] [T]oday, non-memory is monstrous, right?
>
> [] But the most important thing about the memory is if you look at the storage network is that, speed of access of the data and integrity of the data and throughput.  And now it's the excel. It's going to spread all over the place as well.  So you need to tightly couple the controllers with accelerators, right?  And they all belong together, *and together, [with Silicon Motion] we bring the portfolio to make it happen*.
>
> The other part of it is that memory is no longer about moving bits around with [the] controller, right?  Talked about data integrity.  So it's a lot of encryption technologies, signal processing, I/O bandwidths, the mixed-signal IP [is] all common.  *So we'll get the, what they call, the technology synergy.  And therefore, the R&D synergy [w]e need to, for both the companies combined together.*
>
> So we should be able to have synergies in the OpEx. *We still are very, very, what I call, bullish that we can acquire the synergies that we told*

- 23 -

*you all about. **And yes, the revenues of the combined companies have come down [], but it just delays** the, what I call, the benefits of the acquisition accordingly by a year or so. **But the basic rationale has not changed at all. So I believe it's a very strategic asset for the company**.*

61.    Recognizing the materiality to investors of Seendripu's statements reaffirming MaxLinear's commitment to closing the Merger, the next day, June 7, 2023, MaxLinear filed with the SEC on Form 425 a transcript excerpt of the Stifel Conference conversation ***that contained only the above question and answer***. The filing was made "Pursuant to Rule 425," or 17 C.F.R. §230.425 ("Rule 425"), which, according to the SEC, was "designed to reduce selective disclosure" of material information relating to a transaction "by permitting widespread dissemination of information . . . to ***inform all security holders about the terms, benefits and risks of a planned extraordinary transaction***," thereby enabling "a more well informed and efficient market." Importantly, the SEC instructs that transcripts used to communicate information about a pending merger must be filed with the agency, but "routine business communications that refer to the transaction in a non-substantive way" need not be publicly filed. Accordingly, Defendants clearly knew and understood that Seendripu's statements at the Stifel Conference were, in fact, substantive and material to investors, thus necessitating the Rule 425 filing, making the statements in a medium upon which reasonable investors would rely.

62.    Just weeks later, on June 28, 2023, further maintaining the appearance that MaxLinear was committed to closing the Merger (and in compliance with the terms of the Merger Agreement), the Company filed a Form 8-K with the SEC stating that MaxLinear was continuing to take affirmative steps to secure regulatory approval for the Merger:

> The completion of the Merger is conditioned upon, among other things, the expiration or termination of the waiting period applicable to the consummation of the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act" and, such waiting period, the "HSR Waiting Period"). MaxLinear and Silicon Motion previously filed under

the HSR Act, and the HSR Waiting Period expired at 11:59 p.m. ET on June 27, 2022. However, since the Merger was not consummated by June 27, 2023, clearance under the HSR Act has expired, ***and on June 28, 2023, MaxLinear and Silicon Motion re-filed under the HSR Act***.

63. Defendants' statements had their intended effect. The market was reassured that MaxLinear remained committed to combining the companies and that the Company would close the Merger as soon as SAMR signed-off on the deal. For example, on July 24, 2023, Roth MKM issued a report on MXL providing an "Acquisition Update," which stated that "MXL is approaching the early-August outside date for its planned SIMO acquisition while simultaneously working toward securing Chinese regulatory approval for the deal."

**G. In Reality, And Directly Contradicting Their Repeated Public Representations, Defendants Had Secretly Determined By No Later Than The Start Of The Class Period That MaxLinear Would Abandon The Merger**

64. Unbeknownst to investors, even before the start of the Class Period, Defendants had internally determined that they would abandon the Merger, regardless of whether or not SAMR approved it, because the economics of the deal had changed for MaxLinear on several fronts.

65. *First*, in the months following the Merger's announcement, MaxLinear's business had deteriorated. Indeed, according to former employees of the Company, in September of 2022—just four months after entering into the Merger Agreement—MaxLinear's Intel division, which accounted for *half* of MaxLinear's revenue, informed senior management that it expected a 40% drop in revenue for 2023. Specifically, according to FE 2,[3] the Intel division saw explosive growth in 2022 as customers over-ordered microchips to stay ahead of supply chain issues. However, this left the customers with vast excess supply for 2023, including

---

[3] FE 2 was a former Director of Product Marketing at MaxLinear from 2020 until December 31, 2022, She joined MaxLinear as part of the 2020 Intel acquisition and worked in MaxLinear's Israel office. She reported directly to MaxLinear's Vice President and General Manager Doron Tal.

MaxLinear's biggest customer, Comcast Corporation.  The Intel division recognized this problem in August 2022—soon after the Merger was announced—when it asked its customers to forecast their needs for the upcoming year.  According to FE 2, all of the division's large customers significantly reduced their expected orders, resulting in a 40% drop in expected revenue for 2023. This news was highly significant because, as FE 2 explained, the Intel division was responsible for *half* of the Company's total revenues.  FE 2 personally was involved in preparing a slide deck highlighting the poor outlook for 2023, which was presented by the head of the Intel division—Doron Tal—to MaxLinear's executive management, including Defendants Seendripu and Litchfield, in September 2022.

66.    FE 1, who was MaxLinear's Director of Global Trade Compliance[4] from November 2022 to July 2023, explained that due to the poor financial results and gloomy outlook, MaxLinear began laying off large numbers of employees in January 2023.  FE 1 referred to these as "quiet" layoffs and said they occurred at different MaxLinear locations across the globe.

67.    The forecasts proved accurate. When reporting its Q1 2023 results on April 26, 2023, MaxLinear publicly disclosed that its revenue was down "15% sequentially," and provided guidance of only $175 million to $205 million in revenue for Q2 2023—well below consensus expectations.  As Deutsche Bank analysts described in an April 26, 2023 report, this was the "second consecutive quarter" that MaxLinear provided a "significantly weaker guide as a combination of weaker demand and significant channel/customer inventory digestion lead to a ~23% [quarter over quarter] drop in revenue."  Wells Fargo was similarly frustrated by MaxLinear's "much weaker-than-expected guide."    Defendants knew that the

---

[4] FE 1 was MaxLinear's Director of Global Trade Compliance from November 2022 until July 18, 2023, when she was laid off just eight days before the end of the Class Period.  She worked out of MaxLinear's California offices and reported directly to MaxLinear's General Counsel and Associate General Counsel.

Company's poor results would continue for the remainder of 2023 based on MaxLinear's internal forecasting and customer orders.

68.     As a result of MaxLinear's faltering financial results, the Company's stock price lost more than half its value, falling from over $50 per share just prior to the announcement of the Merger in May 2022, to $23.39 by May 4, 2023.

69.     *Second*, interest rates had risen substantially in the second half of 2022 through the first half of 2023, and thus the cost of financing the cash portion of the Merger consideration had increased dramatically. Specifically, when the Merger was initially announced on May 5, 2022, Defendant Litchfield explained that MaxLinear expected to obtain an interest rate of the Secured Overnight Financing Rate ("SOFR Rate") "plus 2.5% to 3.5%," as that was the "range we're thinking about" for the financing of the Merger. On that date, the SOFR Rate was 0.79%, but by May 5, 2023, the SOFR Rate had increased to 5.06%. Consequently, MaxLinear expected to pay interest rates between 7.5% and 8.5% on the debt needed to close the Merger—at least *double* MaxLinear's original expected rates of between 3.29% and 4.29%.

70.     Because MaxLinear needed to borrow $3.25 billion to close the Merger, the rise in interest rates increased MaxLinear's financing costs by ***more than $140 million per year*** to a total annual interest cost of ***$250 million***. Making matters worse, MaxLinear's market capitalization had shrunk during the year after the Merger was announced, falling from $3.4 billion to only $1.9 billion just prior to the Class Period. Thus, the combination of rising interest rates and MaxLinear's smaller enterprise value meant that the Merger would leave MaxLinear significantly more leveraged if the Merger were to proceed, further constraining its business and financial options going forward.

71.     Against this backdrop, Defendants were eager for a way out of the deal. As such, Defendants sought out, and ultimately determined, that Silicon Motion suffered an incurable MAE and committed other purported breaches of the Merger

Agreement as of May 5, 2023. However, Defendants also recognized that they were contractually obligated to close the Merger, and any claim that Silicon Motion had breached the Agreement would unquestionably result in litigation with the possible remedy of specific performance. Accordingly, by the beginning of the Class Period, Defendants internally decided to abandon the Merger under one of two paths. The first path (Plan A) was to wait and hope that SAMR would not approve the transaction by the August 7, 2023 deadline, thereby relieving MaxLinear from the obligation to close the transaction. The second path (Plan B) would occur in the event that SAMR approved the deal. In that case, MaxLinear would unilaterally terminate the Merger by claiming that, as of May 5, 2023, Silicon Motion had suffered an MAE, otherwise breached the Merger Agreement, or failed to obtain all necessary closing conditions, and therefore, the Merger Agreement's Outside Date did **not** automatically extend to August 7, 2023. From Defendants' perspective, Plan A was by far the better of the two options, as it allowed MaxLinear to cleanly walk away from the Merger Agreement with its liability limited to, *at most*, the $160 million break-up fee—which was $90 million less than the expected ***annual*** interest payment of $250 million if the deal were consummated—and there was no scenario in which MaxLinear would be forced to close the deal. Plan B, on the other hand, involved more risk, as it would invariably lead to litigation with Silicon Motion, where MaxLinear would face specific performance and uncapped monetary damages.

72.    Thus, Defendants decided to gamble that SAMR would not provide the approvals in time. Under either scenario, however, Defendants knew they would not go through with the Merger.

**H.    The Truth is Revealed: SAMR Approves The Merger, And Just Hours Later, MaxLinear Unilaterally Terminates The Deal, Causing Silicon Motion ADSs To Lose Nearly Half Their Value**

73.    Defendants' gamble failed. On July 26, 2023, before market open, SAMR granted regulatory approval for the Merger and publicly announced its

decision on the agency's website, thereby removing the final hurdle remaining before MaxLinear and Silicon Motion would close the Merger.  On the strength of Defendants' repeated assurances before and during the Class Period that MaxLinear was fully committed to closing the Merger once SAMR approved it, the price of Silicon Motion ADSs surged by over 82%, from the prior day's close of $52.20 per ADS to an intraday high of $95.33 on July 26, 2023—an increase of $43.13 per ADS.

74.    After SAMR announced its decision, the market understandably expected a prompt closing of the Merger by the August 7, 2023 Outside Date. Indeed, analysts at Wedbush immediately issued a "Quick Note" on the morning of July 26, 2023, reporting that the approval "would seem to *clear the way for the deal to be consummated* ahead of the August deal expiration date" and confirming "*we now believe the transaction is on track to be completed*."  Wells Fargo analysts similarly confirmed that morning that the approval "*pav[ed] the way for a final close ahead of the Aug[.] 7 merger agreement exp[iration]*."

75.    With Plan A no longer viable, Defendants quickly pivoted to their previously devised Plan B.  Thus, at 3:10 PM on July 26, 2023, *just ten hours after SAMR approved the Merger*, MaxLinear shocked the market by announcing that MaxLinear was unilaterally terminating the Merger. Without providing any specifics as to its purported grounds for terminating the deal, MaxLinear's press release, which was also filed on Form 8-K with the SEC, claimed that MaxLinear was terminating the Merger Agreement because: (i) Silicon Motion had failed to satisfy unspecified "conditions" of the Merger; (ii) Silicon Motion had suffered an unspecified MAE; and (iii) Silicon Motion had made unspecified "breaches" of the Merger Agreement.  Significantly, MaxLinear claimed in its press release that these events had occurred *"as of May 5, 2023*," even though MaxLinear had repeatedly reaffirmed its commitment to the Merger *after* that date.

76.     Specifically, MaxLinear's July 26, 2023 press release, issued less than one hour before the end of the trading day, stated:

*Following [the] regulatory approval,* on July 26, 2023, MaxLinear provided notice to Silicon Motion that it has terminated the Merger Agreement and MaxLinear is relieved of its obligation to close because, among other reasons, (i) certain conditions to closing set forth in the Merger Agreement are not satisfied and are incapable of being satisfied, (ii) Silicon Motion has suffered a Material Adverse Effect that is continuing, (iii) Silicon Motion is in material breach of representations, warranties, covenants, and agreements in the Merger Agreement that give rise to the right of the Company to terminate, and (iv) in any event, the First Extended Outside Date has passed and was not automatically extended because certain conditions in Article 6 of the Merger Agreement were *not satisfied or waived as of May 5, 2023*.

77.     Without providing any factual detail, MaxLinear claimed that under these circumstances, it was entitled to avoid paying Silicon Motion even the $160 million break-up fee.

78.     On a conference call after market hours on July 26, 2023, Defendants were unable to—and in fact explicitly refused to—answer any analyst questions or provide any details whatsoever about their abrupt and unexpected termination of the Merger.  Instead, Defendant Litchfield simply stated: "As you saw from our press release, we have exercised our contractual right to terminate the merger agreement. Please note that we do not intend to share any further detail on this matter at this time, and our call today will be focused on our quarterly results."

79.     Prior to the market's open on July 27, 2023, Silicon Motion issued a scathing press release arguing not only that MaxLinear had absolutely no legitimate basis for its termination of the Merger Agreement, but also that the Company had never even mentioned any purported issues with the deal during the 15 months that the two companies had worked together to obtain regulatory approval.  The press release stated:

*In the 15 months since the signing of the merger agreement between the parties, Silicon Motion worked cooperatively with MaxLinear to obtain regulatory approvals for the merger*, *Silicon Motion complied with its obligations under the agreement and Silicon Motion has not suffered a material adverse effect* . . .  Silicon Motion *expects*

***MaxLinear to abide by its obligation under the merger agreement*** and intends to vigorously enforce its rights under the merger agreement.

80.     The market was shocked by MaxLinear's termination, and excoriated Defendants for misleading investors by feigning commitment to the deal after May 5, 2023.  For example, FBN Securities, an institutional brokerage firm, issued a report on July 27 highlighting that MaxLinear's "termination falling so closely on the heels of the SAMR approval suggests ***buyer's remorse***" as the motivating factor. FBN's report further underscored that Defendants' prior public statements expressing commitment to the Merger misled investors, querying that "***if the agreement was not in force as of [May 5], why did MXL continue to perform under the agreement by refiling HSR on [June 28] ... or continue to describe the agreement in its releases and filings as still in force[?]***"  FBN then provided the answer: "***MXL recognized that its cleanest way out in … a deal it no longer wanted was SAMR.***"

81.     Similarly, in a July 27, 2023 report, Wedbush analysts commented that "***the timing of the announcement (post the resolution of a final roadblock preventing a deal), the lack of any prior apparent action by MXL to terminate the deal around May 5th (the first extended outside date), and in particular the two companies' application for HSR [approval] on June 28th (implying everything was still on track as of that date) all suggest***" that something else was at play for MaxLinear.  Wedbush later commented on July 28, 2023 that "***SIMO had no indication MXL intended to terminate the agreement***," which further indicated that MaxLinear was not telling the entire truth.  J.P. Morgan analysts issued a report on July 28, 2023 similarly noting the suspicious timing of the termination, noting that MaxLinear terminated the deal "***alleging Material Adverse Effect, right after China SAMR approved the acquisition***."

82.     In direct response to MaxLinear's announcement that it was terminating the Merger Agreement, the price of Silicon Motion ADSs plunged from

a market high of $95.33 per ADS on July 26, 2023, to close at just $65.35 per ADS on July 26, 2023, a decline of 31%, or over $29.50 per ADS, in less than one hour of trading, at an unprecedented volume of 17,771,620 ADSs.  The price of Silicon Motion ADSs continued to plunge when the market opened the next day, falling an additional $12.84 to close at just $52.51 per ADS on July 27, 2023, on significant trading volume of 9,116,569 ADSs, representing a two-day decline of over 44%, or nearly $43 per ADS from the July 26 intra-day high.

## I.    Post-Class Period Developments Further Confirm The Fraud

83.    Remarkably, MaxLinear ultimately ***admitted*** that Defendants had determined there was an MAE and a material breach of the Merger Agreement long before the July 26, 2023 termination.  Indeed, on August 1, 2023, MaxLinear's head of Investor Relations, Leslie Green, participated in an analyst call during which the analyst repeatedly asked pointed questions about MaxLinear's justification for terminating the Merger.  While Green refused to answer the vast majority of questions, she was forced to admit that it had been a "period of time" before the termination that MaxLinear decided it would terminate the Merger, as the decision involved "a lot of thoughtful consideration" and was thoroughly "discuss[ed]" by the Company's Board before SAMR's approval.  As Green put it: "The decision to go [down] that path is the decision that the board undertook ***over a period of time*** with a lot of thoughtful consideration, and data analysis and consulting that went into that decision.  ***It's not a spur of the moment thing***."  Green later repeated that the termination "was a ***well-considered decision*** that did ***not spontaneously occur, but it occurred over a period of time*** that took a lot of thought, analysis, and discussion that went into it."

84.    Notably, Green's statements on August 1, 2023 stand in sharp contrast to Green's statements on May 3, 2023 that MaxLinear was "actively making progress" to integrate the companies.  In fact, as multiple senior FEs confirm, no such steps were being taken.  The reason why not is clear: as MaxLinear ***admitted***

1   on July 26, the Company had already determined that Silicon Motion was in material

2   breach, and had suffered an uncurable MAE "*as of May 5, 2023*."

3       85.    On August 7, 2023, Silicon Motion issued a press release in which it

4   "categorically rejected MaxLinear's purported termination of the Merger

5   Agreement, and the assertions made by MaxLinear, in its letter of July 26, 2023."

6   Silicon Motion's letter annexed to its press release made clear that MaxLinear had

7   never provided notice of the Company's purported grounds for termination required

8   pursuant to the Merger Agreement "*in the nearly fifteen months since the parties*

9   *signed the Agreement*."

10       86.    MaxLinear stood by its decision to terminate the Merger and therefore

11   failed to close the Merger by the August 7, 2023 Outside Date.  As a result, on

12   August 16, 2023, Silicon Motion issued another press release indicating that it was

13   now treating the Merger Agreement as terminated in light of the passage of the

14   Outside Date and that it intended to pursue substantial damages "well in excess" of

15   the Merger Agreement's termination fee.  The August 16 press release disclosed that

16   Silicon Motion intended to commence an arbitration in the Singapore International

17   Arbitration Centre ("SIAC") against MaxLinear.

18       87.    On September 21, 2023, Silicon Motion issued a third press release

19   again confirming that MaxLinear never provided Silicon Motion with notice or an

20   opportunity to cure, stating: "*In the 15 months following the signing of the Merger*

21   *Agreement, MaxLinear never once asserted, prior to sending its July 26, 2023*

22   *notice of termination, that there had been a material breach of the Merger*

23   *Agreement, nor did it or its representatives ever mention an MAE or a breach of*

24   *the ordinary course covenant*."  Moreover, Silicon Motion revealed that, prior to

25   MaxLinear's termination, Silicon Motion provided Defendants with an advance

26   copy of Silicon Motion's second quarter 2023 results, and MaxLinear "again, did

27   not state that the results gave rise to an MAE."

28

88.    On October 5, 2023, Silicon Motion announced that it had commenced an arbitration in Singapore against MaxLinear for breaching the Merger Agreement. In the October 5, 2023 press release, Silicon Motion stated that it had filed a claim in the SIAC, as provided under the Merger Agreement, seeking "payment of the termination fee of $160 million, further substantial damages, interest and costs." Meanwhile, analysts and sophisticated market participants continued to report on how MaxLinear had misled the market and significantly harmed Silicon Motion investors.  For example, analysts at Wedbush wrote on October 5, 2023, that they considered a judgment awarding Silicon Motion the $160 million breakup fee "the likely base case, with room for potential significant upside."

89.    Similarly, in an August 14, 2023 podcast published on *SeekingAlpha*, Focus Capital described how SAMR's approval came at a severe "downturn" in both MaxLinear's business and the semiconductor industry, "and that, combined with the huge rise in interest rates," unquestionably led MaxLinear to suffer "***buyers' remorse***."  Focus Capital agreed that, left with no other option, MaxLinear internally concluded "***can we even afford it***?"-- "***Let's just take a Hail Mary and try and get out of this thing***."

**J.    The Accounts Of Multiple High-Ranking Former Employees Of The Company Confirm That, Throughout The Class Period, Defendants Had No Intention Of Closing The Merger, And Had Determined To Simply "Walk Away" From The Transaction**

90.    Multiple high-ranking former employees of MaxLinear confirm that, despite Defendants' public statements to investors reaffirming their commitment to the Merger, internally Defendants had decided to simply "walk away" from the deal. Reflecting Defendants' decision, these former employees also confirm that Defendants were in no way genuinely preparing to close the Merger, and even ***as late as mid-July 2023***, Defendants had not taken the most basic and rudimentary steps to prepare for an integration of the two companies.

91.    In particular, FE 1, the Company's former Director of Global Trade Compliance, underscored that comprehensive merger and integration planning was *vital* if MaxLinear was intent on completing the Merger, but that she observed absolutely *no* such efforts at the Company *even as late as July 18, 2023—just eight days before the Merger was terminated*. As an example, FE 1 – who had over 25 years of experience in global trade, logistics, and regulatory compliance, including direct involvement in mergers and acquisitions ("M&A") transactions – described how over 40% of Silicon Motion's transactions were in Chinese and MaxLinear did not have personnel capable of reviewing them; that Silicon Motion's compliance personnel capable of reviewing and translating the contracts were made available to MaxLinear during a transition period; and that MaxLinear not only declined to follow-up on this overture, the Company *laid-off* its top compliance officer (FE 1) just weeks ahead of the August 7, 2023 closing deadline. FE 1 described that the lack of merger and integration planning was seemingly endemic across the Company, including Human Resources ("HR"), Marketing, and Logistics/Supply Chain. FE 1 confirmed that the lack of merger and integration planning that existed across the Company between May to July 2023 with a merger date of August 7, 2023 indicated to her that MaxLinear was not interested in moving forward with the deal.

92.    FE 1 reported directly to MaxLinear's General Counsel, Michelle Sayer and to Associate General Counsel, Rohan Virginkar.[5] She recounted that the three of them had a call with Silicon Motion's compliance professionals on December 7, 2022 to have an initial assessment of Silicon Motion's compliance efforts and subsequently to review their compliance tools and systems. FE1 explained that after the meeting, she raised a concern with Virginkar and Sayer that MaxLinear should have an "integration schedule" of all Merger activities with the milestones and the

---

[5] FE 1 reported to General Counsel Sayer starting in November of 2022, and to Associate General Counsel Virginkar starting in February of 2023.

key functional leaders clearly identified in order to properly integrate the Silicon Motion compliance department and identify a timeline for the transition efforts pre and post-Merger.  In addition, according to FE 1, "several key questions should have been identified, at minimum, the types of contracts, export compliance concerns—including, but not limited to, export classifications, Denied Parties screening and electronic systems and tools—what systems MaxLinear would use post-Merger, and whether MaxLinear would export all of Silicon Motion's transactions into MaxLinear's current tracking system or *vice versa*."  Importantly, FE 1 learned during the initial meeting that as much as 40% of Silicon Motion's contracts were in Chinese, and therefore she felt strongly that MaxLinear needed a plan for reviewing the contracts and assuring their compliance with foreign laws.  FE1 stated that it is industry business practice to have such an integration schedule at least 6 months pre-Merger.

93.    From December 2022 until she left the Company in mid-July 2023, FE 1 stated that she asked Associate General Counsel Virginkar ***every six weeks*** when she would be provided with an integration plan in connection with the upcoming Merger, but none was provided.  In FE 1's own words: "***there was no definitive action plan or timeline***" for the expected integration, which "***was very bothersome to me***" given her repeated entreaties to the Company's senior management.

94.    FE 1 further described how MaxLinear's failure to undertake even basic, pre-merger integration planning was unlike anything she had experienced in her long professional career, where she was directly involved in numerous M&A transactions and handled merger and integration planning on behalf of the acquiring company.  For example, FE 1 explained that based on her past experiences working on M&A in the aerospace defense industry, an integration action plan and timeline was crucial for a successful integration.  Those materials detailed the responsible parties for the integration-related tasks, specified which integration milestones were critical, and provided the necessary timeframe for accomplishing the tasks, with one

milestone triggering a host of others.  As FE 1 explained, "My expectations were based on my experience in mergers and acquisitions. We always had a list of tasks company-wide in terms of what the finance people needed to do to secure the loan, and logistics.  ***Every single function of the company has their milestones***." She added that project managers would be assigned spreadsheets tracking the amount or progress against milestones, and there would be regular team meetings to address milestone developments, where all the managers would report on their progress to ensure they were on track.  FE 1 was clear that "***at MaxLinear, I did not see any of this***" as late as mid-July 2023 (when she was laid off), despite her constant inquiries. FE 1 reiterated, "***There was no plan and no action team in place***."

95.     According to FE 1, despite her repeated concerns raised directly to the General Counsel and Associate General Counsel, management continuously silenced them.  For example, after FE 1 learned in February 2023 that some of Silicon Motion's compliance employees would be available to MaxLinear in the United States, she raised the possibility of retaining those employees post-Merger to help with the Chinese contracts and regulatory compliance.  However, she did not receive an answer to her inquiry.  Instead, by April 2023, Virginkar's and Sayer's focus had entirely shifted away from any potential integration, and shortly before the August 7, 2023 Merger closing deadline, the Company laid off FE 1.  Thus, instead of undertaking vital steps to successfully integrate what would be the largest acquisition in MaxLinear's history, as of April 2023, the General Counsel and Associate General Counsel had instead shifted their focus to implementing general company-wide internal compliance trainings that were rolled out between May and July 2023, and declined to address FE 1's repeated calls that proper merger and integration teams be set-up, checklists put-in place, milestones established, and that the progress be reported to management and the Board.  As FE 1 described, despite a fast-approaching Merger deadline, MaxLinear was singularly focused on generalized, internal compliance issues.  FE 1 confirmed that MaxLinear was

nowhere near the level it needed to be to close the Merger from a planning perspective when this shift in focus occurred, and that by the time she left MaxLinear in mid-July the focus never shifted back to integration planning.

96.    After the May 5 deadline passed and the August 7 deadline grew closer, FE 1 confirmed that she was not included in any integration planning or contract reviews, despite the fact that, as the Director of Global Compliance, she would have been involved in many integration conversations across different business functions and, at minimum, been kept informed of integration action plans and milestones. As FE 1 stated: "***There was this big acquisition supposedly on the Company's RADAR and we had not had any integration plans in place***," emphasizing that "***Based on my position as Director of Global Compliance, if [the integration plans] were in place, I would have seen them***." The Director of Global Compliance was unaware of any integration efforts within the Sales and Marketing, Operations, Finance, Supply Chain/Logistics, or HR departments. Commenting on the lack of integration planning, FE 1 stated that as Director of Global Compliance she worked closely with the HR department, and was especially "***surprised***" that she had neither heard of nor was involved in any integration planning in HR, given the large number of employees who were set to join MaxLinear via the Merger.

97.    Indeed, in the crucial period of May to July 2023, MaxLinear was not even reviewing Silicon Motion's contracts for compliance issues and did not have the capability to review the Chinese language contracts. Furthermore, MaxLinear did not have a plan in place on how to review those contracts ***after*** the Merger closed or how to comply with China's regulations. Given the lack of planning toward closing the Merger, according to FE 1, it was an open secret within the Company, widely discussed in "water cooler conversations," that MaxLinear would not go through with the Merger. FE 1 added that she heard in several water cooler conversations that MaxLinear had concluded that it was no longer in the Company's best economic interest to continue with the Merger. Specifically, FE 1 recounted

1  that "*it came up during a 'water cooler conversation' that it would be more*
2  *beneficial for MaxLinear to break the merger agreement and to pay a fine rather*
3  *than continue with the merger*."

4  98.    FE 1 described that the lack of integration planning indicated to her that
5  MaxLinear's management was not genuinely interested in closing the transaction.
6  In fact, FE 1 was let go by MaxLinear in mid-July, just weeks before the expected
7  Outside Date of August 7, 2023, and only eight days before MaxLinear terminated
8  the deal.   FE 1 queried, why would MaxLinear discharge its top compliance
9  professional if it were serious about closing a Merger with a large foreign company
10  whose contracts were in a foreign language and were governed by complex
11  regulatory environments both domestically and abroad?  As FE 1 understood it, her
12  very dismissal indicated MaxLinear was not going to move forward with the Merger.
13  She stated that if MaxLinear were going to proceed with the Merger of Silicon
14  Motion it would have needed to have a new Director of Global Trade Compliance
15  in place and up to speed remarkably quickly.   FE 1 confirmed however, that she saw
16  a listing for her former job in September 2023, indicating that her position—which
17  would have been essential to any plan to close the Merger—was not filled after she
18  left.

19  99.    Similarly, FE 2 corroborated FE 1's account of an absence of Merger
20  preparation or planning.  Indeed, FE 2 described that up until she left the Company
21  at the end of December 2022, and despite her senior division being responsible for
22  half of the Company's sales, she was not provided with *any* integration checklists,
23  plans, or milestones for the Merger.  FE 2 also described in a lengthy interview with
24  an analyst, and in multiple corroborating interviews with Lead Counsel, that
25  MaxLinear management had simply decided to "*walk away*" from the deal to focus
26  on its own business.  As FE 2 stated succinctly, after receiving numerous "*red flags*"
27  of the Company's poor financial health and "*really bad*" forecasts, management

28

"*finally realized they had made a bad choice with wanting to acquire Silicon Motion, so they tried to minimize their loss by breaking the deal*."

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS

100.    During the Class Period, Defendants made materially false and misleading statements, and omitted material facts, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Throughout the Class Period, MaxLinear's SEC filings, press releases and analyst and investor presentations included material misstatements and omissions concerning the Merger, including, among other misrepresentations, Defendants' statements concerning MaxLinear's intent to close the Merger after obtaining regulatory approval from SAMR.

101.    As discussed above and further below, Defendants' representations were false and misleading when made, and omitted material facts either required to be disclosed or necessary to make Defendants' statements not misleading.  The representations alleged herein to be false and misleading were disseminated to the public, including Silicon Motion investors, in a medium upon which a reasonable investor would rely, and that they were material when disseminated.  These misstatements and omissions had the effect of creating in the market an unrealistically positive assessment of the Merger and the prospects for MaxLinear to complete its acquisition of Silicon Motion.  In truth, Defendants had determined by the start of the Class Period that the Merger Agreement was null and void as of May 5, 2023, that MaxLinear would therefore abandon the Merger, and thus the deal had no chance of completion.  Defendants misleadingly concealed from the market this extraordinarily material information.

102.    The Class Period begins on June 6, 2023, when Defendant Seendripu presented at the Stifel Conference.  During the conference, a senior Stifel analyst asked Defendant Seendripu about MaxLinear's pending acquisition of Silicon Motion and whether MaxLinear was still committed to closing the Merger—*i.e.*,

whether Silicon Motion was a company that MaxLinear was "still . . . very interested

in acquiring." Specifically, the analyst asked: ". . . the last topic of course is SIMO,

I know there's a limitation to what you can say, but at least give us an update on the

asset strategically, you talked obviously about storage and data center, right? ***So I***

***still believe this is an asset that you're very interested in acquiring?***"

103. In response, Defendant Seendripu unequivocally reaffirmed

MaxLinear's commitment to closing the Merger, explaining that "***the basic***

***rationale [for the Merger] has not changed at all***," and that Silicon Motion was, in

fact, still a "***a very strategic asset for the company***":

> Look, we have some conviction [in] what we do. And I don't think we
> touch anything where our core technology platform doesn't expand us
> into the adjacent markets, right? And storage is not an adjacent market.
> Our primary focus [has been] the enterprise market and the data center
> market,  and Silicon Motion is the number one merchant [] controller –
> storage controller supply in the world.  And I don't look at controllers
> at storage.  I look at [it] as data traffic.  I look at [it] as how do you
> improve latency and speed of access and the amount of the memory[.]
> [T]oday, non-memory is monstrous, right?
>
> [] But the most important thing about the memory is if you look at the
> storage network is that, speed of access of the data and integrity of the
> data and throughput.  And now it's the excel, It's going to spread all
> over the place as well.  So you need to tightly couple the controllers
> with accelerators, right?  And they all belong together ***and together***
> ***[with Silicon Motion]***, ***we bring the portfolio to make it happen***.
>
> The other part of it is that memory is no longer about moving bits
> around with [the] controller, right?  Talked about data integrity.  So it's
> a lot of encryption technology, signal processing, I/O bandwidths, the
> mixed-signal IP [is] all common. ***So we'll get the, what they call, the***
> ***technology synergy.  And therefore, the R&D synergy [w]e need to,***
> ***for both the companies combined together.***
>
> So we should be able to have synergies in the OpEx. ***We still are very,***
> ***very, what I call, bullish that we can acquire the synergies that we told***
> ***you all about.***  And yes, the revenues of the combined companies have
> come down [], but it just delays the, what I call, the benefits of the
> acquisition accordingly by a year or so. ***But the basic rationale has***
> ***not changed at all.  So I believe it's a very strategic asset for the***
> ***company***.

104. Buoyed by Defendants' reassurances that MaxLinear was committed to

consummating the Merger, the price of Silicon Motion ADSs rose $2.01 per ADS,

from a close of $66.22 on June 5, 2023, to a close of $68.23 on June 6, 2023, on unusually high trading volume of 895,916 ADSs.

105.    The following day, June 7, 2023, MaxLinear filed a Form 425 with the SEC containing the above question and answer, describing them as "excerpted portions of a transcript of the [Stifel Conference] presentation that relate to the Merger." After publication of Seendripu's statements, the price of Silicon Motion ADSs rose $0.57 per ADS, from a close of $68.23 on June 6, 2023, to a close of $68.80 on June 7, 2023, on significant trading volume of 681,498 ADSs.

106.    The statements referenced in ¶¶103 and 105 were materially false and misleading and omitted material information when made.  In reality, by the time Defendants made these statements, MaxLinear had already decided to terminate the Merger, as the "basic rationale" for the deal no longer remained the same but had *materially* changed from MaxLinear's point of view.  As a result, Defendants no longer believed Silicon Motion was a "very strategic asset for the company."  Indeed, ***according to Defendants' own statements*** following the Class Period, MaxLinear had already determined as of the beginning of the Class Period, that "certain conditions in Article 6 of the Merger Agreement ***were not satisfied or waived as of May 5, 2023***."  Accordingly, by Defendants' own words, Defendant Seendripu ***could not possibly*** have believed, as of June 6, 2023—over a month after Silicon Motion's purported breaches—that the "basic rationale ha[d] not changed" for the Merger, or that MaxLinear's plan was still to consummate the Merger and bring "both companies combined together."  Indeed, further evidencing that it had already long intended to back out of the deal, MaxLinear announced its termination of the Merger just ***ten hours*** after SAMR granted regulatory approval of the deal.  As Green later admitted, MaxLinear did ***not*** decide to terminate the Merger in "***the spur of the moment***" after SAMR approval, but that the decision to terminate was one "***the board undertook over a period of time***" after "***thoughtful consideration***," "***data analysis***," and "***discussion***."

107.    In fact, by the time of the statements, Defendants knew that they no longer wanted to pursue the deal for Silicon Motion, as not only was MaxLinear's business deteriorating, but the financing costs for the transaction had more than doubled due to rising interest rates.  Thus, rather than Silicon Motion being "a very strategic asset" and MaxLinear being "very, very, . . . bullish that [it could] acquire the synergies" expected through the Merger, the exact opposite was true: Defendants knew that none of the synergies would be realized because MaxLinear would terminate the Merger even if SAMR approved it.    Further evidencing that Defendants had no intention of closing the deal, former senior employees of MaxLinear confirmed that MaxLinear had not performed even the most basic and rudimentary integration practices that would be expected of an organization if it was truly intent on completing a pending merger.  To the contrary, these FEs explained that there was not a single integration, checklist, plan, milestone, or action team in place from the time the deal was announced through its termination in July 2023.

108.    On June 28, 2023, MaxLinear filed with the SEC a Form 8-K, which was signed by Defendant Litchfield.  In the Form 8-K, Defendants gave the false impression that MaxLinear remained committed to completing the Merger—including obtaining the necessary regulatory approvals to close the transaction—while omitting the highly material information that the Company had internally concluded that Silicon Motion was in material breach of the Merger Agreement, suffered an MAE, and that MaxLinear would not go through with the deal, stating in part as follows:

> The completion of the Merger is conditioned upon, among other things, the expiration or termination of the waiting period applicable to the consummation of the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act" and, such waiting period, the "HSR Waiting Period").  MaxLinear and Silicon Motion previously filed under the HSR Act, and the HSR Waiting Period expired at 11:59 p.m. ET on June 27, 2022.  ***However, since the Merger was not consummated by June 27, 2023, clearance under the HSR Act has expired, and on June 28, 2023, MaxLinear and Silicon Motion re-filed under the HSR Act.***

109. The statements referenced in ¶108 were materially false and misleading and omitted material information when made. Specifically, the completion of the Merger was not "conditioned upon . . . the expiration or termination of the waiting period applicable to the consummation of the Merger under" the HSR Act, but rather MaxLinear had *already determined* not to go through with the Merger *regardless* of the HSR waiting period. By Defendants' own admission, Defendants failed to disclose that, at the time the Company "re-filed" an application "under the HSR Act," they already had purportedly determined Silicon Motion to be in material breach of the Merger Agreement, rendering the Agreement null and void. Indeed, as an analyst at FBN rhetorically questioned: "if the agreement was not in force as of [May 5, 2023], why did MXL continue to perform under the agreement by refiling HSR on [June 28, 2023?]" Similarly, as an analyst at Wedbush later noted, MaxLinear's "application for [Hart Scott Rodino Act approval] on June 28[th]" had "impl[ied] everything was still on track as of that date."

110. In reality, and as described further above, by the time that Defendants filed the Form 8-K with the SEC, Defendants knew that closing the deal did not make financial sense to MaxLinear and thus they would not consummate the Merger under any circumstances. When SAMR approved the Merger, Defendants implemented their scheme by asserting that Silicon Motion suffered an MAE and committed other material breaches of the Merger Agreement as of May 5, 2023.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

111. As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning the Merger and MaxLinear's intent to close the transaction were materially false and misleading when made. In addition to the allegations set forth above, these particularized facts include the following.

112. *First*, Defendants themselves admitted that they knew they would not close the Merger by the time the Class Period began, and not only did they not

disclose this highly material information, but they reaffirmed, on multiple occasions and in direct response to analyst questions, that they intended to proceed with the Merger.  Indeed, MaxLinear's notice of termination specifically cites a purported failure by Silicon Motion to satisfy certain undisclosed conditions as of *May 5, 2023*, a date *preceding* the start of the Class Period by one full month.  Under the Merger Agreement, the First Extended Outside Date of May 5, 2023 would have "automatically" been extended to August 7, 2023, if the conditions to closing other than regulatory approvals had been accomplished.  However, Defendants' July 26, 2023 termination letter claimed that "the First Extended Outside Date ha[d] passed and was not automatically extended because certain conditions in Article 6 of the Merger Agreement *were not satisfied or waived as of May 5, 2023*."  Thus, Defendants' own public statements in their notice of termination *admit* that whatever condition(s) that purportedly allowed MaxLinear to terminate the Merger were known to Defendants by the start of Class Period.

113.  *Second*, MaxLinear announced its decision to terminate the Merger *just hours* after SAMR granted approval of the Merger.  Indeed, despite waiting fifteen months for SAMR approval and repeatedly assuring investors that MaxLinear was continuing to work toward obtaining SAMR approval by mid-2023, after SAMR granted approval within that exact timeframe, Defendants promptly terminated the Merger *just 10 hours later on that very same day*.  MaxLinear's head of Investor Relations, Leslie Green, admitted on August 1, 2023 that MaxLinear did *not* decide to terminate the Merger in "*the spur of the moment*" after SAMR approval, but that the decision to terminate was one "*the board undertook over a period of time*" after "thoughtful consideration," "data analysis," and "discussion."  Thus, Defendants had already decided against proceeding with the Merger well before SAMR's approval and MaxLinear's public announcement of the termination.

114.  *Third*, despite MaxLinear's attempt to blame the termination on Silicon Motion, MaxLinear never provided Silicon Motion with written notice of Silicon

Motion's purported inability to satisfy any closing conditions, breaches or MAEs. Pursuant to Section 5.7 of the Merger Agreement titled "Certain Notices," MaxLinear was required to provide "***prompt notice***" whenever it became "aware of the occurrence of an event that could prevent or delay beyond the Outside Date (as the same may be extended) the consummation of the Transactions or that would reasonably be expected to result in any of the conditions to the Merger set forth in Article 6 not being satisfied." Thus, Defendants were required to provide Silicon Motion notice once they determined that Silicon Motion suffered an MAE, that closing conditions were not satisfied, or that the First Extended Outside Date was not extended as of May 5, 2023.

115. Similarly, to the extent Silicon Motion was in "material breach of representations, warranties, covenants, and agreements in the Merger Agreement," MaxLinear could only terminate the Merger Agreement after "***deliver[ing] to [Silicon Motion] written notice of such breach***" and providing Silicon Motion with "***at least thirty (30) days***" to cure the breach "***in all material respects***." Silicon Motion has repeatedly and vehemently confirmed that it was never provided with any such notice. Tellingly, MaxLinear has never disputed the fact that it never gave such contractually required notice to Silicon Motion. MaxLinear's failure to provide Silicon Motion with the required prior written notice of the purported breaches, MAEs, and closing condition deficiencies purportedly underpinning the Company's termination of the Merger further demonstrates that Defendants deliberately and intentionally concealed these highly material facts from both SIMO and its investors.

116. *Fourth*, MaxLinear had a strong financial motive to internally terminate the Merger and to wait to disclose its intention to do so pending SAMR's review of the Merger. MaxLinear's costs of financing the acquisition had more than doubled under its loan commitment, as interest rates spiked after the deal was announced in May 2022. The rising interest rate environment meant that MaxLinear was looking

at approximately $250 million a year in borrowing costs, or more, compared to the $110 million a year originally contemplated.

117.   Making matters worse, MaxLinear's financial performance had steadily deteriorated since the announcement of the Merger.  As analysts noted, SAMR's approval came at "the absolute downturn" in MaxLinear's business.  Defendants knew MaxLinear was unlikely to see any significant turnaround in its business anytime soon.   FE 2 described how senior management, including Defendants Seendripu and Litchfield, were informed in September 2022 that MaxLinear was forecasted to see a massive 40% revenue drop in 2023.  However, MaxLinear could not simply terminate and walk away from the Merger Agreement, as any unjustified termination would constitute a "Willful and Material Breach" and subject MaxLinear to uncapped damages or, worse, specific performance—the exact situation MaxLinear wanted to avoid.  Thus, the easiest way for Defendants to guarantee that MaxLinear would not close the deal would be if SAMR either denied approval or delayed its decision beyond the August 7, 2023 Outside Closing Date. If that occurred, MaxLinear could completely avoid the possibility of specific performance, easily walk away from the transaction, and potentially cabin its exposure to the $160 million breakup fee—and possibly significantly less.

118.   The increased cost of the Merger, its delayed timeframe with closing set to occur amid a severe downturn in MaxLinear's business, and the substantial financial consequences attendant to terminating the Merger ahead of SAMR's decision whether or not to approve the deal, provided a strong financial motive for Defendants to mislead investors that MaxLinear remained committed to the Merger, even though Defendants had decided by the start of the Class Period not to proceed with the deal.

119.   *Fifth*, MaxLinear's failure to perform any Merger integration planning for what would be the largest acquisition in Company history strongly corroborates that Defendants knew MaxLinear was not committed to closing the Merger and was,

in fact, abandoning the deal.  Indeed, FE 1 raised this issue with senior executives, including the Company's General Counsel, as early as November 2022.  She continued to ask senior personnel about this "***red flag***" every six weeks thereafter. As FE 1 described, even as of July 18, 2023—just eight days before the Merger was terminated—"***[t]here was no plan and no action team in place***" across the organization, including key departments such as Regulatory Compliance, Finance, Supply Chain/Logistics, and HR.  As an example, FE 1 – who had over twenty five years of experience in global trade, logistics, and regulatory compliance, including direct involvement in numerous M&A transactions – described how over 40% of Silicon Motion's transactions were in Chinese and MaxLinear did not have personnel capable of reviewing them; that Silicon Motion's compliance personnel capable of reviewing and translating the contracts were made available to MaxLinear during a transition period; and that MaxLinear not only declined to follow-up on this overture, the Company ***laid-off*** its top compliance officer (FE 1) just weeks ahead of the August 7, 2023 closing deadline.  MaxLinear's failure to undertake any serious integration efforts as late as July 2023—particularly in light of the Company's growth-by-acquisitions strategy and professed deep experience and history of success integrating acquired companies, and its decision to terminate its Director of Global Compliance without designating any successor—further reinforces that Defendants knew by the start of the Class Period that MaxLinear would not proceed with the deal.

120.  *Sixth*, Silicon Motion's response to MaxLinear's decision to terminate the Merger Agreement, including its repeated and vehement denials of any of MaxLinear's supposed grounds for terminating the deal, and its confirmation that MaxLinear had "never once" provided notice or "ever mention[ed]" any of these supposed grounds "[i]n the 15 months following the signing of the Merger Agreement," further reinforces Defendants' scienter.  In truth, by the start of the Class Period, Defendants had already determined not to proceed with the deal even

if SAMR approved it, but delayed sending any such notice, thereby supporting a cogent and strong inference of Defendants' scienter.

121. *Seventh*, analysts excoriated Defendants for failing to disclose **for months** the extraordinarily material fact that MaxLinear had decided not to go through with the Merger, while **repeatedly** misleading investors that the Company was committed to closing the deal. Analysts seized on the Company's admission that it had determined Silicon Motion was in material breach and suffered an incurable MAE "**as of May 5, 2023**," yet reassured investors that the Company was "very, very bullish" on the Merger and the timeline for closing, and even going so far as to refile the HSR application as late as June 28, 2023. For example, FBN openly called into question Defendants' "**credibility**" for "**describ[ing] the agreement in its releases and filings as still in force**" and "**refil[ing the] HSR [application]**" just weeks before terminating the deal; Wedbush criticized Defendants for not taking "**action … to terminate the deal around May 5th**" and for "**implying everything was still on track**" by refiling the HSR application; and multiple analysts expressed shock at MaxLinear's nearly immediate termination of the Merger "**so closely on the heels of the SAMR approval**," which the market had been led to believe was the "**final roadblock preventing a deal**." What's more, numerous analysts criticized Defendants for concealing its true reason for terminating the deal, with FBN reporting that Defendants' behavior was "**blasphemous**" and multiple analysts noting this was simply a case of "**buyers' remorse**." Analysts' scathing reaction to Defendants' material non-disclosures, rapid-fire termination of the deal after securing regulatory approval, and clear reason for abandoning the deal despite their stated justifications reinforces the strong scienter inference.

122. *Finally*, the multi-billion Merger was to be the largest acquisition, by far, in the Company's history. The Merger was expected to **double** MaxLinear's addressable market, be "immediately and materially accretive" to MaxLinear's

operating income, operating margins, earnings per share, and cash flow, and catapult MaxLinear into a "top-ten fabless semiconductor supplier" in the world.  Further, analysts and investors were hyper-focused on the Merger and whether it would be completed, asked Defendants highly specific questions on these critical topics, and Defendants repeatedly assuaged investor concern in equally specific terms, confirming the Company's commitment to closing the Merger and the expected timeframe.  Moreover, Seendripu was the Chairman of MaxLinear's Board at all relevant times, and therefore, was directly involved in the decision to terminate the deal, which MaxLinear admitted was made after much "thoughtful consideration," "data analysis" and "discussion" that "the Board undertook over a period of time." In these circumstances, it is implausible to suggest that Seendripu, Litchfield, and other members of MaxLinear's executive management team would not know whether the Company intended to proceed with the deal, particularly as late as the June 2023 timeframe.

## VII.    APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

123.   At all relevant times, the market for Silicon Motion ADSs was an efficient market for the following reasons, among others:

   a)   Silicon Motion ADSs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

   b)   According to Silicon Motion's Form 20-F for the fiscal year ended December 31, 2022, Silicon Motion had more than 132 million ordinary shares outstanding as of December 31, 2022, which corresponds with approximately 33 million ADSs;

   c)   As regulated issuers, MaxLinear and Silicon Motion filed periodic public reports with the SEC;

   d)   MaxLinear and Silicon Motion regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the internet, and other wide-ranging public disclosures; and

   e)   Unexpected material news about Silicon Motion was rapidly reflected in and incorporated into the price for Silicon Motion ADSs during the Class Period.

124. As a result of the foregoing, the market for Silicon Motion ADSs promptly digested current information regarding Silicon Motion from publicly available sources and reflected such information in the price of Silicon Motion ADSs. Under these circumstances, all purchasers of Silicon Motion ADSs during the Class Period suffered similar injury through their purchases of Silicon Motion ADSs at artificially inflated prices, and a presumption of reliance applies.

125. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Lead Plaintiffs' claims are based, in significant part, on Defendants' material omissions.

## VIII. LOSS CAUSATION

126. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Silicon Motion ADSs, maintained inflation in the price of Silicon Motion ADSs, and operated as a fraud or deceit on Class Period purchasers of Silicon Motion ADSs by misrepresenting the value of Silicon Motion's business and prospects by concealing MaxLinear's conclusions about the Merger and its decision to terminate the Merger Agreement.

127. Lead Plaintiffs and members of the Class purchased Silicon Motion ADSs at artificially inflated prices during the Class Period. But for Defendants' fraudulent scheme and material misrepresentations and omissions, Lead Plaintiffs and members of the Class would not have purchased Silicon Motion ADSs at artificially inflated prices.

128. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Silicon Motion ADSs fell precipitously as the prior artificial inflation came out of the ADSs' price. The disclosure described below, however, does not necessarily represent an exhaustive list of all stock price declines attributable to Defendants' fraudulent conduct, given that fact and expert

discovery in this case has not yet begun. Lead Plaintiffs expressly reserve the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this case.

129. On July 26, 2023, at 3:10 PM, MaxLinear filed a Form 8-K accompanied by a press release which revealed that MaxLinear was terminating the Merger Agreement, less than ten hours after SAMR had provided its authorization for the Merger, and all other regulatory approvals required to close the deal had been obtained.

130. On this news, the price of Silicon Motion ADS plunged from an intra-day high of $95.33 per ADS on July 26, 2023, to close at just $65.35 per ADS on July 26, 2023, representing a decline of 31% or $29.98 per ADS, on unprecedented trading volume of 17,771,620 ADSs. The price of Silicon Motion ADSs continued to fall when the market opened the next day, declining an additional $12.84 to close at just $52.51 per ADS on July 27, 2023, on significant trading volume of 9,116,569 ADSs, and representing a two-day[6] decline of over 44% or nearly $43 per ADS from the July 26 intra-day high.

131. As a result of their purchases of Silicon Motion ADSs during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

132. The statutory safe harbor or bespeaks caution doctrine applicable to forward looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may

---

[6] Measured from the $95.33 per ADS market high on July 26, 2023.

1    be characterized as forward-looking, they were not adequately identified as forward-
2    looking statements when made, and there were no meaningful cautionary statements
3    identifying important facts that could cause actual results to differ materially from
4    those in the purportedly forward-looking statements.

5        133.   To the extent that the statutory safe harbor does apply to any forward-
6    looking statements pleaded herein, Defendants are liable for those false forward-
7    looking statements because at the time each of those forward-looking statements was
8    made, each of these Defendants had actual knowledge that the particular forward-
9    looking statement was materially false or misleading.  Defendants are liable for the
10   statements pleaded because, at the time each of those statements was made,
11   Defendants knew the statement was false, and the statement was authorized and/or
12   approved by an executive officer and/or director of MaxLinear who knew that such
13   statement was false when made.

14   **X.    CLASS ACTION ALLEGATIONS**

15       134.   Lead Plaintiffs bring this action as a class action pursuant to Federal
16   Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all
17   purchasers of Silicon Motion ADSs during the Class Period (the "Class").  Excluded
18   from the Class are Defendants, the officers and directors of MaxLinear and Silicon
19   Motion, at all relevant times, members of their immediate families, and their legal
20   representatives, heirs, successors or assigns, and any entity in which Defendants
21   have or had a controlling interest.

22       135.   The members of the Class are so numerous that joinder of all members
23   is impracticable.  Throughout the Class Period, Silicon Motion ADSs were actively
24   traded on the NASDAQ.  While the exact number of Class members is unknown to
25   Lead Plaintiffs at this time and can only be ascertained through appropriate
26   discovery, Lead Plaintiffs believe that there could be hundreds or thousands of
27   members in the proposed Class.  Record owners and other members of the Class
28   may be identified from records maintained by Silicon Motion or its transfer agent or

the depository bank for the ADSs and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

136.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful statements and conduct in violation of federal law that is complained of herein.

137.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

138.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

   a)  whether the Exchange Act was violated by Defendants as alleged herein;

   b)  whether statements made by Defendants misrepresented material facts about the business, operations, and prospects of Silicon Motion;

   c)  whether Defendants acted with scienter; and to what extent the members of the Class have sustained damages and the proper measure of damages.

139.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

# XI.    CLAIMS FOR RELIEF

<u>COUNT I</u>

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
Against All Defendants**

140.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

141.    This Count is asserted on behalf of all members of the Class against Defendants MaxLinear, Seendripu, and Litchfield for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

142.    During the Class Period, Defendants carried out a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Silicon Motion ADSs; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Silicon Motion ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

143.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases, conferences with analysts and investors,

and other documents and statements described above, including statements made to securities analysts and the media that were designed to influence the market for Silicon Motion securities. Such reports, filings, releases, and statements were materially false or misleading in that they failed to disclose material adverse information and misrepresented the truth about MaxLinear's business and operations, including without limitation its commitment to acquiring Silicon Motion and consummating the Merger.

144.   Defendants are also liable for engaging in deceptive and manipulative acts in a scheme to defraud investors. As part of their scheme to defraud investors, Defendants directed MaxLinear to apply for regulatory approval of the Merger, including with Chinese and U.S. authorities, despite knowing that MaxLinear was not committed to and would not consummate the Merger, including filing a Form 8-K with the SEC disclosing that "MaxLinear and Silicon Motion re-filed under the HSR Act."

145.   During the Class Period, Defendants made or were responsible for the materially false and misleading statements and omissions alleged herein, which they knew or severely recklessly disregarded to be materially false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

146.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Silicon Motion ADSs during the Class Period.

147. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Silicon Motion ADSs, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, MaxLinear's business, operations and commitment to the Merger; (ii) artificially inflate and maintain the market price of Silicon Motion ADSs; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase Silicon Motion ADSs at artificially inflated prices, and to suffer losses when the true facts became known.

148. Defendants MaxLinear, Seendripu and Litchfield are liable for all materially false or misleading statements made during the Class Period, as alleged above in § V.

149. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with the intent to deceive, manipulate or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers of Silicon Motion ADSs, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

150. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Silicon Motion ADSs, which inflation was removed from its price when the true facts

became known. Lead Plaintiffs and the Class would not have purchased Silicon Motion ADSs at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements and fraudulent course of conduct.

151.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Silicon Motion ADSs during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

152.  Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

153.  This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

154.  Defendants Seendripu and Litchfield were and acted as controlling persons of MaxLinear within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance and intentions regarding the Silicon Motion Merger, Defendants Seendripu and Litchfield had the power to influence and control, and did actually influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are materially false or misleading. Each of Defendants Seendripu and Litchfield was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other

statements alleged by Lead Plaintiffs to be materially false or misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

155.   As senior corporate officers and/or directors of the Company, and as more fully described above, Defendants Seendripu and Litchfield had direct involvement in the day-to-day operations of the Company. Defendants Seendripu and Litchfield signed the Company's SEC filings during the Class Period and were directly involved in providing false information and certifying and approving the false statements disseminated by MaxLinear during the Class Period. As a result of the foregoing, Defendants Seendripu and Litchfield as a group, and individually, were controlling persons of MaxLinear within the meaning of Section 20(a) of the Exchange Act.

156.   As set forth above, MaxLinear violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.

157.   By virtue of their controlling positions of MaxLinear and as a result of their own aforementioned conduct, Defendants Seendripu and Litchfield are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as MaxLinear is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Silicon Motion ADSs. Moreover, as detailed above, each of the Individual Defendants culpably participated in the material misstatements and omissions alleged herein.

158.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Silicon Motion ADSs during the Class Period.

## XII.  PRAYER FOR RELIEF

159.  WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

a) Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Lead Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as deemed appropriate by the Court.

## XIII.  JURY DEMAND

160.  Lead Plaintiffs demand a trial by jury on all issues so triable.

DATED:  February 15, 2024          Respectfully submitted,

**SAXENA WHITE P.A.**

/s/ *David R. Kaplan*

David R. Kaplan (SBN 230144)
Emily Bishop (SBN 319383)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice* forthcoming)
David J. Schwartz (*pro hac vice* forthcoming)
Joshua H. Saltzman (*pro hac vice* forthcoming)
10 Bank Street, Suite 882

1    White Plains, NY 10606
2    Tel.: (914) 437-8551
     Fax: (888) 216-2220
3    ssinger@saxenawhite.com
     dschwartz@saxenawhite.com
4    jsaltzman@saxenawhite.com
5
     -and-
6
7    Joseph E. White, III (*pro hac vice*
     forthcoming)
8    Lester R. Hooker (SBN 241590)
9    Jonathan D. Lamet (*pro hac vice* forthcoming)
10   7777 Glades Road, Suite 300
     Boca Raton, FL 33434
11   Tel.: (561) 394-3399
     Fax: (561) 394-3382
12   jwhite@saxenawhite.com
13   lhooker@saxenawhite.com
     jlamet@saxenawhite.com
14
15   **ENTWISTLE & CAPPUCCI LLP**
16   Vincent R. Cappucci (*pro hac vice*)
     Andrew J. Entwistle (*pro hac vice*)
17   Robert N. Cappucci (*pro hac vice*)
18   Jonathan H. Beemer (*pro hac vice*
     forthcoming)
19   Jessica A. Margulis (*pro hac vice* forthcoming)
20   230 Park Avenue, 3rd Floor
     New York, NY 10169
21   Tel.: (212) 894-7200
22   vcappucci@entwistle-law.com
     aentwisstle@entwistle-law.com
23   rcappucci@entwistle-law.com
     jbeemer@entwistle-law.com
24   jmargulis@entwistle-law.com
25
     *Counsel for Lead Plaintiffs and Lead Counsel*
26   *for the Class*
27
28