SAXENA WHITE P.A.
David R. Kaplan (SBN 230144)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com

ENTWISTLE & CAPPUCCI LLP
Vincent R. Cappucci
(*pro hac vice*)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

*[Additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WATER ISLAND EVENT-DRIVEN FUND, on Behalf of Itself and All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    vs.<br><br>MAXLINEAR, INC., KISHORE SEENDRIPU, STEVEN LITCHFIELD, SILICON MOTION TECHNOLOGY CORPORATION, WALLACE KOU and RIYADH LAI,<br><br>                    Defendants. | Case No. 3:23-cv-01607-CAB-VET<br><br>CLASS ACTION<br><br>AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ........................................................................ 2

II.    JURISDICTION AND VENUE .................................................................... 11

III.   PARTIES ........................................................................................................ 11

IV.    OVERVIEW OF THE FRAUD .................................................................... 17

       A.    MaxLinear's Business And Growth-By-Acquisitions Strategy ........ 19

       B.    Silicon Motion's Business and Growth Strategy ............................... 20

       C.    MaxLinear and Silicon Motion Jointly Announce A
             "Transformative" $3.8 Billion Acquisition of Silicon Motion .......... 21

       D.    The Merger Agreement Required Joint Approval of Merger
             Related Updates by Both MaxLinear and Silicon Motion ................ 25

       E.    MaxLinear and Silicon Motion Issue the Joint Proxy
             Statement/Prospectus ...................................................................... 26

       F.    The Market Understood That The Only Remaining Condition
             Facing The Merger's Completion Was Whether The Parties
             Would Gain Regulatory Approval Of The Deal By SAMR ............. 28

       G.    The Merger Agreement Further Provided That MaxLinear
             Could Not Simply Walk Away From The Deal ................................. 31

       H.    MaxLinear Repeatedly Assured Silicon Motion Investors That
             It Was Committed To The Merger And Regulatory Approval
             For The Deal Was On Track .............................................................. 33

       I.    The MaxLinear Defendants Falsely Assured Investors That
             Silicon Motion Was A *Strategic Asset* Even Though
             MaxLinear Had Determined an MAE and Other Financial
             Issues Existed Which Would Cause it to Abandon the Merger ......... 35

       J.    Silicon Motion Made Materially False and Misleading
             Statements and Omissions of Material Facts During the Class
             Period ................................................................................................ 41

       K.    Directly Contradicting Their Repeated Public Representations
             to Silicon Motion Investors, The MaxLinear Defendants Had
             Determined By No Later Than May 5, 2023 That Silicon
             Motion's MAE And Other Material Breaches, As Well As
             MaxLinear's Own Change In Circumstances, Negatively
             Impacted The Merger ........................................................................ 42

       L.    The Truth is Revealed: SAMR Approves The Merger, And Just
             Hours Later, MaxLinear Publicly Terminates The Deal,
             Causing Silicon Motion ADSs To Lose Nearly Half Their
             Value ................................................................................................. 46

i

M.   The Accounts Of Multiple High-Ranking Former Employees Of MaxLinear Confirm That During the Class Period, the MaxLinear Defendants Had No Intention Of Closing The Merger, And Had Determined To Simply "Walk Away" From The Transaction ................................................................. 49

N.   Subsequent Developments Confirm The Fraud ............................... 55

V.   THE MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 56

VI.   ADDITIONAL SCIENTER ALLEGATIONS ............................................. 64

VII.   APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ................................................................................................. 70

VIII.   LOSS CAUSATION ..................................................................................... 71

IX.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE .................................................. 72

X.   CLASS ACTION ALLEGATIONS .............................................................. 73

XI.   CLAIMS FOR RELIEF ............................................................................... 74

COUNT I For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5  Against All Defendants ................................................................. 74

COUNT II For Violation of §20(a) of the Exchange Act  Against the Silicon Motion Individual Defendants and MaxLinear Individual Defendants ................................................................................................. 78

XII.   PRAYER FOR RELIEF ............................................................................... 80

XIII.   JURY DEMAND ........................................................................................... 81

1    Lead Plaintiffs the Westchester Funds, the Alpine Funds, the Atlas Fund and
2  the Kryger Funds (collectively, "Lead Plaintiffs"), by their undersigned counsel,
3  bring this action ("Action") for violations of Sections 10(b) and 20(a) of the
4  Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a),
5  and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §
6  240.10b-5, against MaxLinear, Inc. ("MaxLinear" or "MXL"), Kishore Seendripu
7  ("Seendripu") and Steven Litchfield ("Litchfield") (collectively, the "MaxLinear
8  Defendants"), as well as Silicon Motion Technology Corporation ("Silicon Motion,"
9  "SIMO," or "Company"), Wallace Kou ("Kou") and Riyadh Lai ("Lai")
10 (collectively, the "Silicon Motion Defendants," and together with the MaxLinear
11 Defendants, "Defendants").  Lead Plaintiffs bring these claims on behalf of a class
12 of investors who purchased or otherwise acquired the American Depositary Shares
13 ("ADSs") of Silicon Motion from May 5, 2023 through July 26, 2023, inclusive (the
14 "Class Period") and were damaged thereby (collectively, the "Class").

15    Lead Plaintiffs allege the following based upon personal knowledge as to
16 themselves and their own acts, and upon information and belief as to all other matters
17 based on the investigation conducted by and through counsel, which included,
18 among other things, review and analysis of: (a) MaxLinear's and Silicon Motion's
19 public filings with the SEC; (b) company press releases, reports and postings on
20 MaxLinear's and Silicon Motion's websites; (c) investor communications,
21 conference calls and investor presentations by MaxLinear and Silicon Motion; (d)
22 research reports concerning MaxLinear and Silicon Motion by securities, financial
23 and semiconductor industry analysts; (e) news articles and media reports concerning
24 MaxLinear and Silicon Motion, including their failed merger (the "Merger"); (f) data
25 reflecting the prices of MaxLinear's and Silicon Motion's equity securities; (g)
26 interviews with former MaxLinear employees; (h) consultation with financial
27 experts; and (i) additional material and data concerning Defendants and the global
28 semiconductor markets.

Lead Plaintiffs' investigation is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this amended complaint (the "Amended Complaint") after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This is a securities class action in which MaxLinear, a United States-based provider of microchips for the telecom industry, and Silicon Motion, a Hong Kong-based developer of digital data storage technology, made a series of material misstatements and omissions of material facts directly to Silicon Motion securityholders about Silicon Motion, the acquisition of Silicon Motion securities by MaxLinear in the subject Merger and MaxLinear's commitment to the transaction. Specifically, on May 5, 2022, MaxLinear and Silicon Motion announced a "transformative" Merger whereby MaxLinear would acquire Silicon Motion for $3.8 billion in stock and cash. Under the terms of the Merger, holders of Silicon Motion ADSs would receive 0.388 shares of MaxLinear common stock for each Silicon Motion ADS plus $93.54 in cash per ADS.

2. At the time of the announcement, the Merger consideration represented a nearly 50% premium for Silicon Motion securityholders. Defendants emphasized that the combined company would have a "highly diversified technology platform with strong positions across the broadband, connectivity, infrastructure, and storage end markets." According to Defendants, the Merger would catapult the combined entity into the upper echelons of the semiconductor supply industry, increasing the "total addressable market opportunity to $15 billion."

3. Analysts covering Silicon Motion were enthusiastic about the deal. J.P. Morgan reported on May 6, 2022, that the "combination could help SIMO break into enterprise SSD controller markets more easily, securing some continuation of long term growth." Roth MKM opined that "MXL can leverage its larger corporate and

customer footprint to drive broader adoption of SIMO's enterprise storage products in particular."  Analysts at investment banking firm Craig-Hallum also stated on May 5, 2022, that Silicon Motion "is an attractive acquisition target" and noted that certain deal terms were "not overly aggressive" and could provide the basis for a potential "bidding war" further driving up the price of Silicon Motion's ADSs.

4.      Silicon Motion and MaxLinear executed an Agreement and Plan of Merger on May 5, 2022, that governed the transaction (the "Merger Agreement"). Significantly, under the express terms of the Merger Agreement, both MaxLinear and Silicon Motion were responsible for and were required to approve each other's public statements regarding the status of the Merger.  Accordingly, the statements made by MaxLinear and Silicon Motion during the Class Period were effectively joint statements by both parties to Silicon Motion and MaxLinear securityholders.

5.      During the Class Period, MaxLinear and Silicon Motion regularly provided Silicon Motion investors with details concerning Silicon Motion, its securities and the Merger through SEC filings, including the Joint Proxy Statement/Prospectus of MaxLinear and Silicon Motion, dated July 13, 2022 ("Joint Proxy Statement/Prospectus").  The Joint Proxy Statement/Prospectus was part of a registration statement filed on July 11, 2022 on SEC Form S-4 by MaxLinear pursuant to the Securities Act of 1933 ("Securities Act"), "with respect to the [MaxLinear] shares ***to be issued to [Silicon Motion] securityholders*** pursuant to the Merger Agreement" in exchange for their Silicon Motion securities.[1]  The Joint Proxy Statement/Prospectus was also issued by Silicon Motion and used to solicit votes from Silicon Motion securityholders regarding the Merger.

6.      MaxLinear also directly communicated updates about Silicon Motion, Silicon Motion securities and the Merger to Silicon Motion securityholders through statutorily-required SEC Forms 425 before and during the Class Period.  The Forms

---

[1] All emphasis herein is added unless otherwise noted.

425 were filed pursuant to Rule 425 (17 C.F.R. § 230.425) under the Securities Act, which requires companies engaged in mergers or other business combinations to file regular communications with the SEC about the subject companies and the status of the transaction.  MaxLinear's Merger-related statements in the Forms 425 were plainly and explicitly directed to Silicon Motion securityholders and were about Silicon Motion and its securities, including the ADSs at issue in this Action.

7.    Indeed, the Forms 425 contained a cover page or legend on the face of the filing (i) expressly identified Silicon Motion in bold as the "**Subject Company**" of the Form 425; (ii) expressly listed Silicon Motion's SEC file number in bold further identifying it as the "**Subject Company**" of the Form 425; (iii) were included in Silicon Motion's own SEC filings and posted on the Electronic Data Gathering, Analysis and Retrieval ("EDGAR") database maintained by the SEC regarding Silicon Motion and made available to Silicon Motion securityholders; (iv) explicitly stated that the Form 425 "relate[d] to the Merger" between Silicon Motion and MaxLinear; and (v) "URGE[D]" Silicon Motion securityholders in all capital letters to read the Joint Proxy Statement/Prospectus issued by MaxLinear and Silicon Motion as well as *other documents provided to Silicon Motion securityholders* filed with the SEC, *including all other Class Period MaxLinear Forms 425 and the statements therein*.[2]  The content of certain of the Forms 425 was also posted on Silicon Motion's website during the Class Period for its investors' review.

8.    Through these SEC filings, Defendants repeatedly represented to Silicon Motion investors that (i) Defendants had provided Silicon Motion investors with all material information concerning Silicon Motion's financial condition and securities in connection with the Merger; (ii) MaxLinear was fully committed to the transaction; and (iii) as soon as approval was obtained from the State Administration

---

[2] Copies of relevant Forms 425 are attached as Exhibits 1-3 hereto, which include the following: (i) the Form 425 filed on April 27, 2023; (ii) the Form 425 filed on June 7, 2023; and (iii) the Form 425 / Form 8-K filed on June 28, 2023.

for Market Regulation ("SAMR")—China's main antitrust regulator—the Merger would close.  Accordingly, Silicon Motion securityholders were laser focused on whether SAMR would grant approval of the Merger—a concern that only heightened as U.S.-China trade relations deteriorated in late 2022 and early 2023— and SAMR's review of the Merger sat pending for nearly a year.

9.    During the Class Period, Defendants continued to tout to Silicon Motion securityholders the purported quality of the Company as an acquisition target, the synergies of the two companies and other purported benefits of the Merger, emphasizing that the transaction would be completed once SAMR approved the deal.  For example, on June 6, 2023, at a large and important investor conference held by Stifel, Nicolaus & Company, Inc. ("Stifel" or the "Stifel Conference"), MaxLinear's CEO—Defendant Seendripu—described to Silicon Motion securityholders and others in the market the purported value and performance of Silicon Motion—which he labeled a "strategic asset"—based upon its analysis of Silicon Motion's financials, and MaxLinear's commitment to consummating its acquisition of Silicon Motion.  Specifically, during the Stifel Conference, Seendripu stated during a "fireside chat" that Silicon Motion remained "***a very strategic asset for [MaxLinear];***" "***the basic rationale [for the Merger] has not changed at all;***" and MaxLinear was still "***very, very, . . . bullish***" that the Merger would provide all of the "***synergies that we told you all about***."  Significantly, MaxLinear made clear that these statements were about Silicon Motion, as it provided these statements directly to Silicon Motion investors through a Form 425 that, as discussed above, expressly identified Silicon Motion as the "Subject Company" to which the statements referred, and which MaxLinear explicitly "urged" Silicon Motion securityholders to review.

10.    As late as June 28, 2023, MaxLinear continued to issue statements about the combination of the companies and the closing of the Merger, filing a Form 8-K and Form 425 about Silicon Motion and directed to Silicon Motion

securityholders that reaffirmed MaxLinear and Silicon Motion were taking affirmative steps to obtain necessary regulatory approval for the Merger. Silicon Motion also filed an SEC Form 6-K containing the same information. Specifically, Defendants announced that MaxLinear and Silicon Motion had refiled their application for U.S. antitrust approval under the Hart-Scott-Rodino Antitrust Improvements Act (the "HSR Act") since the Merger had not yet been consummated and "clearance under the HSR Act has expired"—which, again, reassured Silicon Motion securityholders that both companies were fully committed to completing the deal, subject only to HSR and SAMR approval.

11.     MaxLinear's statements to Silicon Motion investors were utterly false. As MaxLinear has now admitted, by no later than May 5, 2023—nearly three months before it publicly terminated the Merger—MaxLinear determined that Silicon Motion had suffered an incurable material adverse effect ("MAE") and other material breaches under the terms of the Merger Agreement. Indeed, it is now clear that, by May 5, 2023, MaxLinear was searching for a reason to abandon the Merger because (a) Silicon Motion's MAE, material breaches and related financial issues rendered Silicon Motion an undesirable acquisition target; (b) the significant decline in MaxLinear's financial performance, forecast and stock price following the announcement of the Merger negatively impacted MaxLinear's ability to afford the deal; and (c) changing macroeconomic conditions during the Class Period negatively impacted the closing of the Merger, including a downturn in the semiconductor market and soaring interest rates that dramatically increased the $3.1 billion cash component of the deal.

12.     Although the MaxLinear Defendants were aware that Silicon Motion had experienced an MAE and committed other material breaches by May 5, 2023, they did not want to terminate the Merger at that time because doing so would subject MaxLinear to litigation, with the risk of facing express remedies under the Merger Agreement including specific performance—*i.e.,* being forced to go through with

the deal that they no longer wanted—plus uncapped money damages.  If, however, SAMR denied approval, or delayed its decision past the Merger Agreement's deadline, as MaxLinear hoped and expected, MaxLinear had an "easy out" and could not be forced to complete the transaction.  So, rather than disclose the MAE and Silicon Motion's other material breaches, the MaxLinear Defendants decided to hold their determination of these issues preventing closing in their "back pocket" as an alternative method of terminating the transaction in the event SAMR greenlighted the deal.  As MaxLinear's Investor Relations point person, Leslie Green ("Green"), candidly admitted during an August 2023 interview, the MaxLinear Defendants determined well before SAMR made its final decision that MaxLinear would abandon the deal, after much "***thoughtful consideration***," "***data analysis***" and "***discussion***" that "***the board undertook over a period of time***."

13.    In addition to the MaxLinear Defendants' own admissions, multiple high-ranking former employees of MaxLinear have confirmed that it had decided to "***walk away***" from the deal due to changed circumstances during the Class Period. These former employees,[3] which include MaxLinear's former Director of Global Trade Compliance and its former Director of Product Marketing, have also made clear that, among other things, ***as late as mid-July 2023***, MaxLinear had not taken even the most basic and rudimentary steps to prepare for a Merger of the two companies—an impending multi-billion-dollar transaction that was to be the largest acquisition in MaxLinear's history.  These senior FEs reported that, contrary to standard industry practice, MaxLinear did not have any checklists, plans or milestones prepared for the Merger; indeed, "***there was no definitive action plan or timeline***" and there was "***no action team in place***" for integrating Silicon Motion.

---

[3] The terms "Former Employees" and "FE" refer to the former employees of MaxLinear whose reports are discussed in this Amended Complaint.  In order to preserve the Former Employees' anonymity while maintaining readability, the Amended Complaint uses the pronouns "she," "her" and "hers" in connection with all of the Former Employees, regardless of their gender.

These deficiencies were a clear "***red flag***" regarding MaxLinear's intentions with respect to the Merger and were "***very bothersome***" because the concerns had been repeatedly raised with MaxLinear's senior executives, including its General Counsel, ***for months***.

14.    Moreover, the Silicon Motion Defendants for their part made material misstatements and omitted material facts concerning the existence of an MAE and Silicon Motion's material breaches of the Merger Agreement when making statements to Silicon Motion investors.  For example, in its SEC Form 6-K and attached press release filed on May 5, 2023, Silicon Motion falsely assured its ADS holders that the Merger was on track.  Silicon Motion's press release stated that "[d]espite today's difficult operating environment, we are working hard with our customers and our manufacturing partners to continue delivering cost effective, high-performance, differentiated solutions that will enable us to maintain our leadership in the storage controller market.  We are confident that we have the right customers, strong design win momentum and are taking necessary steps to ensure the long-term growth of our revenue and profitability."  The Silicon Motion Defendants further stated that Silicon Motion was proceeding with the Merger, and the transaction was merely "pending satisfaction of customary closing conditions, including antitrust approval" from SAMR.

15.    Both statements omitted the extraordinarily material fact that Silicon Motion had experienced an MAE by that date that would prevent the Merger from closing.  While Silicon Motion contended that the closing of the Merger was only subject to customary closing conditions, including antitrust approval, it failed to notify its securityholders that an MAE and other material breaches of the Merger Agreement existed, and that MaxLinear had stopped all integration and transition efforts, constituting enormous red flags that clearly indicated to the Silicon Motion Defendants that the Merger was in peril.  Having spoken to identify a single risk to closing, Silicon Motion was obligated to identify these additional material facts to

its investors. Moreover, having the right and obligation to review MaxLinear's statements made to Silicon Motion investors through Rule 425 filings and otherwise, Silicon Motion could not hide its head in the sand knowing the statements MaxLinear was making to Silicon Motion investors were materially false and misleading. Silicon Motion also had a duty to update its prior statements as to the existence of the MAE, other material breaches of the Merger Agreement and MaxLinear's failure to proceed with even basic integration procedures for merging the companies. Silicon Motion thus violated the federal securities laws by failing to update its securityholders accordingly.

16.    The truth was disclosed through a remarkable turn of events on July 26, 2023. Before the market opened that day, SAMR approved the Merger, thereby paving the way for the deal to close. Given Defendants' repeated statements affirming their commitment to closing the Merger and that the Merger was on track, investors flooded the market on unusually high trading volume, causing the price of Silicon Motion ADSs to surge by over 82% from the prior day's close of $52.20 to an intraday high of $95.33, as analysts widely concluded that the transaction would be completed before the upcoming August 7, 2023 deal deadline. However, at 3:10 PM the very same day—less than ten hours after SAMR approved the Merger—MaxLinear stunned the market by publicly ***terminating*** the deal. MaxLinear informed the market of its decision in a terse press release which made clear that Silicon Motion had been in material breach of the Agreement ***as of May 5, 2023***, stating that "certain conditions in Article 6 of the Merger Agreement were not satisfied or waived," and therefore the Merger Agreement was wholly ineffective as of that date.

17.    MaxLinear's unexpected announcement caused the immediate collapse of the price of Silicon Motion's ADSs, which fell from an intra-day high of $95.33 on July 26, 2023 to a close of just $65.35 per ADS—***a decline of nearly $30 per ADS in less than one hour, on unprecedented trading volume of 17,771,620 ADSs***.

The next day, Silicon Motion's ADS price continued its freefall, declining an additional $12.84 per ADS, on significant trading volume of 9,116,569 ADSs, to close at just $52.51 on July 27, 2023—a two-day drop of over ***44%***, or nearly ***$43 per ADS*** from the July 26 intra-day high.

18.    Analysts excoriated MaxLinear for terminating the deal given its Class Period statements assuaging investors that the Merger would close upon obtaining regulatory approval.  For example, in a July 27, 2023 report, Wedbush analysts highlighted the highly suspicious "***timing of the announcement (post the resolution of a final roadblock preventing a deal), the lack of any prior apparent action by MXL to terminate the deal around May 5th (the first extended outside date)***, *and in particular the two companies' application for HSR on June 28th (implying everything was still on track as of that date*)."

19.    FBN Securities ("FBN") also openly called into question Defendants' "***credibility***" for "***describ[ing] the agreement in its releases and filings as still in force***" and "***refil[ing the] HSR [application]***" just weeks before terminating the deal.  Similarly, Wedbush criticized Defendants for not taking "***action … to terminate the deal around May 5th***" and for "***implying everything was still on track***" by refiling the HSR application.  Multiple analysts also expressed shock at MaxLinear's nearly immediate termination of the Merger "***so closely on the heels of the SAMR approval***," which the market had been led to believe was the "***final roadblock preventing a deal***."

20.    On October 5, 2023, Silicon Motion filed an arbitration claim in the Singapore International Arbitration Centre ("SIAC").  Thereafter, on April 30, 2024, it was disclosed to Silicon Motion securityholders that MaxLinear had filed a defense in the arbitration on November 20, 2023, asserting that Silicon Motion had breached the Merger Agreement because its business "sustained a material adverse effect and it failed to operate its business in the ordinary course."  Silicon Motion further disclosed ***for the first time*** that MaxLinear had asserted a ***claim for fraud***

- 10 -

against Silicon Motion, stating that the "projections that [MaxLinear] was provided [by Silicon Motion] prior to entering the Merger Agreement *were inflated*."

21.    As a result of Defendants' material misstatements and omissions of material facts, Silicon Motion investors purchasing ADSs during the Class Period suffered substantial losses.  This Action seeks redress on their behalf.

## II.    JURISDICTION AND VENUE

22.    Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

23.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because MaxLinear and Silicon Motion conduct business and/or reside in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

24.    In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiffs

25.    Lead Plaintiff "Westchester Funds" are six related private investment funds: JNL/Westchester Capital Event Driven Fund; The Merger Fund®; The Merger Fund® VL; Virtus Westchester Event-Driven Fund, a series of Virtus Event Opportunities Trust; Westchester Capital Master Trust; and The Westchester Merger Arbitrage Strategy Sleeve of the JNL Multi-Manager Alternative Fund.

26.    Lead Plaintiff "Alpine Funds" are nine related private investment funds: Alpine Associates, A Limited Partnership; Alpine Dedicated, L.P.; Alpine Heritage II, L.P.; Alpine Heritage Japan Trust; Alpine Heritage Offshore Fund Ltd.; Alpine Heritage, L.P.; Alpine Institutional, L.P.; Alpine Merger Growth, L.P.; and Alpine Partners, L.P.

27.    Lead Plaintiff "Atlas Fund" is Atlas Diversified Master Fund, Ltd., a private investment fund.

28.    Lead Plaintiff "Kryger Funds" are two related private investment funds: Kryger Capital Ltd. – Event Fund, and Kryger Capital Ltd. – Enhanced Fund.

29.    The Westchester Funds, the Alpine Funds, the Atlas Fund, and the Kryger Funds are collectively referred to herein as "Lead Plaintiffs." As set forth in the previously filed certifications in this Action (ECF No. 15-3), and the updated certifications, Lead Plaintiffs purchased Silicon Motion ADSs during the Class Period and have been damaged thereby.

**B.    Defendants**

30.    Defendant MaxLinear is a Delaware corporation with its principal executive offices located in Carlsbad, California. MaxLinear common stock is listed and publicly traded on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MXL." MaxLinear is a provider of radio frequency ("RF"), analog, and mixed-signal integrated circuits – sometimes referred to as chips, microchips, or semiconductors – for the connected home, wired and wireless communications infrastructure, and industrial and multi-market applications.

31.    Defendant Kishore Seendripu is a co-founder of MaxLinear and has served as its Chairman, President, and Chief Executive Officer since MaxLinear's inception in 2003. Seendripu is also a member of MaxLinear's Board of Directors (the "MXL Board"). Seendripu made, approved, or adopted false statements that caused or maintained artificial inflation in the price of Silicon Motion's ADSs,

including statements at the Stifel Cross Sector Insight Conference held on June 6, 2023, and in a Form 8-K filed by MaxLinear on June 28, 2023 that he approved.

32.     Defendant Steven Litchfield has served as Chief Financial Officer and Chief Corporate Strategy Officer of MaxLinear since July 2018.  Litchfield made, approved, or adopted false statements that caused or maintained artificial inflation in the price of Silicon Motion's ADSs, including statements in a Form 8-K filed by MaxLinear on June 28, 2023 that he signed.

33.     Defendants referenced above in ¶¶ 31 to 32 are referred to herein as the "MaxLinear Individual Defendants."

34.     During the Class Period, the MaxLinear Individual Defendants, as senior executive officers and/or directors of MaxLinear, were privy to confidential, proprietary and material adverse non-public information concerning MaxLinear and Silicon Motion, and their operations, finances, financial condition and present and future business prospects, including in relation to the proposed Merger, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or MXL Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the MaxLinear Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

35.     The MaxLinear Individual Defendants are liable as direct participants in the wrongs complained of herein.   In addition, the MaxLinear Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause MaxLinear to engage in the unlawful conduct complained of herein.  Because of their positions of control, the MaxLinear

1  Individual Defendants were able to and did, directly or indirectly, control the
2  conduct of MaxLinear's business.

3      36.   The MaxLinear Individual Defendants, because of their positions with
4  MaxLinear, controlled and/or possessed the authority to control the contents of its
5  reports, press releases, and presentations to securities analysts, and through them, to
6  the investing public.  The misrepresentations alleged herein were disseminated to
7  the public, including Silicon Motion investors, in a medium upon which a reasonable
8  investor would rely, and were material when disseminated.  The MaxLinear
9  Individual Defendants were provided with copies of MaxLinear's reports and
10 publicly disseminated documents, and certain Silicon Motion public statements,
11 alleged herein to be misleading, prior to or shortly after their issuance and had the
12 ability and opportunity to prevent their issuance or cause them to be corrected.  Thus,
13 the MaxLinear Individual Defendants had the opportunity to commit the fraudulent
14 acts alleged herein.

15     37.   As senior executive officers and/or directors and as controlling persons
16 of a publicly traded company whose securities were, and are, registered with the
17 SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed
18 by the federal securities laws, the MaxLinear Individual Defendants had a duty to
19 disseminate promptly accurate and truthful information with respect to MaxLinear's
20 financial condition and performance, growth, operations, financial statements,
21 business, products, markets, management, earnings, present and future business
22 prospects, and information regarding the Merger with Silicon Motion to correct any
23 previously issued statements that had become materially misleading or untrue.  The
24 MaxLinear Individual Defendants' misrepresentations and omissions during the
25 Class Period violated these specific requirements and obligations.

26     38.   Silicon Motion is a Cayman Islands company with its global
27 headquarters in Hong Kong.  Silicon Motion was founded in Silicon Valley,
28 California in 1995, and currently operates in Taiwan, the United States, Korea,

China, Malaysia, Singapore and other locations internationally. Its ADSs are listed and traded on the NASDAQ under the ticker symbol "SIMO," with each ADS representing four ordinary shares of Silicon Motion.

39.    Defendant Wallace Kou is the founder of Silicon Motion and has served as its President and Chief Executive Officer since 1995. Mr. Kou is also a member of the Silicon Motion Board of Directors. Kou made, approved, or adopted false statements during the Class Period that caused or maintained artificial inflation in the price of Silicon Motion's ADSs, including statements in the May 5, 2023 Form 6-K and attached press release, the June 28, 2023 Form 6-K, and the July 6, 2023 Form 6-K and press release.

40.    Defendant Riyadh Lai served as Silicon Motion's Chief Financial Officer during the Class Period. Lai made, approved, or adopted false statements during the Class Period that caused or maintained artificial inflation in the price of Silicon Motion's ADSs, including statements in the May 5, 2023 Form 6-K and attached press release, the June 28, 2023 Form 6-K, and the July 6, 2023 Form 6-K and press release.

41.    Defendants referenced above in ¶¶ 39 and 40 are referred to herein as the "Silicon Motion Individual Defendants."

42.    During the Class Period, the Silicon Motion Individual Defendants, as senior executive officers and/or directors of Silicon Motion, were privy to confidential, proprietary and material adverse non-public information concerning Silicon Motion, and its operations, finances, financial condition and present and future business prospects, including in relation to the proposed Merger, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Silicon Motion Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Silicon Motion Individual Defendants knew or recklessly disregarded that the

adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

43.    The Silicon Motion Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Silicon Motion Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause Silicon Motion to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Silicon Motion Individual Defendants were able to and did, directly or indirectly, control the conduct of Silicon Motion's business.

44.    The Silicon Motion Individual Defendants, because of their positions with Silicon Motion, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts, and through them, to the investing public.  The misrepresentations alleged herein were disseminated to the public, including Silicon Motion investors, in a medium upon which a reasonable investor would rely, and were material when disseminated.  The Silicon Motion Individual Defendants were provided with copies of Silicon Motion's reports and publicly disseminated documents, and certain MaxLinear public statements, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Silicon Motion Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

45.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Silicon Motion Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Silicon Motion's financial condition and performance, growth, operations, financial

statements, business, products, markets, management, earnings, present and future business prospects, and information regarding the Merger with Silicon Motion to correct any previously issued statements that had become materially misleading or untrue.    The Silicon Motion Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV.    OVERVIEW OF THE FRAUD

46.    The material misrepresentations alleged herein constitute direct violations of the federal securities laws and this Amended Complaint fully complies with all applicable legal authority in this Circuit regarding standing.    As detailed further below, Defendants' Class Period misrepresentations were made about Silicon Motion and Silicon Motion securities, and were expressly directed to Silicon Motion securityholders, including Lead Plaintiffs and the Class.

47.    During the Class Period, the MaxLinear Defendants made a series of material misrepresentations directly to Silicon Motion securityholders concerning Silicon Motion, the acquisition of Silicon Motion ADSs by MaxLinear in the subject Merger and MaxLinear's commitment to the transaction.    In this regard, MaxLinear falsely described to Silicon Motion securityholders the purported value and performance of Silicon Motion based upon its analysis of Silicon Motion's financials and MaxLinear's commitment to consummating its acquisition of the Company.

48.    As noted above, MaxLinear's Forms 425, filed pursuant to Rule 425 (17 C.F.R. § 230.425) under the Securities Act, were, on their face, explicitly about Silicon Motion, directed to Silicon Motion securityholders and specifically related to the Joint Proxy Statement/Prospectus issued by both Silicon Motion and MaxLinear and filed in connection with the Merger.    Rule 425 requires companies engaged in mergers or other business combinations to file prospectuses and other communications with the SEC concerning the transaction.    According to the SEC, the "purpose of [Rule 425] is to permit more oral and written communications with

shareholders about tender offers, mergers and other business combination transactions on a more-timely basis, so long as the written communications are filed on the date of first use." *See* SEC Proposed Collection; Comment Request; Extension: Rule 425, 88 FR 68726 (SEC File No. 270-462, OMB Control No. 3235-0521) (proposed Oct. 4, 2023).

49.     The SEC has further stated that Rule 425 is "designed to reduce selective disclosure" of material information relating to a transaction "by permitting widespread dissemination of information . . . to *inform all security holders about the terms, benefits and risks of a planned extraordinary transaction*," thereby enabling "*a more well informed and efficient market*." Regulation of Takeovers and Security Holder Communications, Exchange Act Release No. 33-7760, 34-42055, IC-24107, 64 FR 61408 (Nov. 10, 1999).

50.     The MaxLinear Forms 425 filed before and during the Class Period (i) expressly identified Silicon Motion as the "Subject Company" of the Form 425; (ii) explicitly listed Silicon Motion's SEC file number that further identified it as the "Subject Company" of the Form 425; (iii) were found in Silicon Motion's SEC filings on the EDGAR database maintained by the SEC and available to Silicon Motion securityholders; (iv) stated that their contents "relate[d] to the Merger" between Silicon Motion and MaxLinear; and (v) specifically directed *Silicon Motion* securityholders to review the Joint Proxy Statement/Prospectus *and other documents provided to Silicon Motion securityholders*, which necessarily included all associated MaxLinear Forms 425 and the statements therein.

51.     Moreover, the Silicon Motion Defendants for their part, made materially false and misleading statements and omissions of material facts concerning Silicon Motion's financial condition, the existence of an MAE and material breaches of the Merger Agreement to Silicon Motion investors throughout the Class Period. While Silicon Motion contended that the closing of the Merger was only subject to customary closing conditions, including antitrust approval, it

failed to notify its securityholders that an MAE and other material breaches of the Merger Agreement existed, and that MaxLinear had stopped all integration and transition efforts, constituting enormous red flags that clearly indicated to the Silicon Motion Defendants that the Merger was in peril. Having spoken to identify a single risk to closing, Silicon Motion was obligated to identify these additional material facts to its investors. Moreover, having the right and obligation to review MaxLinear's statements made to Silicon Motion investors through Rule 425 filings and otherwise, Silicon Motion could not hide its head in the sand knowing the statements MaxLinear was making to Silicon Motion investors were materially false and misleading.

52.     The Silicon Motion Defendants further violated the federal securities laws by failing to update their prior statements to Silicon Motion securityholders regarding the existence of the MAE on May 5, 2023, Silicon Motion's other material breaches of the Merger Agreement and upon their realization that MaxLinear had failed to proceed with the requisite integration procedures for merging the companies.

### A.    MaxLinear's Business And Growth-By-Acquisitions Strategy

53.     MaxLinear provides communications microchips used in broadband, mobile and wireline infrastructure, data center, and multimarket applications. In particular, MaxLinear's RF receiver products enable the display of broadband video and data content in a range of electronic devices.

54.     Founded in 2003 by Defendant Seendripu, MaxLinear went public in 2010 and soon embarked on a growth-by-acquisitions strategy. Given the limited size of its markets, MaxLinear needed to expand its product offerings to achieve substantial revenue growth. Between 2015 and 2020, MaxLinear acquired five companies, with deal sizes ranging from approximately $21 million to $472 million. In 2020, MaxLinear completed its most significant acquisition to-date, acquiring Intel Corporation's Home Gateway Platform Division, which doubled MaxLinear's

addressable market and accounted for nearly half of its $890 million annual revenue in 2021.

55. MaxLinear's growth-by-acquisitions strategy required significant expertise in integration planning, preparation, and execution. In this regard, MaxLinear has long held itself out as adept at integrating acquired companies. For example, during a November 7, 2016 earnings call, MaxLinear's CFO hailed MaxLinear's "progress in integrating newly acquired growth vehicles," which enabled MaxLinear to "realize revenue increases year-over-year." Similarly, during a February 8, 2017 earnings call, MaxLinear's CFO boasted that "[o]ur progress in acquiring and integrating new growth initiatives and diversifying our product portfolio and end-market exposure have enabled us to deliver significant revenue growth expansion in both gross and operating margins and more than the doubling of our annual cash flow from operations."

56. Given its successful history acquiring and integrating companies, MaxLinear reaffirmed its growth-by-acquisitions strategy in early 2022. For example, in response to analysts' questions during MaxLinear's Q1 2022 earnings call on April 27, 2022, Defendant Litchfield, MaxLinear's CFO, told investors that because MaxLinear was "generating a lot of cash" it would "continue to look at acquisitions." Defendant Seendripu reiterated that, given MaxLinear's "strong" and "accelerating" performance, "we got a lot of momentum [on] our ability to execute on acquisitions" and "this is going to be a story [that] continues."

**B.    Silicon Motion's Business and Growth Strategy**

57. Silicon Motion is an American-Hong-Kong technology company that produces and develops NAND flash controllers for solid-state storage devices ("SSD") used in computers, smartphones and other electronic devices.

58. Silicon Motion was founded in San Jose, California by Defendant Kou in 1995, and merged with Feiya Technology Company based in Taiwan in 2002. In 2005, the combined company was renamed Silicon Motion Technology Company

and began trading on the NASDAQ stock exchange under ticker symbol "SIMO." Silicon Motion has been the largest global supplier of SSD controllers since 2021.

59.    Like MaxLinear, Silicon Motion experienced growth through mergers and acquisitions with other technology companies.  In April 2007, Silicon Motion acquired South Korean company Future Communications IC, Inc. ("FCI") for $90 million.  At the time, FCI was a leading designer of radio frequency integrated circuits for mobile television and wireless communications.  The acquisition resulted in Silicon Motion's Mobile Communications product line and helped Silicon Motion provide more comprehensive technology for mobile devices, including digital audio players, personal media players, and navigation systems.  Silicon Motion sold FCI to Dialog Semiconductor in 2019.

60.    In 2015, Silicon Motion completed its acquisition of Shannon Systems (a/k/a Shanghai Baocun Information Technology Co., Ltd.), a leading supplier of SSD and storage array solutions for China's internet industry for $57.5 million. Silicon Motion's agreement in 2022 to be acquired by MaxLinear was consistent with its overall effort to become a global diversified technology company that would have the ability to provide technology across the broadband, connectivity, infrastructure and digital storage end markets.

**C.    MaxLinear and Silicon Motion Jointly Announce A "Transformative" $3.8 Billion Acquisition of Silicon Motion**

61.    On May 5, 2022, MaxLinear and Silicon Motion jointly announced the Merger and their execution of the Merger Agreement.  In an SEC Form 6-K filed on May 6, 2022, Silicon Motion provided a description of the core terms of the Merger, including the cash and stock components Silicon Motion investors would receive under the transaction.   The Form 6-K was signed by Silicon Motion's Chief Financial Officer, Riyadh Lai.   The joint MaxLinear and Silicon Motion press release attached to Silicon Motion's Form 6-K stated that the cash and stock deal valued Silicon Motion at $3.8 billion and valued the combined company at $8 billion

in enterprise value.  Silicon Motion also posted a copy of the press release announcing the Merger on its website.

62.  MaxLinear's acquisition of Silicon Motion would be, by far, the largest and most significant acquisition in MaxLinear's history.  To ensure Silicon Motion investors would approve the deal, the Merger provided Silicon Motion ADS holders a premium of nearly 50% for their ADSs exchanged in the Merger.  Specifically, the Merger consideration was valued at $114.34 per ADS at the time, which included $93.54 in cash and 0.388 shares of MaxLinear common stock for each Silicon Motion ADS (the "Merger Consideration").  This amount equated to an approximately 48% premium to the $77.09 closing price for Silicon Motion ADSs on April 22, 2022—the last trading day before it was reported that Silicon Motion was exploring a sale.[4]

63.  Like MaxLinear, Silicon Motion is a microchip maker, but its chips are mainly used in consumer products such as personal computers, smartphones, flash memory cards, and flash drives used in expandable storage.  Thus, the concept behind the Merger was that Silicon Motion's popular NAND flash controller technology and extensive customer relationships would be complementary to MaxLinear's traditional broadband, connectivity, and infrastructure business— thereby greatly expanding MaxLinear's market and fueling MaxLinear's steep growth trajectory, while being immediately accretive to its bottom line.

64.  Defendants touted the considerable expected benefits of the Merger to Silicon Motion and MaxLinear investors.  For example, in their joint press release announcing the deal on May 5, 2022, Defendants stated that (i) the Merger would provide MaxLinear "transformative scale" as it "roughly doubles MaxLinear's total addressable market opportunity to $15 billion, with expected "[c]ombined revenues"

---

[4] The Merger Consideration also included $23.385 in cash and 0.097 shares of MaxLinear common stock for each Silicon Motion ordinary share not represented by an ADS, for total per ordinary share consideration of $28.59.

of "more than $2 billion annually;" (ii) it would be "immediately and materially accretive" to MaxLinear's operating income, operating margins, earnings per share, and cash flow; and (iii) it was poised to catapult MaxLinear into a "top-ten fabless semiconductor supplier." In the joint press release, Defendants further stated that the "business combination" was anticipated to "expand the combined company's total addressable market and create a highly profitable cash generating semiconductor leader." Defendants further touted the Merger by stating in their press release that "[t]ogether, MaxLinear and Silicon Motion will have expanded resources to better support the combined company's broad customer relationships with their long-term storage requirements."

65.     During an accompanying investor call on May 5, 2022, Defendant Seendripu explained that the combined company was expected to "capture end-to-end platform functionality," especially in the critical enterprise data center market, and that the scale created by the Merger would allow for "increased capacity" via its manufacturing partners. Defendant Litchfield similarly underscored that the acquisition provided MaxLinear "an opportunity to really expand" MaxLinear's geographic reach, including in Asia. On May 6, 2022, MaxLinear filed the transcript of this investor call on SEC Form 425. This Form 425 also appeared on the same date on Silicon Motion's associated SEC filings in the EDGAR database maintained by the SEC.

66.     The May 6 Form 425 filing, as well as all subsequent Form 425 filings before and during the Class Period, expressly indicated that the statements therein were about both Silicon Motion and MaxLinear. For example, the legend at the top of the May 6 Form 425 stated that the May 5, 2022 investor conference was about "Subject Company: Silicon Motion Technology Corporation." The legend further identified "Commission File No.: 000-51380," which is Silicon Motion's SEC file number. The Form 425 found in both companies' SEC EDGAR filings also notified their respective shareholders that "[o]n May 5, 2022, MaxLinear **and Silicon Motion**

held a conference call to announce the transaction." Thus, Silicon Motion expressly adopted the statements by the MaxLinear Individual Defendants.

67.    Silicon Motion's stock price soared on news that Silicon Motion was exploring a sale, and continued to rise after the Merger Agreement was announced. After reports of a possible sale circulated on April 22, 2022, the price of Silicon Motion ADSs climbed from a close of $77.09 per ADS on Friday, April 22, 2022, to a close of $87.02 on Monday, April 25, 2022—an increase of more than 12% per ADS. Following the Merger's public announcement on May 5, 2022, Silicon Motion ADSs continued to soar, rising from a close of $81.20 per ADS on May 4, 2022, to a close of $95.16 per ADS on May 5, 2022—an increase of more than 17%.

68.    Analysts covering both MaxLinear and Silicon Motion were enthusiastic about the Merger and issued reports extolling its expected benefits. For example, on May 5, 2022, shortly after the deal was publicly announced, CFRA Research analysts noted they were "encouraged by the combined entity as it doubles MXL's total addressable market opportunity to $15B" and would "be immediately and materially accretive to operating margins, EPS, and cash flow." Analysts at Roth MKM were similarly "encouraged by the acquisition" of Silicon Motion and praised the "combined product platform opportunity and fabless manufacturing synergies." Needham & Co. analysts underlined in a May 5, 2022 report: "we believe scale matters" in the semiconductor industry.

69.    Analysts covering Silicon Motion were similarly enthusiastic about the deal. J.P. Morgan reported on May 6, 2022 that the "combination could help SIMO break into enterprise SSD controller markets more easily, securing some continuation of long term growth." Roth MKM opined that "MXL can leverage its larger corporate and customer footprint to drive broader adoption of SIMO's enterprise storage products in particular." Analysts at investment banking firm Craig-Hallum also described on May 5, 2022, how Silicon Motion "is an attractive acquisition target" and noted that certain deal terms were "not overly aggressive"

and could provide the basis for a potential "bidding war" further driving up Silicon Motion's ADSs.

### D. The Merger Agreement Required Joint Approval of Merger Related Updates by Both MaxLinear and Silicon Motion

70.    Silicon Motion's Form 6-K filed on May 6, 2022 also attached a copy of the Merger Agreement between Silicon Motion and MaxLinear, dated May 5, 2022.  The Merger Agreement was signed by Defendants Seendripu and Litchfield of MaxLinear, and Defendant Kou of Silicon Motion.  Article 5 of the Merger Agreement contained a series of covenants that both Silicon Motion and MaxLinear were required to satisfy under the Merger.

71.    Article 5.3 of the Merger Agreement is titled "Preparation of the Form S-4; Preparation of Proxy Statement; Company Meeting."  Among other things, Article 5.3(a)(i) required MaxLinear to "prepare and file with the SEC a preliminary Form S-4" registration statement in connection with the MaxLinear stock issued to Silicon Motion securityholders under the Merger.  This provision also required MaxLinear to use its "reasonable best efforts," with the cooperation of Silicon Motion, to "have the Form S-4 declared effective under the Securities Act as promptly as reasonably practicable," and to remain effective "as long as necessary to consummate the Merger . . . , including the Share Issuance" of MaxLinear stock to Silicon Motion securityholders as part of their Merger Consideration.

72.    The SEC requires reporting companies such as MaxLinear to file a Form S-4 registration statement in order to publicly offer securities under a merger or acquisition.  MaxLinear was therefore required to file a Form S-4 registration statement in order to issue the stock component of the Merger Consideration paid to Silicon Motion ADS holders (*i.e.*, 0.388 shares of MaxLinear common stock for each Silicon Motion ADS exchanged in the Merger).

73.    In turn, Article 5.3(a)(ii) of the Merger Agreement provided that Silicon Motion "shall prepare the Proxy Statement" with the requisite disclosures

concerning the Merger for the adoption and approval of the Merger Agreement by Silicon Motion shareholders.  Article 5.3(a)(iii) required both Silicon Motion and MaxLinear to provide each other information "relating to it that the other party may reasonably request in connection with the Form S-4 or the Proxy Statement."  Under Article 5.3(b), Silicon Motion was required to "cause the Form S-4 and the Proxy Statement to be mailed to its shareholders within five (5) Business Days of the date the Form S-4 is declared effective by the SEC under the Securities Act."

74.     Significantly, Article 5.8 of the Merger Agreement, which was titled "Public Announcements," specifically required the companies' joint approval of all public statements concerning the Merger.  This included the companies' May 5, 2022 joint press release announcing the Merger and execution of the Merger Agreement, which was not to be "issued prior to the approval of each of [Silicon Motion] and [MaxLinear]."  Article 5.8 also required joint approval of all future public statements concerning the Merger.  Specifically, Article 5.8 provided that:

> From and after the date of this Agreement . . .so long as this Agreement is in effect, [MaxLinear] . . .on the one hand, and [Silicon Motion] on the other, and any of their respective affiliates, ***shall not issue any press release or make any public statement with respect to the Merger or this Agreement without the prior written consent of the other party*** (which consent shall not be unreasonably withheld, conditioned or delayed)."

Accordingly, all public statements concerning the Merger made by the companies throughout the Class Period were jointly approved by both MaxLinear and Silicon Motion before being presented to Silicon Motion and MaxLinear securityholders.

### E.     MaxLinear and Silicon Motion Issue the Joint Proxy Statement/Prospectus

75.     On July 11, 2022, MaxLinear filed with the SEC its Form S-4 registration statement in connection with the Merger under SEC Registration Number 333-265645.  The registration statement also included a joint preliminary

Proxy Statement and Merger Prospectus of Silicon Motion and MaxLinear. The MaxLinear Form S-4 registration statement was deemed effective on July 13, 2022.

76. Both Silicon Motion and MaxLinear filed the final Joint Proxy Statement/Prospectus with the SEC on July 13, 2022. The Joint Proxy Statement/Prospectus were one and the same document. MaxLinear filed this joint document under SEC Rule 424(b)(3), which governs the filing of prospectus supplements. Silicon Motion attached the Joint Proxy Statement/Prospectus to its SEC Form 6-K filed on July 13, 2022. The Joint Proxy Statement/Prospectus expressly stated that it related to the MaxLinear Form S-4 registration statement filed in connection with the Merger (*i.e.*, SEC Registration Number 333-265645).

77. Specifically, the Proxy Statement sent to Silicon Motion securityholders explained that it was a joint document issued by both MaxLinear and Silicon Motion, as follows:

### ABOUT THIS PROXY STATEMENT/PROSPECTUS

This document, which forms part of a registration statement on Form S-4 filed with the United States Securities and Exchange Commission (the "SEC") by [MaxLinear] (File No. 333-265645), constitutes a prospectus of [MaxLinear] under Section 5 of the Securities Act, with respect to the [MaxLinear] Shares to be issued to [Silicon Motion] securityholders pursuant to the Merger Agreement, dated May 5, 2022, by and among [MaxLinear], Merger Sub and [Silicon Motion]. This document also constitutes a proxy statement of [Silicon Motion].

78. On its face, the Joint Proxy Statement/Prospectus plainly reflected that it was a joint document issued by both Silicon Motion and MaxLinear. The first page of the Joint Proxy Statement/Prospectus reflected this fact, as follows:

Filed Pursuant to Rule 424(b)(3)
Registration Statement No. 333-265645





**PROXY STATEMENT
OF SILICON MOTION TECHNOLOGY
CORPORATION**

**PROSPECTUS
OF MAXLINEAR, INC.**

PROPOSED MERGER — YOUR VOTE IS VERY IMPORTANT

The boards of directors of MaxLinear, Inc. ("Parent") and Silicon Motion Technology Corporation ("Silicon Motion" or the "Company") have each unanimously approved a transaction that will result in the merger of Shark Merger Sub ("Merger Sub") with and into the Company with the Company continuing as the surviving company (the "Surviving Company") as a wholly-owned subsidiary of Parent (the "Merger").

Parent is offering to acquire all of the issued and outstanding ordinary shares, par value $0.01 per share, of the Company ("Company Shares"), including Company Shares represented by American Depositary Shares ("ADSs"), each representing four Company Shares. In this proxy statement/prospectus, the Company refers to holders of Company Shares as holders of Company Shares or Company shareholders, the Company refers to holders of ADSs as holders of ADSs or ADS holders and the Company refers to Company shareholders and holders of ADSs together as Company securityholders.

**F.    The Market Understood That The Only Remaining Condition Facing The Merger's Completion Was Whether The Parties Would Gain Regulatory Approval Of The Deal By SAMR**

79.    The Merger required regulatory approval from governmental authorities in the United States and China.  In the United States, the Merger had to be approved by the Antitrust Division of the U.S. Department of Justice, and by the Federal Trade Commission under the HSR Act.  In China, the Merger needed the approval of the Chinese antitrust regulator, SAMR.  Under the Merger Agreement, approval by all of these regulatory authorities was required by no later than August 7, 2023.

80.    In contrast, financing the deal was not an issue.  MaxLinear had secured committed financing for the cash portion of the deal with Wells Fargo, in addition to the combined companies' $277 million in cash on hand.

81.    On August 31, 2022, Silicon Motion investors approved the Merger at an extraordinary general meeting ("EGM").  MaxLinear announced this approval by

Silicon Motion investors in a Form 8-K and Form 425 filed with the SEC on August 31, 2022. These filings stated, among other things, that "[a]t the EGM, shareholders of Silicon Motion approved, by the requisite vote, the acquisition of Silicon Motion by MaxLinear." The Form 8-K and Form 425 also attached as an exhibit a joint press release announcing the results of the EGM.

82. Silicon Motion made the verbatim announcement of the Merger approval and attachment of the companies' joint press release in a Form 6-K filed with the SEC on August 31, 2022. MaxLinear's Form 425 attaching its Form 8-K that announced the Merger vote was also placed in Silicon Motion's SEC EDGAR filings presented to Silicon Motion securityholders.

83. The companies made clear from the shareholder approval that customary closing conditions and regulatory approval were the only obstacles to the deal's close. Indeed, the joint MaxLinear-Silicon Motion press release announcing Silicon Motion investor approval explicitly stated that, "[t]he remaining requirements for closure of the transaction are customary closing conditions set forth in the Merger Agreement, including approval from the State Administration for Market Regulation (SAMR) of the People's Republic of China."

84. The companies reiterated the need for SAMR approval of the Merger in additional SEC filings on August 31, 2022. MaxLinear filed a separate Form 8-K and Form 425 on this date (which was again included in Silicon Motion's SEC filings) stating that the "Merger remains subject to review and clearance by [SAMR] in the People's Republic of China . . . On August 31, 2022, SAMR advised the parties [*i.e.*, Silicon Motion and MaxLinear] to refile [for SAMR approval of the Merger] under the normal procedure, which the parties intend to submit to SAMR as promptly as reasonably practicable." Silicon Motion also filed a Form 6-K with the SEC on September 1, 2022, containing the exact same language regarding SAMR approval.

85.     Investors appreciated that the key risk facing the Merger was obtaining SAMR's authorization.  Indeed, as noted above, on the same day that Silicon Motion investors approved the Merger, SAMR informed MaxLinear and Silicon Motion that it would not approve the deal under an expedited review and that the parties needed to submit a regular application for regulatory approval (which the parties did).  In contrast, the Merger swiftly obtained U.S. approval.  According to MaxLinear's SEC filings, the Merger was authorized to proceed under U.S. law on June 27, 2022, after expiration of the HSR Act's ordinary statutory waiting period.

86.     As 2022 progressed, investor concern regarding SAMR approval was heightened due to deteriorating China-United States trade relations.  On October 7, 2022, just five weeks after Silicon Motion investors approved the Merger, the U.S. Government announced sweeping new limits on the sale of certain semiconductor technology to China.  According to an article published in *The New York Times* on October 7, 2022, the trade restrictions were "aimed at crippling Beijing's access to critical technologies that are needed for everything from supercomputing to guiding weapons."  U.S. companies were no longer allowed to supply certain advanced computing chips, chip-making equipment, and other products to China unless they received a special license.

87.     Chinese regulators, in turn, retaliated against Washington's curbs on China's tech industry by slowing down its merger reviews of several proposed acquisitions by U.S. companies.  As *The Wall Street Journal* reported on April 4, 2023 in an article titled "China's New Tech Weapon: Dragging Its Feet on Global Merger Approvals," MaxLinear's proposed acquisition of Silicon Motion was among the deals being slow-tracked by Beijing.  Another prominent example included Intel Corp.'s $5.2 billion takeover of Tower Semiconductor.  In each case, SAMR asked the companies involved to make available in China products they sold in other countries in a bid to counter U.S. export controls on China, *The Wall Street Journal* reported, citing people close to the process.  *The Wall Street Journal*

specifically highlighted the delay in the MaxLinear Merger as part of China's "expanding toolbox of economic coercion," and was a way to "pressure foreign companies, and by extension, their governments."

88.     Analysts seized on the rising political tensions between Beijing and Washington as creating substantial uncertainty about whether the Merger would move forward, specifically noting that Chinese regulatory approval was the "last step" remaining before the Merger could be completed.  For example, Wedbush commented on November 1, 2022, that "the tension between US and China certainly creates uncertainty around SAMR approval."  Wells Fargo also emphasized in a February 1, 2023 report that "the proposed acq[uisition] of SIMO remains a key focus area for investors," noting that the "*last step is China SAMR approval*."  On February 2, 2023, Needham & Co. similarly warned that the "uncertainty around the SIMO acquisition remains the biggest overhang on the [MXL] stock," and explained that both MaxLinear's and Silicon Motion's "shares may be range bound" as "*the two parties wait in purgatory for a deal resolution*."  On February 9, 2023, J.P. Morgan opined that "the prolonged process of approval in China could indicate that there may be potential accommodations and concessions required to secure approval for the deal."  And, on March 16, 2023, Wells Fargo reiterated that uncertainty around the Merger was a "*key focus area*" for investors.

### G.     The Merger Agreement Further Provided That MaxLinear Could Not Simply Walk Away From The Deal

89.     Importantly, the Merger Agreement made it crystal clear that MaxLinear could not simply back out of the deal ahead of SAMR's decision, for example, because of a change in business strategy or declining market for the companies' products.  Indeed, the Merger Agreement permitted a party to terminate only in narrow, prescribed circumstances, required specific processes to be followed—*including providing prompt notice of any claimed material breaches or MAEs*—and imposed steep penalties for improper termination.

90.    *First*, if the Merger failed to gain regulatory approval, either through a regulatory denial or because regulatory approvals were delayed beyond the agreed-upon closing deadline, MaxLinear would have an "easy out" and could ***not*** be forced to complete the deal under any circumstances.  If this occurred, MaxLinear could cap its liabilities at the $160 million break-up fee (and potentially avoid paying any break-up fee at all if it also established that Silicon Motion was "in material breach of any representation, warranty [or] covenant" of the Agreement and the breach was the "primary cause" preventing any condition to closing).

91.    Under the Merger Agreement, the "Original Outside Date" for closing was February 6, 2023, but, assuming no party breached the Merger Agreement and all that remained pending was the necessary regulatory approvals, the date would be ***automatically extended twice***: the "First Extended Outside Date" expired on May 5, 2023, and the "Second Extended Outside Date" was August 7, 2023.  After all the Outside Dates passed (*i.e.*, if regulatory approval was still not received by August 7, 2023, or if a denial was received by that time), MaxLinear had the right to terminate the deal.

92.    *Second*, MaxLinear could validly terminate the Merger if Silicon Motion was in breach of its "representations, warranties or covenants" under the Merger Agreement.  However, before effectuating a termination for a prior breach, MaxLinear was required to deliver "***written notice of such breach***" and provide Silicon Motion the ability to cure the specified breach within ***thirty days***, or by the next applicable Outside Date, whichever occurred first.

93.    Similarly, MaxLinear could validly terminate the deal if an unexpected development had a "Material Adverse Effect," or an "MAE," on Silicon Motion's "business, financial condition, assets, liabilities or results of operations." Significantly, however, MaxLinear was required to give Silicon Motion "***prompt notice***" of the MAE if the issue was expected to prevent or delay the transaction from closing.  Moreover, both the Merger Agreement and Delaware law (which

under the Merger Agreement governed the determination of an MAE) greatly limited what conditions could constitute an MAE that could warrant termination. Mere business or economic deterioration was ***expressly excluded*** from the definition of an MAE, and therefore could never be a valid basis of termination. Specifically, the Merger Agreement expressly excluded from an MAE: (a) changes in economic or regulatory conditions, including changes in interest rates or customer demand for MaxLinear or Silicon Motion's products, (b) changes in "global or national political conditions," (c) changes in the trading price for Silicon Motion's ADSs, and (d) "any failure by [Silicon Motion] . . . to meet any revenue, earnings or other financial projections or forecasts."

94.    Accordingly, the Merger Agreement provided no circumstances allowing MaxLinear to walk away from the deal if the Merger no longer made economic sense or became a poor deal for MaxLinear. In fact, terminating the deal to escape adverse business or financial consequences would amount to a "Willful and Material Breach" by MaxLinear under the terms of the Merger Agreement, and subject MaxLinear to express remedies including specific performance—*i.e.*, forcing MaxLinear to proceed with the Merger—as well as uncapped money damages.

**H.    MaxLinear Repeatedly Assured Silicon Motion Investors That It Was Committed To The Merger And Regulatory Approval For The Deal Was On Track**

95.    Following the Merger announcement, the investing public repeatedly questioned Defendants regarding the progress of the Merger and the anticipated timeline in which MaxLinear was expected to receive regulatory approval. In response, Defendants consistently provided Silicon Motion investors the exact assurance for which it was clamoring: that the Merger was progressing as expected, that SAMR approval remained on track, and once MaxLinear and Silicon Motion obtained that approval, MaxLinear would close the Merger.

96.    For example, in an April 26, 2023 press release announcing MaxLinear's results for Q1 2023, Defendant Seendripu reaffirmed that MaxLinear remained "excited" by the "pending acquisition" as it provided MaxLinear "future growth prospects" due to the "comprehensive combined product portfolio."  During the accompanying first quarter earnings call held the same day, Seendripu reiterated that MaxLinear was "looking forward to a pending acquisition of Silicon Motion" and Litchfield noted that "things are moving as expected on the SAMR front." Similarly, during the earnings call, Defendant Litchfield added that MaxLinear "continue[d] to progress through the SAMR approval process," "remain[ed] confident of a mid-2023 close," and "look[ed] forward to bringing our technology-focused cultures together very soon."

97.    MaxLinear filed the April 26 press release with the SEC on Form 8-K, and the transcript of the accompanying earnings call on Form 425.  *See* attached Exhibit 1.  The Form 425 contained a cover page (or "Filing Detail") *and* a legend at the very top of the Form 425 expressly noted that the statements at the conference were about Silicon Motion and its securities, by stating in bold font: "**Subject Company: Silicon Motion Technology Corporation**."    The legend further identified in bold font "**Commission File No.: 000-51380**" under the "**Subject Company**" header, which was Silicon Motion's SEC file number.  The Form 425 further stated that "[t]his filing relates to the proposed transaction" between Silicon Motion and MaxLinear and that it "excerpted portions of a transcript of [the April 26 investor conference call] that relate to the Merger."  A verbatim copy of this Form 425 was also found in Silicon Motion's SEC EDGAR filings presented to Silicon Motion securityholders.

98.    The market credited Defendants' assurances.  For example, after the call, Deutsche Bank reported that MaxLinear's "Management noted that the SIMO acquisition remains on track for completion in mid-'23," and Wells Fargo highlighted how "MXL reiterated that the acq[uisition] is progressing and they

expect it to close by mid-CY23."  The next day, April 27, 2023, Benchmark similarly reported that the "SIMO acquisition is tracking to expectations" and Needham & Co. declared that "[t]he pending acquisition of Silicon Motion . . . remains on track, is progressing well, and is expected to close by 2Q23 or 3Q23."

99.    On May 3, 2023—just ***two days*** before MaxLinear would later claim that Silicon Motion was in material breach of the Merger Agreement—MaxLinear participated in an interview with analysts to discuss the Merger.  During the interview, an analyst from Alliance Global Partners Merger Arbitrage Group asked about the progress of the Merger, and specifically, SAMR approval.  In response, Leslie Green, MaxLinear's Investor Relations point person, assured investors that all was well with respect to the Merger's progress and the prospects for regulatory approval within the anticipated mid-2023 timeframe, stating: "***we continue to actively work to get the deal closed by mid-year, which was always the time frame that we expected***."  When the analyst asked a follow-up question regarding whether MaxLinear "remain[ed] committed to acquiring [Silicon Motion]" and whether "[n]othing's changed there," Green, on behalf of MaxLinear, unequivocally confirmed that MaxLinear remained committed to completing the Merger once SAMR approved the deal, stating: "No, nothing's changed there."

100.    SAMR did not approve the Merger by the First Extended Outside Date, May 5, 2023.  Accordingly, investor focus on the Merger intensified as the market questioned whether the deal would close prior to the now final August 7, 2023 deadline, the "Second Extended Outside Date."

I.    **The MaxLinear Defendants Falsely Assured Investors That Silicon Motion Was A "*Strategic Asset*" Even Though MaxLinear Had Determined an MAE and Other Financial Issues Existed Which Would Cause it to Abandon the Merger**

101.    As of May 5, 2023, MaxLinear determined that Silicon Motion had experienced an MAE and was in breach of the Merger Agreement.  Specifically, in MaxLinear's own words, "certain conditions in Article 6 of the Merger Agreement

were not satisfied or waived *as of May 5, 2023*," and therefore the First Outside Date was "*not automatically extended*" to August 7, 2023, rendering the Merger Agreement null and void.  Importantly, the conditions of Article 6 of the Merger Agreement were broad and expressly included (i) Silicon Motion's representations and warranties; (ii) that Silicon Motion "performed and complied" with all its obligations under the Merger Agreement; and (iii) the absence of an MAE.  Thus, in MaxLinear's view, by not satisfying the conditions of Article 6, Silicon Motion's actions rendered the Merger Agreement unenforceable by the start of the Class Period.  Despite having come to this conclusion, the MaxLinear Defendants did not disclose this extraordinarily material fact to either investors or to Silicon Motion. Instead, they continued to falsely reassure the market that MaxLinear was fully committed to the Merger and was actively taking steps necessary for it to be completed by the August 7, 2023 deadline.

102.   On June 6, 2023, MaxLinear, Defendant Seendripu and Leslie Green, MaxLinear's Investor Relations representative, participated in the Stifel Cross Sector Insight Conference in Boston, Massachusetts. The Stifel Conference is Stifel's "signature event" of the year and in 2023 was attended in-person by over 300 companies and 1,600 investors, with additional participants on-line.  The goal of the Stifel Conference was "to provide institutional investors with high-level access to senior management" of the presenting companies.  The 2023 Stifel Conference was attended by company representatives, institutional investors, and private equity/venture capital investors from a variety of sectors, including business services, consumer and retail services, internet, materials, media, and technology. Prior to the conference, MaxLinear issued a press release publicizing its participation at the conference and providing a link for interested investors to view the presentation via a webcast.

103.  At the Stifel Conference, Defendant Seendripu participated in a "fireside chat" with Stifel's Managing Director of the Technology Group, Tore

Svanberg. Early in the interview, Svanberg declared that the Silicon Motion Merger was "one of the topics investors want to hear most about" and that he would be setting aside time specifically to discuss the Merger. After discussing MaxLinear's business segments, Svanberg "of course" returned to the issue that was top of mind for investors—the Merger—and asked Seendripu for an "update" on Silicon Motion as an "asset strategically" and whether MaxLinear was "still" "interested in acquiring" Silicon Motion:

> Okay. And the – and the last topic of course, is SIMO, I know there's a limitation to what you can say, but at least give us an update on the asset strategically, you talked obviously about storage and data center, right? So I *still believe this is an asset that you're very interested in acquiring*?

104. Despite the MaxLinear Defendants' internal conclusion that Silicon Motion had already suffered an MAE and breached the Merger Agreement *a full month* before the Stifel Conference, thereby rendering the Merger null and void, Defendant Seendripu spoke at great length and in great detail about Silicon Motion and its many expected benefits. Seendripu punctuated the discussion by emphasizing that Silicon Motion remained a "*very strategic asset*" for MaxLinear and that management remained "*very, very bullish*" on combining the companies:

> Look, we have some conviction [in] what we do. And I don't think we touch anything where our core technology platform doesn't expand us into the adjacent markets, right? And storage is not an adjacent market. Our primary focus [has been] the enterprise market and the data center market, and Silicon Motion is the number one merchant [] controller – storage controller supply in the world. And, I don't look at controllers at storage. I look at [it] as data traffic. I look at [it] as how do you improve latency and speed of access and the amount of the memory[.] [T]oday, non-memory is monstrous, right?
>
> [] But the most important thing about the memory is if you look at the storage network is that, speed of access of the data and integrity of the data and throughput. And now it's the excel. It's going to spread all over the place as well. So you need to tightly couple the controllers with accelerators, right? And they all belong together, *and together, [with Silicon Motion] we bring the portfolio to make it happen*.
>
> The other part of it is that memory is no longer about moving bits around with [the] controller, right? Talked about data integrity. So it's a lot of encryption technologies, signal processing, I/O bandwidths, the

mixed-signal IP [is] all common. ***So we'll get the, what they call, the technology synergy. And therefore, the R&D synergy [w]e need to, for both the companies combined together.***

So we should be able to have synergies in the OpEx. ***We still are very, very, what I call, bullish that we can acquire the synergies that we told you all about. And yes, the revenues of the combined companies have come down [], but it just delays*** the, what I call, the benefits of the acquisition accordingly by a year or so. ***But the basic rationale has not changed at all. So I believe it's a very strategic asset for the company***.

105.    Recognizing the materiality of Seendripu's statements and that they were about Silicon Motion and its securities, the next day, June 7, 2023, MaxLinear filed with the SEC on Form 425 a transcript excerpt of the Stifel Conference conversation ***that contained only the above question and answer***. Importantly, the SEC instructs that transcripts used to communicate information about a pending merger must be filed with the agency under Rule 425, but "routine business communications that refer to the transaction in a non-substantive way" need not be publicly filed. Accordingly, Defendants clearly knew and understood that Defendant Seendripu's statements at the Stifel Conference were, in fact, substantive and material to Silicon Motion investors, thus necessitating the Rule 425 filing, making the statements in a medium upon which reasonable investors of Silicon Motion would rely.

106.    The June 7 Form 425 attaching the above transcript excerpt from the Stifel Conference clearly stated that its contents were about Silicon Motion and its securities. *See* attached Exhibit 2. Specifically, the Form 425 contained a cover page ***and*** a legend at the very the top of the Form 425 noting in bold font "**Subject Company: Silicon Motion Technology Corporation,**" , and further identified in bold font "**Commission File No.: 000-51380**," *i.e.*, Silicon Motion's SEC file number. The Form 425 also stated that "[t]his filing relates to the proposed transaction" between Silicon Motion and MaxLinear and that it "excerpted portions of a transcript of [the June 6, 2023 Stifel Conference] that relate to the Merger."

107.    The last page of the Form 425 further demonstrated that it was directed to both MaxLinear and Silicon Motion securityholders, informed such securityholders about where they could find additional information concerning the Merger, and "URGE[D]" investors and securityholders in all caps to read such materials.  Specifically, the Form 425 contained the following section:

**Additional Information and Where to Find It**

***This communication is being made in respect of a proposed business combination involving MaxLinear and Silicon Motion***. In connection with the proposed transaction, MaxLinear has filed with the SEC, and the SEC has declared effective, a Registration Statement on Form S-4 that includes a proxy statement of Silicon Motion and a prospectus of MaxLinear (the "Registration Statement").

The proxy statement/prospectus and this communication are not offers to sell MaxLinear securities, and are not soliciting an offer to buy MaxLinear securities, in any state where the offer and sale is not permitted.

MAXLINEAR AND SILICON MOTION URGE INVESTORS AND SECURITY HOLDERS TO READ THE REGISTRATION STATEMENT ON FORM S-4 ***AND OTHER DOCUMENTS PROVIDED TO SILICON MOTION SECURITY HOLDERS FILED WITH THE SEC*** CAREFULLY AND IN THEIR ENTIRETY BECAUSE THEY CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED TRANSACTION.

This explicit direction to Silicon Motion securityholders to review the Form S-4 registration statement, Joint Proxy Statement/Prospectus, and "OTHER DOCUMENTS" provided to Silicon Motion securityholders filed with the SEC necessarily included the June 7, 2023 Form 425 containing the Stifel Conference excerpt.

108.    A verbatim copy of the June 7, 2023 Form 425 with the attached excerpt from the Stifel Conference was also included in Silicon Motion's SEC filings on the EDGAR database.

109.    Buoyed by Defendants' reassurances that MaxLinear was committed to consummating the Merger and that there were no obstacles to closing the deal other than customary closing conditions and regulatory approval, the price of Silicon Motion ADSs rose $2.01 per ADS, from a close of $66.22 on June 5, 2023, to a close

of $68.23 on June 6, 2023, on unusually high trading volume of 895,916 ADSs. After re-publication of Seendripu's statements on the Form 425, the price of Silicon Motion ADSs rose $0.57 per ADS, from a close of $68.23 on June 6, 2023, to a close of $68.80 on June 7, 2023, on significant trading volume of 681,498 ADSs.

110.   Just weeks later, on June 28, 2023, further maintaining the façade that MaxLinear was committed to closing the Merger (and in compliance with the terms of the Merger Agreement), and that all customary closing conditions other than regulatory approvals were satisfied, MaxLinear filed a From 425 and Form 8-K with the SEC stating that MaxLinear was continuing to take affirmative steps to secure regulatory approval for the Merger:

> The completion of the Merger is conditioned upon, among other things, the expiration or termination of the waiting period applicable to the consumation of the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act" and, such waiting period, the "HSR Waiting Period"). MaxLinear and Silicon Motion previously filed under the HSR Act, and the HSR Waiting Period expired at 11:59 p.m. ET on June 27, 2022. However, since the Merger was not consummated by June 27, 2023, clearance under the HSR Act has expired, **and on June 28, 2023, MaxLinear and Silicon Motion re-filed under the HSR Act**.

111.   Once again demonstrating that this communication was about Silicon Motion and directed to Silicon Motion securityholders, the Form 425/8-K included the verbatim statement above (*supra* ¶ 110) informing such investors that the Form 425/8-K related back to MaxLinear's Form S-4 registration statement, as well as the Joint Proxy Statement/Prospectus of MaxLinear and Silicon Motion that was disseminated to Silicon Motion securityholders in connection with the Merger. It further directed Silicon Motion securityholders to review the Merger-related registration statement, Joint Proxy Statement/Prospectus and "OTHER DOCUMENTS" filed with the SEC and provided to Silicon Motion securityholders, including MaxLinear's June 28 Form 425/8-K.

112.   As described further below, Silicon Motion also filed a Form 6-K with the SEC on June 28, 2023 signed by Defendant Lai that contained a verbatim recitation of the MaxLinear Form 425/8-K quoted above (*supra* ¶ 110).

**J.**   **Silicon Motion Made Materially False and Misleading Statements and Omissions of Material Facts During the Class Period**

113.   On May 5, 2023, Silicon Motion filed a Form 6-K and press release concerning the Merger.  In the press release, Silicon Motion stated that:

> [d]espite today's difficult operating environment, we are working hard with our customers and our manufacturing partners to continue delivering cost effective, high-performance, differentiated solutions that will enable us to maintain our leadership in the storage controller market. We are confident that we have the right customers, strong design win momentum and are taking necessary steps to ensure the long-term growth of our revenue and profitability."

The Silicon Motion Defendants further stated that Silicon Motion was proceeding with the Merger, and the transaction was merely "pending satisfaction of customary closing conditions, including antitrust approval [from SAMR]."

114.   In addition, in its SEC Form 6-K filed on June 28, 2023, the Silicon Motion Defendants once again assured their securityholders that the Merger was on track by also stating that:

> The completion of the Merger is conditioned upon, among other things, the expiration or termination of the waiting period applicable to the consummation of the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act" and, such waiting period, the "HSR Waiting Period").  MaxLinear and Silicon Motion previously filed under the HSR Act, and the HSR Waiting Period expired at 11:59 p.m. ET on June 27, 2022.  However, since the Merger was not consummated by June 27, 2023, clearance under the HSR Act has expired, ***and on June 28, 2023, MaxLinear and Silicon Motion re-filed under the HSR Act***.

115.   These statements omitted the material fact that an MAE and other material breaches of the Merger Agreement existed by May 5, 2023 that prevented the Merger from closing.  Silicon Motion continued to make material misstatements

and omissions of material facts concerning its financial condition and the status of the Merger as detailed more fully below in Section V.

\*      \*      \*

116.   The foregoing statements had their intended effect.  The market was assured that Silicon Motion's financial condition was sound and not afflicted by an MAE, MaxLinear remained committed to combining the companies and the Merger would close as soon as SAMR signed-off on the deal.  For example, on July 24, 2023, Roth MKM issued a report on MXL providing an "Acquisition Update," which stated that "MXL is approaching the early-August outside date for its planned SIMO acquisition while simultaneously working toward securing Chinese regulatory approval for the deal."

**K.    Directly Contradicting Their Repeated Public Representations to Silicon Motion Investors, The MaxLinear Defendants Had Determined By No Later Than May 5, 2023 That Silicon Motion's MAE And Other Material Breaches, As Well As MaxLinear's Own Change In Circumstances, Negatively Impacted The Merger**

117.   Unbeknownst to investors, by no later than May 5, 2023, the MaxLinear Defendants had not only determined that Silicon Motion suffered an incurable MAE and otherwise materially breached the Merger Agreement, but MaxLinear, itself, had experienced a change in economic circumstances.

118.   *First*, in the months following the Merger's announcement, MaxLinear's business had deteriorated.  Indeed, according to former employees of MaxLinear, in September of 2022—just four months after entering into the Merger Agreement—MaxLinear's Intel division, which accounted for *half* of MaxLinear's revenue, informed senior management that it expected a 40% drop in revenue for 2023.  Specifically, according to FE 2,[5] the Intel division saw explosive growth in

---

[5] FE 2 was a former Director of Product Marketing at MaxLinear from 2020 until December 31, 2022, She joined MaxLinear as part of the 2020 Intel acquisition and worked in MaxLinear's Israel office.  She reported directly to MaxLinear's Vice President and General Manager Doron Tal.

2022 as customers over-ordered microchips to stay ahead of supply chain issues. However, this left the customers with vast excess supply for 2023, including MaxLinear's biggest customer, Comcast Corporation.  The Intel division recognized this problem in August 2022—soon after the Merger was announced—when it asked its customers to forecast their needs for the upcoming year.  According to FE 2, all of the division's large customers significantly reduced their expected orders, resulting in a 40% drop in expected revenue for 2023. This news was highly significant because, as FE 2 explained, the Intel division was responsible for *half* of MaxLinear's total revenues.  FE 2 personally was involved in preparing a slide deck highlighting the poor outlook for 2023, which was presented by the head of the Intel division—Doron Tal—to MaxLinear's executive management, including Defendants Seendripu and Litchfield, in September 2022.

119.   FE 1, who was MaxLinear's Director of Global Trade Compliance[6] from November 2022 to July 2023, explained that due to the poor financial results and gloomy outlook, MaxLinear began laying off large numbers of employees in January 2023.  FE 1 referred to these as "quiet" layoffs and said they occurred at different MaxLinear locations across the globe.

120.   The forecasts proved accurate. When reporting its Q1 2023 results on April 26, 2023, MaxLinear publicly disclosed that its revenue was down "15% sequentially," and provided guidance of only $175 million to $205 million in revenue for Q2 2023—well below consensus expectations.  As Deutsche Bank analysts described in an April 26, 2023 report, this was the "second consecutive quarter" that MaxLinear provided a "significantly weaker guide as a combination of weaker demand and significant channel/customer inventory digestion lead to a ~23%

---

[6] FE 1 was MaxLinear's Director of Global Trade Compliance from November 2022 until July 18, 2023, when she was laid off just eight days before the end of the Class Period.  She worked out of MaxLinear's California offices and reported directly to MaxLinear's General Counsel and Associate General Counsel.

[quarter over quarter] drop in revenue." Wells Fargo was similarly frustrated by MaxLinear's "much weaker-than-expected guide." Defendants knew that MaxLinear's poor results would continue for the remainder of 2023 based on MaxLinear's internal forecasting and customer orders.

121. As a result of MaxLinear's faltering financial results, MaxLinear's stock price lost more than half its value, falling from over $50 per share just prior to the announcement of the Merger in May 2022, to $23.39 by May 4, 2023.

122. *Second*, interest rates had risen substantially in the second half of 2022 through the first half of 2023, and thus the cost of financing the cash portion of the Merger Consideration had increased dramatically. Specifically, when the Merger was initially announced on May 5, 2022, Defendant Litchfield explained that MaxLinear expected to obtain an interest rate of the Secured Overnight Financing Rate ("SOFR Rate") "plus 2.5% to 3.5%," as that was the "range we're thinking about" for the financing of the Merger. On that date, the SOFR Rate was 0.79%, but by May 5, 2023, the SOFR Rate had increased to 5.06%. Consequently, MaxLinear expected to pay interest rates between 7.5% and 8.5% on the debt needed to close the Merger—at least ***double*** MaxLinear's original expected rates of between 3.29% and 4.29%.

123. Because MaxLinear needed to borrow $3.25 billion to close the Merger, the rise in interest rates increased MaxLinear's financing costs by ***more than $140 million per year*** to a total annual interest cost of ***$250 million***. Making matters worse, MaxLinear's market capitalization had shrunk during the year after the Merger was announced, falling from $3.4 billion to only $1.9 billion just prior to the Class Period. Thus, the combination of rising interest rates and MaxLinear's smaller enterprise value meant that the Merger would leave MaxLinear significantly more leveraged if the Merger were to proceed, further constraining its business and financial options going forward.

124.   Against this backdrop, the MaxLinear Defendants were eager for a way out of the deal.  As such, the MaxLinear Defendants sought out, and ultimately determined, that they could point to the MAE and Silicon Motion's other breaches of the Merger Agreement as of May 5, 2023.  However, the MaxLinear Defendants also recognized that they were contractually obligated to close the Merger, and any claim that Silicon Motion suffered an MAE and had breached the Agreement would unquestionably result in litigation with the possible remedy of specific performance. Accordingly, by the beginning of the Class Period, the MaxLinear Defendants internally decided to proceed under one of two paths.  The first path (Plan A) was to wait and hope that SAMR would not approve the transaction by the August 7, 2023 deadline, thereby relieving MaxLinear from the obligation to close the transaction. The second path (Plan B) would occur in the event that SAMR approved the deal. In that case, MaxLinear would unilaterally terminate the Merger by asserting that, as of May 5, 2023, Silicon Motion had suffered an MAE, otherwise breached the Merger Agreement and/or failed to obtain all necessary closing conditions. Therefore, the Merger Agreement's Outside Date did ***not*** automatically extend to August 7, 2023.

125.   From the MaxLinear Defendants' perspective, Plan A was by far the better of the two options, as it allowed MaxLinear to cleanly walk away from the Merger Agreement with its liability limited to, *at most*, the $160 million break-up fee—which was $90 million less than the expected ***annual*** interest payment of $250 million if the deal were consummated—and there was no scenario in which MaxLinear would be forced to close the deal.  Furthermore, under Plan A, MaxLinear could still use the MAE to negotiate a discount to the break-up fee, all while its liabilities were capped.  Plan B, on the other hand, involved more risk, as it would invariably lead to litigation with Silicon Motion, where MaxLinear would face specific performance and uncapped monetary damages.

126.   Thus, the MaxLinear Defendants decided to gamble that SAMR would not provide the approvals in time.  Under either scenario, however, the MaxLinear Defendants knew during the Class Period that they would not go through with the Merger.

**L.    The Truth is Revealed: SAMR Approves The Merger, And Just Hours Later, MaxLinear Publicly Terminates The Deal, Causing Silicon Motion ADSs To Lose Nearly Half Their Value**

127.   The MaxLinear Defendants' gamble failed.  On July 26, 2023, before market open, SAMR granted regulatory approval for the Merger and publicly announced its decision on the agency's website, thereby removing the final hurdle remaining before MaxLinear and Silicon Motion would close the Merger.  On the strength of the MaxLinear Defendants' repeated assurances before and during the Class Period that MaxLinear was fully committed to closing the Merger once SAMR approved it, the price of Silicon Motion ADSs surged by over 82%, from the prior day's close of $52.20 per ADS to an intraday high of $95.33 on July 26, 2023—an increase of $43.13 per ADS.

128.   After SAMR announced its decision, the market understandably expected a prompt closing of the Merger by the August 7, 2023 Outside Date. Indeed, analysts at Wedbush immediately issued a "Quick Note" on the morning of July 26, 2023, reporting that the approval "would seem to *clear the way for the deal to be consummated* ahead of the August deal expiration date" and confirming "*we now believe the transaction is on track to be completed*."  Wells Fargo analysts similarly confirmed that morning that the approval "*pav[ed] the way for a final close ahead of the Aug[.] 7 merger agreement exp[iration]*."

129.   With Plan A no longer viable, the MaxLinear Defendants quickly pivoted to their previously devised Plan B.  Thus, at 3:10 PM on July 26, 2023, *just ten hours after SAMR approved the Merger*, MaxLinear shocked the market by announcing that MaxLinear was unilaterally terminating the Merger. Without providing any specifics as to its purported grounds for terminating the deal,

MaxLinear's press release, which was also filed on Form 8-K with the SEC, claimed that MaxLinear was terminating the Merger Agreement because: (i) Silicon Motion had failed to satisfy "conditions" of the Merger; (ii) Silicon Motion had suffered an MAE; and (iii) Silicon Motion had committed "breaches" of the Merger Agreement. Significantly, MaxLinear asserted in its press release that these events had occurred **"as of May 5, 2023**," even though MaxLinear had repeatedly reaffirmed its commitment to the Merger **after** that date.

130. Specifically, MaxLinear's July 26, 2023 press release, issued less than one hour before the end of the trading day, stated:

> **Following [the] regulatory approval,** on July 26, 2023, MaxLinear provided notice to Silicon Motion that it has terminated the Merger Agreement and MaxLinear is relieved of its obligation to close because, among other reasons, (i) certain conditions to closing set forth in the Merger Agreement are not satisfied and are incapable of being satisfied, (ii) Silicon Motion has suffered a Material Adverse Effect that is continuing, (iii) Silicon Motion is in material breach of representations, warranties, covenants, and agreements in the Merger Agreement that give rise to the right of the Company to terminate, and (iv) in any event, the First Extended Outside Date has passed and was not automatically extended because certain conditions in Article 6 of the Merger Agreement were **not satisfied or waived as of May 5, 2023**.

131. Without providing any factual detail, MaxLinear stated that under these circumstances, it was entitled to avoid paying Silicon Motion even the $160 million break-up fee.

132. On a conference call after market hours on July 26, 2023, the MaxLinear Defendants were unable to—and in fact explicitly refused to—answer any analyst questions or provide any details whatsoever about their abrupt and unexpected termination of the Merger. Instead, Defendant Litchfield simply stated: "As you saw from our press release, we have exercised our contractual right to terminate the merger agreement. Please note that we do not intend to share any further detail on this matter at this time, and our call today will be focused on our quarterly results."

133.    Prior to the market's open on July 27, 2023, Silicon Motion issued a press release arguing not only that MaxLinear had no legitimate basis for its termination of the Merger Agreement, but also that MaxLinear had never mentioned any issues with the deal during the 15 months that the two companies had worked together to obtain regulatory approval.  The press release stated:

> *In the 15 months since the signing of the merger agreement between the parties, Silicon Motion worked cooperatively with MaxLinear to obtain regulatory approvals for the merge*r, ***Silicon Motion complied with its obligations under the agreement and Silicon Motion has not suffered a material adverse effect . . .*** Silicon Motion *expects MaxLinear to abide by its obligation under the merger agreement* and intends to vigorously enforce its rights under the merger agreement.

134.    The market was shocked by MaxLinear's termination and excoriated the MaxLinear Defendants for misleading investors by feigning commitment to the deal after May 5, 2023.  For example, FBN Securities, an institutional brokerage firm, issued a report on July 27 underscoring that the MaxLinear Defendants' prior public statements expressing commitment to the Merger misled investors, querying that "***if the agreement was not in force as of [May 5], why did MXL continue to perform under the agreement by refiling HSR on [June 28] ... or continue to describe the agreement in its releases and filings as still in force[?]***"  FBN then provided the answer: "***MXL recognized that its cleanest way out in … a deal it no longer wanted was SAMR.***"

135.    Similarly, in a July 27, 2023 report, Wedbush analysts commented that "***the timing of the announcement (post the resolution of a final roadblock preventing a deal), the lack of any prior apparent action by MXL to terminate the deal around May 5th (the first extended outside date), and in particular the two companies' application for HSR [approval] on June 28th (implying everything was still on track as of that date) all suggest***" that something else was at play for MaxLinear.  Wedbush later commented on July 28, 2023 that "***SIMO had no indication MXL intended to terminate the agreement***," which further indicated that MaxLinear was not telling the entire truth.  J.P. Morgan analysts issued a report on

July 28, 2023 similarly noting the suspicious timing of the termination, noting that MaxLinear terminated the deal "*alleging Material Adverse Effect, right after China SAMR approved the acquisition*."

136.    In direct response to MaxLinear's public disclosure that it was terminating the Merger Agreement, the price of Silicon Motion ADSs plunged from a market high of $95.33 per ADS on July 26, 2023, to close at just $65.35 per ADS on July 26, 2023, a decline of 31%, or over $29.50 per ADS, in less than one hour of trading, at an unprecedented volume of 17,771,620 ADSs. The price of Silicon Motion ADSs continued to plunge when the market opened the next day, falling an additional $12.84 to close at just $52.51 per ADS on July 27, 2023, on significant trading volume of 9,116,569 ADSs, representing a two-day decline of over 44%, or nearly $43 per ADS from the July 26 intra-day high.

**M.    The Accounts Of Multiple High-Ranking Former Employees Of MaxLinear Confirm That During the Class Period, the MaxLinear Defendants Had No Intention Of Closing The Merger, And Had Determined To Simply "Walk Away" From The Transaction**

137.    Multiple high-ranking former employees of MaxLinear confirm that, despite the MaxLinear Defendants' public statements to investors reaffirming their commitment to the Merger, internally MaxLinear had decided to simply "walk away" from the deal. Reflecting the MaxLinear Defendants' decision, these former employees also confirm that MaxLinear was in no way genuinely preparing to close the Merger, and even *as late as mid-July 2023*, the MaxLinear Defendants had not taken the most basic and rudimentary steps to prepare for an integration of the two companies.

138.    In particular, FE 1, MaxLinear's former Director of Global Trade Compliance, underscored that comprehensive merger and integration planning was *vital* if MaxLinear was intent on completing the Merger, but that she observed absolutely *no* such efforts at MaxLinear *even as late as July 18, 2023—just eight days before the Merger was terminated*. As an example, FE 1 – who had over 25

years of experience in global trade, logistics, and regulatory compliance, including direct involvement in mergers and acquisitions ("M&A") transactions – described how over 40% of Silicon Motion's transactions were in Chinese and MaxLinear did not have personnel capable of reviewing them; that Silicon Motion's compliance personnel capable of reviewing and translating the contracts were made available to MaxLinear during a transition period; and that MaxLinear not only declined to follow-up on this overture, MaxLinear **_laid-off_** its top compliance officer (FE 1) just weeks ahead of the August 7, 2023 closing deadline.  FE 1 described that the lack of merger and integration planning was seemingly endemic across MaxLinear, including Human Resources ("HR"), Marketing, and Logistics/Supply Chain.   FE 1 confirmed that the lack of merger and integration planning that existed across MaxLinear between May to July 2023 with a merger date of August 7, 2023 indicated to her that MaxLinear was not interested in moving forward with the deal.

139.    FE 1 reported directly to MaxLinear's General Counsel, Michelle Sayer and to Associate General Counsel, Rohan Virginkar.[7]  She recounted that the three of them had a call with Silicon Motion's compliance professionals on December 7, 2022 to have an initial assessment of Silicon Motion's compliance efforts and subsequently to review their compliance tools and systems.  FE1 explained that after the meeting, she raised a concern with Virginkar and Sayer that MaxLinear should have an "integration schedule" of all Merger activities with the milestones and the key functional leaders clearly identified in order to properly integrate the Silicon Motion compliance department and identify a timeline for the transition efforts pre and post-Merger.

140.    In addition, according to FE 1, "several key questions should have been identified, at minimum, the types of contracts, export compliance concerns—

---

[7] FE 1 reported to General Counsel Sayer starting in November of 2022, and to Associate General Counsel Virginkar starting in February of 2023.

including, but not limited to, export classifications, Denied Parties screening and electronic systems and tools—what systems MaxLinear would use post-Merger, and whether MaxLinear would export all of Silicon Motion's transactions into MaxLinear's current tracking system or *vice versa*." Importantly, FE 1 learned during the initial meeting that as much as 40% of Silicon Motion's contracts were in Chinese, and therefore she felt strongly that MaxLinear needed a plan for reviewing the contracts and assuring their compliance with foreign laws. FE1 stated that it is industry business practice to have such an integration schedule at least 6 months pre-Merger.

141. From December 2022 until she left MaxLinear in mid-July 2023, FE 1 stated that she asked Associate General Counsel Virginkar *every six weeks* when she would be provided with an integration plan in connection with the upcoming Merger, but none was provided. In FE 1's own words: "*there was no definitive action plan or timeline*" for the expected integration, which "*was very bothersome to me*" given her repeated entreaties to MaxLinear's senior management.

142. FE 1 further described how MaxLinear's failure to undertake even basic, pre-merger integration planning was unlike anything she had experienced in her long professional career, where she was directly involved in numerous M&A transactions and handled merger and integration planning on behalf of the acquiring company. For example, FE 1 explained that based on her past experiences working on M&A in the aerospace defense industry, an integration action plan and timeline was crucial for a successful integration. Those materials detailed the responsible parties for the integration-related tasks, specified which integration milestones were critical, and provided the necessary timeframe for accomplishing the tasks, with one milestone triggering a host of others.

143. As FE 1 explained, "My expectations were based on my experience in mergers and acquisitions. We always had a list of tasks company-wide in terms of what the finance people needed to do to secure the loan, and logistics. *Every single*

*function of the company has their milestones*." She added that project managers would be assigned spreadsheets tracking the amount or progress against milestones, and there would be regular team meetings to address milestone developments, where all the managers would report on their progress to ensure they were on track. FE 1 was clear that "*at MaxLinear, I did not see any of this*" as late as mid-July 2023 (when she was laid off), despite her constant inquiries. FE 1 reiterated, "*There was no plan and no action team in place*."

144.    According to FE 1, despite her repeated concerns raised directly to the General Counsel and Associate General Counsel, management continuously silenced them. For example, after FE 1 learned in February 2023 that some of Silicon Motion's compliance employees would be available to MaxLinear in the United States, she raised the possibility of retaining those employees post-Merger to help with the Chinese contracts and regulatory compliance. However, she did not receive an answer to her inquiry. Instead, by April 2023, Virginkar's and Sayer's focus had entirely shifted away from any potential integration, and shortly before the August 7, 2023 Merger closing deadline, MaxLinear laid off FE 1.

145.    Thus, instead of undertaking vital steps to successfully integrate what would be the largest acquisition in MaxLinear's history, as of April 2023, the General Counsel and Associate General Counsel had instead shifted their focus to implementing general company-wide internal compliance trainings that were rolled out between May and July 2023, and declined to address FE 1's repeated calls that proper merger and integration teams be set-up, checklists put-in place, milestones established, and that the progress be reported to management and the Board. As FE 1 described, despite a fast-approaching Merger deadline, MaxLinear was singularly focused on generalized, internal compliance issues. FE 1 confirmed that MaxLinear was nowhere near the level it needed to be to close the Merger from a planning perspective when this shift in focus occurred, and that by the time she left MaxLinear in mid-July the focus never shifted back to integration planning.

146.    After the May 5 deadline passed and the August 7 deadline grew closer, FE 1 confirmed that she was not included in any integration planning or contract reviews, despite the fact that, as the Director of Global Compliance, she would have been involved in many integration conversations across different business functions and, at minimum, been kept informed of integration action plans and milestones.  As FE 1 stated: "***There was this big acquisition supposedly on the Company's RADAR and we had not had any integration plans in place***," emphasizing that "***Based on my position as Director of Global Compliance, if [the integration plans] were in place, I would have seen them***."    The Director of Global Compliance was unaware of any integration efforts within the Sales and Marketing, Operations, Finance, Supply Chain/Logistics, or HR departments.  Commenting on the lack of integration planning, FE 1 stated that as Director of Global Compliance she worked closely with the HR department, and was especially "***surprised***" that she had neither heard of nor was involved in any integration planning in HR, given the large number of employees who were set to join MaxLinear via the Merger.

147.    Indeed, in the crucial period of May to July 2023, MaxLinear was not even reviewing Silicon Motion's contracts for compliance issues and did not have the capability to review the Chinese language contracts.  Furthermore, MaxLinear did not have a plan in place on how to review those contracts ***after*** the Merger closed or how to comply with China's regulations.  Given the lack of planning toward closing the Merger, according to FE 1, it was an open secret within MaxLinear, widely discussed in "water cooler conversations," that MaxLinear would not go through with the Merger.  FE 1 added that she heard in several water cooler conversations that MaxLinear had concluded that it was no longer in MaxLinear's best economic interest to continue with the Merger.  Specifically, FE 1 recounted that "***it came up during a 'water cooler conversation' that it would be more beneficial for MaxLinear to break the merger agreement and to pay a fine rather than continue with the merger***."

148. FE 1 described that the lack of integration planning indicated to her that MaxLinear's management was not genuinely interested in closing the transaction. In fact, FE 1 was let go by MaxLinear in mid-July, just weeks before the expected Outside Date of August 7, 2023, and only eight days before MaxLinear publicly terminated the deal. FE 1 queried, why would MaxLinear discharge its top compliance professional if it were serious about closing a Merger with a large foreign company whose contracts were in a foreign language and were governed by complex regulatory environments both domestically and abroad? As FE 1 understood it, her very dismissal indicated MaxLinear was not going to move forward with the Merger. She stated that if MaxLinear were going to proceed with the Merger of Silicon Motion it would have needed to have a new Director of Global Trade Compliance in place and up to speed remarkably quickly. FE 1 confirmed however, that she saw a listing for her former job in September 2023, indicating that her position—which would have been essential to any plan to close the Merger— was not filled after she left.

149. Similarly, FE 2 corroborated FE 1's account of an absence of Merger preparation or planning. Indeed, FE 2 described that up until she left MaxLinear at the end of December 2022, and despite her senior division being responsible for half of MaxLinear's sales, she was not provided with *any* integration checklists, plans, or milestones for the Merger. FE 2 also described in a lengthy interview with an analyst, and in multiple corroborating interviews with Lead Counsel, that MaxLinear management had simply decided to "*walk away*" from the deal to focus on its own business. As FE 2 stated succinctly, after receiving numerous "*red flags*" of MaxLinear's poor financial health and "*really bad*" forecasts, management "*finally realized they had made a bad choice with wanting to acquire Silicon Motion, so they tried to minimize their loss by breaking the deal*."

**N.    Subsequent Developments Confirm The Fraud**

150.    Remarkably, MaxLinear ultimately *admitted* that the MaxLinear Defendants had determined there was an MAE and material breaches of the Merger Agreement long before the July 26, 2023 termination announcement.  Indeed, on August 1, 2023, MaxLinear's head of Investor Relations, Leslie Green, participated in an analyst call during which the analyst repeatedly asked pointed questions about MaxLinear's justification for terminating the Merger.  While Green refused to answer the vast majority of questions, she was forced to admit that it had been a "period of time" before the termination announcement that MaxLinear was searching for a reason to abandon the Merger, which involved "a lot of thoughtful consideration" and was thoroughly "discuss[ed]" by MaxLinear's Board before SAMR's approval.  As Green put it: "The decision to go [down] that path is the decision that the board undertook *over a period of time* with a lot of thoughtful consideration, and data analysis and consulting that went into that decision. *It's not a spur of the moment thing*."  Green later repeated that the termination "was a *well-considered decision* that did *not spontaneously occur, but it occurred over a period of time* that took a lot of thought, analysis, and discussion that went into it."

151.    Notably, Green's statements on August 1, 2023 stand in sharp contrast to Green's statements on May 3, 2023 that MaxLinear was "actively making progress" to integrate the companies.  In fact, as multiple senior FEs confirm, no such steps were being taken.  The reason why they were not taken is clear: as MaxLinear *admitted* on July 26, MaxLinear had already determined that Silicon Motion had suffered an uncurable MAE and other material breaches "*as of May 5, 2023*."

152.    On August 7, 2023, Silicon Motion issued a press release in which it "categorically rejected MaxLinear's purported termination of the Merger Agreement, and the assertions made by MaxLinear, in its letter of July 26, 2023."  Silicon Motion's letter annexed to its press release made clear that MaxLinear had

1  never provided notice of its purported grounds for termination required pursuant to
2  the Merger Agreement "**in the nearly fifteen months since the parties signed the**
3  **Agreement**."

4     153.   MaxLinear stood by its ultimate decision to terminate the Merger and
5  therefore failed to close the Merger by the August 7, 2023 Outside Date.  As a result,
6  on August 16, 2023, Silicon Motion issued another press release indicating that it
7  was now treating the Merger Agreement as terminated in light of the passage of the
8  Outside Date and that it intended to pursue substantial damages "well in excess" of
9  the Merger Agreement's termination fee.  The August 16 press release disclosed that
10  Silicon Motion intended to commence an arbitration in Singapore's SIAC against
11  MaxLinear.

12     154.   On October 5, 2023, Silicon Motion announced that it had commenced
13  an arbitration in Singapore against MaxLinear for breaching the Merger Agreement.
14  In the October 5, 2023 press release, Silicon Motion stated that it had filed a claim
15  in the SIAC, as provided under the Merger Agreement, seeking "payment of the
16  termination fee of $160 million, further substantial damages, interest and costs."

17     155.   On April 30, 2024, it was disclosed to Silicon Motion securityholders
18  that MaxLinear filed a defense in the arbitration on November 20, 2023, asserting
19  that Silicon Motion had breached the Merger Agreement because its business
20  "sustained a material adverse effect and failed to operate its business in the ordinary
21  course."  It was further disclosed **for the first time** that MaxLinear had asserted a
22  **claim for fraud against Silicon Motion**, stating that the projections that [MaxLinear]
23  was provided [by Silicon Motion] prior to entering the Merger Agreement **were**
24  **inflated**."

25  **V.     THE MATERIALLY FALSE AND MISLEADING STATEMENTS**

26     156.   During the Class Period, Defendants made materially false and
27  misleading statements and omitted material facts, in violation of Sections 10(b) and
28  20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Defendants'

SEC filings, press releases and analyst and investor presentations included material misstatements and omitted material facts. Through the SEC filings and other materials, Defendants repeatedly represented to Silicon Motion investors that (i) Defendants had provided Silicon Motion investors with all material information concerning Silicon Motion's financial condition in connection with the Merger, (ii) MaxLinear was fully committed to the transaction, and (iii) as soon as approval was obtained from SAMR—China's main antitrust regulator—the Merger would close.

157. MaxLinear's statements to Silicon Motion investors were utterly false. As MaxLinear has now admitted, on or before May 5, 2023—nearly three months before it publicly terminated the Merger—MaxLinear determined that Silicon Motion suffered an incurable MAE and other material breaches under the terms of the Merger Agreement. Indeed, it is now clear that, by May 5, 2023, MaxLinear was searching for a reason to abandon the Merger because (a) Silicon Motion's MAE, material breaches, and related financial issues rendered Silicon Motion an undesirable acquisition target; (b) the significant decline in MaxLinear's financial performance, forecast, and stock price following the announcement of the Merger negatively impacted MaxLinear's ability to afford the deal; and (c) changing macroeconomic conditions during the Class Period negatively impacted the closing of the Merger, including a downturn in the semiconductor market and soaring interest rates that dramatically increased the $3.1 billion cash component of the deal.

158. The Silicon Motion Defendants for their part made materially false and misleading statements and omissions of material facts concerning Silicon Motion's financial condition, the existence of an MAE and material breaches of the Merger Agreement to Silicon Motion investors throughout the Class Period.

159. The Class Period begins on May 5, 2023, when Silicon Motion filed a Form 6-K and press release concerning the Merger. In the press release, Silicon Motion stated that "[d]espite today's difficult operating environment, we are working hard with our customers and our manufacturing partners to continue

1    delivering cost effective, high-performance, differentiated solutions that will enable
2    us to maintain our leadership in the storage controller market.  We are confident that
3    we have the right customers, strong design win momentum and are taking necessary
4    steps to ensure the long-term growth of our revenue and profitability."   The Silicon
5    Motion Defendants further stated that Silicon Motion was proceeding with the
6    Merger, and the transaction was merely "pending satisfaction of customary closing
7    conditions, including antitrust approval [from SAMR]."

8        160.   The above statements omitted the highly material fact that an MAE and
9    other material breaches of the Merger Agreement existed by May 5, 2023 that would
10   prevent the closing of the Merger.  While Silicon Motion contended that the closing
11   of the Merger was only subject to customary closing conditions, including antitrust
12   approval, it failed to notify its securityholders that an MAE and other material
13   breaches of the Merger Agreement existed, and that MaxLinear had stopped all
14   integration and transition efforts, constituting enormous red flags that clearly
15   indicated to the Silicon Motion Defendants that the Merger was in peril.  Having
16   spoken to identify a single risk to closing, Silicon Motion was obligated to identify
17   these additional material facts to its investors.  Moreover, having the right and
18   obligation to review MaxLinear's statements made to Silicon Motion investors
19   through Rule 425 filings and otherwise, Silicon Motion could not hide its head in
20   the sand knowing the statements MaxLinear was making to Silicon Motion investors
21   were materially false and misleading.

22       161.   On June 6, 2023, Defendant Seendripu made a presentation on behalf
23   of MaxLinear at the Stifel Conference.  During the conference, a senior Stifel analyst
24   asked Defendant Seendripu about MaxLinear's pending acquisition of Silicon
25   Motion and whether MaxLinear was still committed to closing the Merger—*i.e.*,
26   whether Silicon Motion was a company that MaxLinear was "still . . . very interested
27   in acquiring."  Specifically, the analyst asked: ". . . the last topic of course is SIMO,
28   I know there's a limitation to what you can say, but at least give us an update on the

asset strategically, you talked obviously about storage and data center, right?  *So I still believe this is an asset that you're very interested in acquiring?*"

162.    In    response,    Defendant    Seendripu    unequivocally    reaffirmed MaxLinear's commitment to closing the Merger, explaining that "*the basic rationale [for the Merger] has not changed at all*," and that Silicon Motion was, in fact, still a "*a very strategic asset for the company*":

> Look, we have some conviction [in] what we do.  And I don't think we touch anything where our core technology platform doesn't expand us into the adjacent markets, right?  And storage is not an adjacent market. Our primary focus [has been] the enterprise market and the data center market,  and Silicon Motion is the number one merchant [] controller – storage controller supply in the world.  And I don't look at controllers at storage.  I look at [it] as data traffic.  I look at [it] as how do you improve latency and speed of access and the amount of the memory[.] [T]oday, non-memory is monstrous, right?

> [] But the most important thing about the memory is if you look at the storage network is that, speed of access of the data and integrity of the data and throughput.  And now it's the excel, It's going to spread all over the place as well.  So you need to tightly couple the controllers with accelerators, right?  And they all belong together *and together [with Silicon Motion], we bring the portfolio to make it happen*.

> The other part of it is that memory is no longer about moving bits around with [the] controller, right?  Talked about data integrity.  So it's a lot of encryption technology, signal processing, I/O bandwidths, the mixed-signal IP [is] all common.  *So we'll get the, what they call, the technology synergy.  And therefore, the R&D synergy [w]e need to, for both the companies combined together.*

> So we should be able to have synergies in the OpEx.  *We still are very, very, what I call, bullish that we can acquire the synergies that we told you all about.*  And yes, the revenues of the combined companies have come down [], but it just delays the, what I call, the benefits of the acquisition accordingly by a year or so.  *But the basic rationale has not changed at all.  So I believe it's a very strategic asset for the company*.

163.    Buoyed by Defendants' reassurances that MaxLinear was committed to consummating the Merger, the price of Silicon Motion ADSs rose $2.01 per ADS, from a close of $66.22 on June 5, 2023, to a close of $68.23 on June 6, 2023, on unusually high trading volume of 895,916 ADSs.

164.    The following day, June 7, 2023, MaxLinear filed a Form 425 with the SEC containing the above question and answer, describing them as "excerpted portions of a transcript of the [Stifel Conference] presentation that relate to the Merger."  *See* Exhibit 2. As noted above, the Form 425 (i) expressly identified Silicon Motion in bold as the "**Subject Company**" of the Form 425; (ii) listed Silicon Motion's SEC file number in bold, further identifying it as the "**Subject Company**" of the Form 425; (iii) was included in Silicon Motion's own SEC filings and posted on the EDGAR database maintained by the SEC regarding Silicon Motion and made available to Silicon Motion securityholders; (iv) explicitly stated that the above transcript included in the Form 425 "relate[d] to the Merger" between Silicon Motion and MaxLinear; and (v) urged Silicon Motion securityholders to read the Joint Proxy Statement/Prospectus *and other documents provided to Silicon Motion securityholders* filed with the SEC, including the Form 425 and all statements therein.  After publication of Seendripu's statements, the price of Silicon Motion ADSs rose $0.57 per ADS, from a close of $68.23 on June 6, 2023, to a close of $68.80 on June 7, 2023, on significant trading volume of 681,498 ADSs.

165.    The statements referenced in ¶¶162 and 164 were materially false and misleading and omitted material information when made.  In reality, Silicon Motion was not a "strategic asset" and would not create the referenced "synergies" between the two companies given the occurrence of the MAE negatively affecting its business operations, financial performance and prospects.

166. Moreover, by the time the MaxLinear Defendants made these statements, the "basic rationale" for the deal no longer remained the same but had *materially* changed from MaxLinear's point of view.  As a result, the MaxLinear Defendants no longer believed Silicon Motion was a "very strategic asset for the company."  Indeed, *according to the MaxLinear Defendants' own statements* following the Class Period, MaxLinear had already determined as of the beginning of the Class Period, that "certain conditions in Article 6 of the Merger Agreement

1    ***were not satisfied or waived as of May 5, 2023***."  Accordingly, by the MaxLinear

2    Defendants' own words, Defendant Seendripu ***could not possibly*** have believed, as

3    of June 6, 2023—over a month after Silicon Motion's breaches and MAE—that the

4    "basic rationale ha[d] not changed" for the Merger, or that MaxLinear's plan was

5    still to consummate the Merger and bring "both companies combined together."

6    Indeed, further evidencing that it had intended to back out of the deal, MaxLinear

7    announced its termination of the Merger just ***ten hours*** after SAMR granted

8    regulatory approval of the deal.  As Green later admitted, MaxLinear did ***not*** decide

9    to terminate the Merger in "***the spur of the moment***" after SAMR approval, but that

10   the decision to terminate was one "***the board undertook over a period of time***" after

11   "***thoughtful consideration***," "***data analysis***," and "***discussion***."

12       167.   In fact, by the time of the statements, the MaxLinear Defendants knew

13   that they no longer wanted to pursue the deal for Silicon Motion, as not only was

14   MaxLinear's business deteriorating, but the financing costs for the transaction had

15   more than doubled due to rising interest rates.  Thus, rather than Silicon Motion

16   being "a very strategic asset" and MaxLinear being "very, very, . . . bullish that [it

17   could] acquire the synergies" expected through the Merger, the exact opposite was

18   true: the MaxLinear Defendants knew that none of the synergies provided by the

19   "**Subject Company**" – *i.e.* Silicon Motion – would be realized because MaxLinear

20   would terminate the Merger even if SAMR approved it.  Further evidencing that the

21   MaxLinear Defendants had no intention of acquiring Silicon Motion, former senior

22   employees of MaxLinear confirmed that MaxLinear had not performed even the

23   most basic and rudimentary integration practices that would be expected of an

24   organization if it was truly intent on completing a pending merger.  To the contrary,

25   these FEs explained that there was not a single integration, checklist, plan, milestone,

26   or action team in place from the time the deal was announced through its termination

27   in July 2023.

28

168.  On June 28, 2023, MaxLinear filed with the SEC a Form 425 and 8-K, which was signed by Defendant Litchfield. *See* Exhibit 3. The Form 425/8-K again urged Silicon Motion securityholders to read the Form S-4 registration statement, Joint Proxy Statement/Prospectus, and "OTHER DOCUMENTS PROVIDED TO SILICON MOTION SECURITY HOLDERS FILED WITH THE SEC," in the Form 425/8-K and all statements therein.

169.  In the Form 425 and 8-K, the MaxLinear Defendants gave the false impression that MaxLinear remained committed to completing the Merger—including obtaining the necessary regulatory approvals to close the transaction—while omitting the highly material information that MaxLinear had internally concluded that Silicon Motion was in material breach of the Merger Agreement, suffered an MAE, and that MaxLinear would not go through with the deal, stating in part as follows:

> The completion of the Merger is conditioned upon, among other things, the expiration or termination of the waiting period applicable to the consumption of the Merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act" and, such waiting period, the "HSR Waiting Period"). MaxLinear and Silicon Motion previously filed under the HSR Act, and the HSR Waiting Period expired at 11:59 p.m. ET on June 27, 2022. ***However, since the Merger was not consummated by June 27, 2023, clearance under the HSR Act has expired, and on June 28, 2023, MaxLinear and Silicon Motion re-filed under the HSR Act***.

170.  On June 28, 2023, the Silicon Motion Defendants filed an SEC Form 6-K containing the same statements concerning regulatory approval for the Merger.

171.  The statements referenced in ¶¶169 through 170 were materially false and misleading and omitted material information when made. Specifically, the completion of the Merger was not "conditioned upon . . . the expiration or termination of the waiting period applicable to the consummation of the Merger under" the HSR Act, but rather MaxLinear had ***already determined*** not to go through with the Merger ***regardless*** of the HSR waiting period. By the MaxLinear Defendants' own admission, at the time the company "re-filed" an application

"under the HSR Act," they already had determined Silicon Motion to be in material breach of the Merger Agreement, rendering the Agreement null and void. The Silicon Motion Defendants also failed to disclose the existence of the MAE and that Silicon Motion was in material breach of the Merger Agreement at that time, which prevented the closing of the Merger. Indeed, as an analyst at FBN rhetorically questioned: "if the agreement was not in force as of [May 5, 2023], why did MXL continue to perform under the agreement by refiling HSR on [June 28, 2023?]" Similarly, as an analyst at Wedbush later noted, MaxLinear's "application for [Hart Scott Rodino Act approval] on June 28th" had "impl[ied] everything was still on track as of that date."

172. Moreover, and as described further above, by the time that MaxLinear filed the Form 425/8-K with the SEC, the MaxLinear Defendants knew that closing the deal did not make financial sense to MaxLinear and thus they would not consummate the Merger under any circumstances.

173. On July 7, 2023, the Silicon Motion Defendants filed an SEC Form 6-K and press release advising Silicon Motion securityholders of its forthcoming second quarter 2023 financial results. Specially, the Form 6-K stated that Silicon Motion:

> will release its second quarter 2023 financial results after the market closes on July 27, 2023. The company will not be conducting its customary earnings conference call due to restrictions associated with the Transaction with MaxLinear, and thus will not be providing updates regarding the Transaction or additional financial details or guidance beyond what will be made available in the earnings press release.

174. The above statements were materially false and misleading because they failed to disclose the existence of the MAE and other material breaches of the Merger Agreement by Silicon Motion, which prevented the closing of the Merger.

175. Silicon Motion further violated the federal securities laws by failing to update its prior statements to its securityholders regarding the existence of the MAE

on May 5, 2023, its other material breaches of the Merger Agreement, and upon its realization that MaxLinear had failed to proceed with the requisite integration procedures for merging the companies.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

176.    As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions about Silicon Motion, the Merger and the closing of the transaction were materially false and misleading when made.  In addition to the allegations set forth above, these particularized facts include the following.

177.    *First*, the MaxLinear Defendants themselves admitted that they knew they would not close the Merger by May 5, 2023, and not only did they not disclose this highly material information, but they reaffirmed, on multiple occasions and in direct response to analyst questions, that they intended to proceed with the Merger. Indeed, MaxLinear's notice of termination specifically cites an MAE and a failure by Silicon Motion to satisfy certain undisclosed conditions as of ***May 5, 2023***, a date ***preceding*** MaxLinear's termination of the Merger by over two months.  Under the Merger Agreement, the First Extended Outside Date of May 5, 2023 would have "automatically" been extended to August 7, 2023, if the conditions to closing other than regulatory approvals had been accomplished.   However, the MaxLinear Defendants' July 26, 2023 termination letter claimed that "the First Extended Outside Date ha[d] passed and was not automatically extended because certain conditions in Article 6 of the Merger Agreement ***were not satisfied or waived as of May 5, 2023***."  Thus, the MaxLinear Defendants' own public statements in their notice of termination ***admit*** that the condition(s) that allowed MaxLinear to terminate the Merger were known to the MaxLinear Defendants by May 5, 2023.

178.    *Second*, MaxLinear announced its decision to terminate the Merger ***just hours*** after SAMR granted approval of the Merger.  Indeed, despite waiting fifteen months for SAMR approval and repeatedly assuring investors that MaxLinear was

continuing to work toward obtaining SAMR approval by mid-2023, after SAMR granted approval within that exact timeframe, the MaxLinear Defendants publicly terminated the Merger *just 10 hours later on that very same day*.  MaxLinear's head of Investor Relations, Leslie Green, admitted on August 1, 2023 that MaxLinear did *not* decide to terminate the Merger in "*the spur of the moment*" after SAMR approval, but that the decision to terminate was one "*the board undertook over a period of time*" after "thoughtful consideration," "data analysis," and "discussion." Thus, the MaxLinear Defendants had already decided against proceeding with the Merger well before SAMR's approval and MaxLinear's public announcement of the termination.

179.   *Third*, MaxLinear never provided Silicon Motion with written notice of Silicon Motion's inability to satisfy any closing conditions, breaches or an MAE. Pursuant to Section 5.7 of the Merger Agreement titled "Certain Notices," MaxLinear was required to provide "*prompt notice*" whenever it became "aware of the occurrence of an event that could prevent or delay beyond the Outside Date (as the same may be extended) the consummation of the Transactions or that would reasonably be expected to result in any of the conditions to the Merger set forth in Article 6 not being satisfied."  Thus, Defendants were required to provide Silicon Motion (and, by extension, Silicon Motion securityholders) notice once they determined that Silicon Motion suffered an MAE, that closing conditions were not satisfied, or that the First Extended Outside Date was not extended as of May 5, 2023.

180.   Similarly, to the extent Silicon Motion was in "material breach of representations, warranties, covenants, and agreements in the Merger Agreement," MaxLinear could only terminate the Merger Agreement after "*deliver[ing] to [Silicon Motion] written notice of such breach*" and providing Silicon Motion with "*at least thirty (30) days*" to cure the breach "*in all material respects*."  Silicon Motion has repeatedly and vehemently confirmed that it was never provided with

any such notice. Tellingly, MaxLinear has never disputed the fact that it never gave such contractually required notice to Silicon Motion. MaxLinear's failure to provide Silicon Motion with the required prior written notice of the breaches, MAE, and closing condition deficiencies underpinning MaxLinear's termination of the Merger further demonstrates that the MaxLinear Defendants deliberately and intentionally concealed these highly material facts from Silicon Motion securityholders.

181. *Fourth*, MaxLinear had a strong financial motive to internally terminate the Merger and to wait to disclose its intention to do so pending SAMR's review of the Merger. MaxLinear's costs of financing the acquisition had more than doubled under its loan commitment, as interest rates spiked after the deal was announced in May 2022. The rising interest rate environment meant that MaxLinear was looking at approximately $250 million a year in borrowing costs, or more, compared to the $110 million a year originally contemplated.

182. Making matters worse, MaxLinear's financial performance had steadily deteriorated since the announcement of the Merger. As analysts noted, SAMR's approval came at "the absolute downturn" in MaxLinear's business. The MaxLinear Defendants knew MaxLinear was unlikely to see any significant turnaround in its business anytime soon. FE 2 described how senior management, including Defendants Seendripu and Litchfield, were informed in September 2022 that MaxLinear was forecasted to see a massive 40% revenue drop in 2023. However, MaxLinear could not simply terminate and walk away from the Merger Agreement, as any unjustified termination would constitute a "Willful and Material Breach" and subject MaxLinear to uncapped damages or, worse, specific performance—the exact situation MaxLinear wanted to avoid. Thus, the easiest way for the MaxLinear Defendants to guarantee that MaxLinear would not close the deal would be if SAMR either denied approval or delayed its decision beyond the August 7, 2023 Outside Closing Date. If that occurred, MaxLinear could completely avoid the possibility of

specific performance, easily walk away from the transaction, and potentially cabin its exposure to the $160 million breakup fee—and possibly significantly less.

183.    The increased cost of the Merger, its delayed timeframe with closing set to occur amid a severe downturn in MaxLinear's business, and the substantial financial consequences attendant to terminating the Merger ahead of SAMR's decision whether or not to approve the deal, provided a strong financial motive for the MaxLinear Defendants to mislead Silicon Motion securityholders that MaxLinear remained committed to the Merger, even though Defendants had decided by May 5, 2023 that an MAE and other material breaches of the Merger Agreement had occurred.

184.    *Fifth*, MaxLinear's failure to perform any Merger integration planning for what would be the largest acquisition in MaxLinear's history strongly corroborates that the MaxLinear Defendants knew MaxLinear was not committed to closing the Merger and was, in fact, abandoning the deal.  Indeed, FE 1 raised this issue with senior executives, including MaxLinear's General Counsel, as early as November 2022.  She continued to ask senior personnel about this "***red flag***" every six weeks thereafter.  As FE 1 described, even as of July 18, 2023—just eight days before the Merger was terminated—***"[t]here was no plan and no action team in place***" across the organization, including key departments such as Regulatory Compliance, Finance, Supply Chain/Logistics, and HR.  As an example, FE 1 – who had over twenty five years of experience in global trade, logistics, and regulatory compliance, including direct involvement in numerous M&A transactions – described how over 40% of Silicon Motion's transactions were in Chinese and MaxLinear did not have personnel capable of reviewing them; that Silicon Motion's compliance personnel capable of reviewing and translating the contracts were made available to MaxLinear during a transition period; and that MaxLinear not only declined to follow-up on this overture, MaxLinear ***laid-off*** its top compliance officer (FE 1) just weeks ahead of the August 7, 2023 closing deadline.  MaxLinear's failure

to undertake any serious integration efforts as late as July 2023—particularly in light of MaxLinear's growth-by-acquisitions strategy and professed deep experience and history of success integrating acquired companies, and its decision to terminate its Director of Global Compliance without designating any successor—further reinforces that the MaxLinear Defendants knew during the Class Period that MaxLinear would not proceed with the deal.

185. *Sixth*, Silicon Motion's response to MaxLinear's decision to terminate the Merger Agreement, including its repeated and vehement denials of any of MaxLinear's supposed grounds for terminating the deal, and its confirmation that MaxLinear had "never once" provided notice or "ever mention[ed]" any of these supposed grounds "[i]n the 15 months following the signing of the Merger Agreement," further reinforces the MaxLinear Defendants' scienter. In truth, by May 5, 2023, the MaxLinear Defendants had already determined that an incurable MAE and other material breaches of the Merger Agreement had occurred which prevented the Merger from closing, but delayed sending any such notice, thereby supporting a cogent and strong inference of the MaxLinear Defendants' scienter.

186. *Seventh*, analysts excoriated the MaxLinear Defendants for failing to disclose *for months* the extraordinarily material fact that MaxLinear had determined an incurable MAE and other material breaches of the Merger Agreement had occurred, while *repeatedly* misleading investors that MaxLinear was committed to closing the deal. Analysts seized on MaxLinear's admission that it had determined Silicon Motion was in material breach and suffered an incurable MAE "*as of May 5, 2023*," yet reassured investors that MaxLinear was "very, very bullish" on the Merger and the timeline for closing, and even going so far as to refile the HSR application as late as June 28, 2023. For example, FBN openly called into question the MaxLinear Defendants' "*credibility*" for "*describ[ing] the agreement in its releases and filings as still in force*" and "*refil[ing the] HSR [application]*" just weeks before terminating the deal; Wedbush criticized the MaxLinear Defendants

- 68 -

for not taking "**action … to terminate the deal around May 5th**" and for "**implying everything was still on track**" by refiling the HSR application; and multiple analysts expressed shock at MaxLinear's nearly immediate termination of the Merger "**so closely on the heels of the SAMR approval**," which the market had been led to believe was the "**final roadblock preventing a deal**."  Analysts' scathing reaction to the MaxLinear Defendants' material non-disclosures, rapid-fire termination of the deal after securing regulatory approval, and clear reason for abandoning the deal despite their stated justifications reinforces the strong scienter inference.

187.  *Eighth*, the multi-billion Merger was to be the largest acquisition, by far, in MaxLinear's history. The Merger was expected to **double** MaxLinear's addressable market, be "immediately and materially accretive" to MaxLinear's operating income, operating margins, earnings per share, and cash flow, and catapult MaxLinear into a "top-ten fabless semiconductor supplier" in the world.  Further, analysts and investors were hyper-focused on the Merger and whether it would be completed, asked the MaxLinear Defendants highly specific questions on these critical topics, and these Defendants repeatedly assuaged investor concern in equally specific terms, confirming MaxLinear's commitment to closing the Merger and the expected timeframe.  Moreover, Seendripu was the Chairman of MaxLinear's Board at all relevant times, and therefore, was directly involved in the decision to terminate the deal, which MaxLinear admitted was made after much "thoughtful consideration," "data analysis" and "discussion" that "the Board undertook over a period of time."  In these circumstances, it is implausible to suggest that Seendripu, Litchfield, and other members of MaxLinear's executive management team would not know whether MaxLinear intended to proceed with the deal, particularly as late as the June 2023 timeframe.

188.  *Finally*, as discussed above, the Silicon Motion Defendants issued materially false statements and omissions of material facts concerning Silicon Motion's financial condition as it related to the Merger and Silicon Motion's

compliance with the terms of the Merger Agreement.   However, at the time it made these misstatements it failed to disclose the existence of the MAE and other material breaches of the Merger Agreement in violation of the federal securities laws. Moreover, Silicon Motion had a strong motive to conceal this information from Silicon Motion securityholders, as well as MaxLinear, in order to ensure that the Merger would be consummated at a significant premium to the price of Silicon Motion's equity securities during the Class Period.

## VII.    APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

189.    At all relevant times, the market for Silicon Motion ADSs was an efficient market for the following reasons, among others:

a)   Silicon Motion ADSs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)   According to Silicon Motion's Form 20-F for the fiscal year ended December 31, 2022,  Silicon Motion had more than 132 million ordinary shares outstanding as of December 31, 2022, which corresponds with approximately 33 million ADSs;

c)   As regulated issuers, MaxLinear and Silicon Motion filed periodic public reports with the SEC;

d)   MaxLinear and Silicon Motion regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the internet, and other wide-ranging public disclosures; and

e)   Unexpected material news about Silicon Motion was rapidly reflected in and incorporated into the price for Silicon Motion ADSs during the Class Period.

190.    As a result of the foregoing, the market for Silicon Motion ADSs promptly digested current information regarding Silicon Motion from publicly available sources and reflected such information in the price of Silicon Motion ADSs.  Under these circumstances, all purchasers of Silicon Motion ADSs during the Class Period suffered similar injury through their purchases of Silicon Motion ADSs at artificially inflated prices, and a presumption of reliance applies.

191.   A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Lead Plaintiffs' claims are based, in significant part, on Defendants' material omissions.

## VIII.  LOSS CAUSATION

192.   During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Silicon Motion ADSs, maintained inflation in the price of Silicon Motion ADSs, and operated as a fraud or deceit on Class Period purchasers of Silicon Motion ADSs by misrepresenting the value of Silicon Motion's business and prospects and concealing MaxLinear's conclusions about the Merger, including its decision to terminate the Merger Agreement.

193.   Lead Plaintiffs and members of the Class purchased Silicon Motion ADSs at artificially inflated prices during the Class Period.  But for Defendants' fraudulent scheme and material misrepresentations and omissions, Lead Plaintiffs and members of the Class would not have purchased Silicon Motion ADSs at artificially inflated prices.

194.   As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Silicon Motion ADSs fell precipitously as the prior artificial inflation came out of the ADSs' price.  The disclosure described below, however, does not necessarily represent an exhaustive list of all stock price declines attributable to Defendants' fraudulent conduct, given that fact and expert discovery in this case has not yet begun.  Lead Plaintiffs expressly reserve the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this case.

195. On July 26, 2023, at 3:10 PM, MaxLinear filed a Form 8-K accompanied by a press release which revealed that MaxLinear was terminating the Merger Agreement, less than ten hours after SAMR had provided its authorization

for the Merger, and all other regulatory approvals required to close the deal had been obtained.

196.   On this news, the price of Silicon Motion ADSs plunged from an intra-day high of $95.33 per ADS on July 26, 2023, to close at just $65.35 per ADS on July 26, 2023, representing a decline of 31% or $29.98 per ADS, on unprecedented trading volume of 17,771,620 ADSs.  The price of Silicon Motion ADSs continued to fall when the market opened the next day, declining an additional $12.84 to close at just $52.51 per ADS on July 27, 2023, on significant trading volume of 9,116,569 ADSs, and representing a two-day[8] decline of over 44% or nearly $43 per ADS from the July 26 intra-day high.

197.   As a result of their purchases of Silicon Motion ADSs during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## IX.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

198.   The statutory safe harbor or bespeaks caution doctrine applicable to forward looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Amended Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

199.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

---

[8] Measured from the $95.33 per ADS market high on July 26, 2023.

looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of MaxLinear who knew that such statement was false when made.

## X.    CLASS ACTION ALLEGATIONS

200. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Silicon Motion ADSs during the Class Period. Excluded from the Class are Defendants, the officers and directors of MaxLinear and Silicon Motion, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

201. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Silicon Motion ADSs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there could be hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Silicon Motion or its transfer agent or the depositary bank for the ADSs and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

202. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful statements and conduct in violation of federal law that is complained of herein.

203.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

204.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a) whether the Exchange Act was violated by Defendants as alleged herein;

b) whether statements made by Defendants misrepresented material facts about the business, operations and prospects of Silicon Motion;

c) whether Defendants acted with scienter; and to what extent the members of the Class have sustained damages and the proper measure of damages.

205.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against All Defendants

206.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

207.    This Count is asserted on behalf of all members of the Class against Defendants MaxLinear, Seendripu, Litchfield, Silicon Motion, Kou and Lai for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

208.   During the Class Period, Defendants carried out a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Silicon Motion ADSs; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Silicon Motion ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

209.   Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the SEC filings, press releases, conferences with analysts and investors, and other documents and statements described above, including statements made to securities analysts and the media that were designed to influence the market for Silicon Motion securities. Such reports, filings, releases, and statements were materially false or misleading in that they failed to disclose material adverse information and misrepresented the truth about MaxLinear's business and operations, including without limitation its commitment to acquiring Silicon Motion and consummating the Merger.

210.   Defendants are also liable for engaging in deceptive and manipulative acts in a scheme to defraud investors. As part of their scheme to defraud investors, the MaxLinear Defendants directed MaxLinear to apply for regulatory approval of the Merger, including with Chinese and U.S. authorities, despite knowing that

MaxLinear was not committed to and would not consummate the Merger. The Silicon Motion Defendants similarly directed Silicon Motion to apply for regulatory approval of the Merger, including with Chinese and U.S. authorities, despite knowing that Silicon Motion suffered an MAE or otherwise breached the Merger Agreement.  Defendants nonetheless made SEC filings disclosing that "MaxLinear and Silicon Motion re-filed under the HSR Act."

211.  During the Class Period, Defendants made or were responsible for the materially false and misleading statements and omissions alleged herein, which they knew or severely recklessly disregarded to be materially false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

212.  Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Silicon Motion ADSs during the Class Period.

213.  Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed

devices and artifices to defraud in connection with the purchase and sale of Silicon Motion ADSs, which were intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, MaxLinear's business, operations and commitment to the Merger; (ii) artificially inflate and maintain the market price of Silicon Motion ADSs; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase Silicon Motion ADSs at artificially inflated prices, and to suffer losses when the true facts became known.

214. Defendants MaxLinear, Seendripu, Litchfield, Silicon Motion, Kou and Lai are liable for all materially false or misleading statements made during the Class Period, as alleged above in Section V.

215. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with the intent to deceive, manipulate or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers of Silicon Motion ADSs, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

216. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Silicon Motion ADSs, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased Silicon Motion ADSs at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements and fraudulent course of conduct.

217. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Silicon Motion ADSs during the Class Period.

1
2
3

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against the Silicon Motion Individual Defendants and MaxLinear Individual Defendants**

4   218.   Lead Plaintiffs repeat and re-allege each and every allegation contained
5   above as if fully set forth herein.

6   219.   This Count is asserted on behalf of all members of the Class against the
7   Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C.
8   §78t(a).

9   220.   Defendants Seendripu and Litchfield were and acted as controlling
10  persons of MaxLinear within the meaning of Section 20(a) of the Exchange Act as
11  alleged herein.   By virtue of their high-level positions within MaxLinear,
12  participation in and/or awareness of MaxLinear's operations and/or intimate
13  knowledge of MaxLinear's actual performance and intentions regarding the Silicon
14  Motion Merger, Defendants Seendripu and Litchfield had the power to influence and
15  control, and did actually influence and control, directly or indirectly, the decision-
16  making of MaxLinear, including the content and dissemination of the various
17  statements which Lead Plaintiffs contend are materially false or misleading. Each of
18  Defendants Seendripu and Litchfield was provided with or had unlimited access to
19  copies of MaxLinear's reports, press releases, public filings, and other statements
20  alleged by Lead Plaintiffs to be materially false or misleading prior to and/or shortly
21  after these statements were issued, and had the ability to prevent the issuance of the
22  statements or cause the statements to be corrected. Moreover, as discussed above,
23  each of Defendants Seendripu and Litchfield, had access to copies of Silicon
24  Motion's press releases, public filings, and other statements alleged by Lead
25  Plaintiffs to be materially false or misleading prior to these statements being issued,
26  and had the ability to prevent the issuance of the statements or cause the statements
27  to be corrected.
28

221.   As senior corporate officers and/or directors of MaxLinear, and as more fully described above, Defendants Seendripu and Litchfield had direct involvement in the day-to-day operations of MaxLinear. Defendants Seendripu and Litchfield signed MaxLinear's SEC filings during the Class Period and were directly involved in providing false information and certifying and approving the false statements disseminated by MaxLinear during the Class Period.  As a result of the foregoing, Defendants Seendripu and Litchfield as a group, and individually, were controlling persons of MaxLinear within the meaning of Section 20(a) of the Exchange Act.

222.   Defendants Kou and Lai were and acted as controlling persons of Silicon Motion within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions within Silicon Motion, participation in and/or awareness of Silicon Motion's operations and/or intimate knowledge of Silicon Motion's actual performance and intentions regarding the Merger, Defendants Kou and Lai had the power to influence and control, and did actually influence and control, directly or indirectly, the decision-making of Silicon Motion, including the content and dissemination of the various statements which Lead Plaintiffs contend are materially false or misleading.  Each of Defendants Kou and Lai was provided with or had unlimited access to copies of Silicon Motion's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be materially false or misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Moreover, as discussed above, each of Defendants Kou and Lai, had access to copies of MaxLinear's press releases, public filings, and other statements alleged by Lead Plaintiffs to be materially false or misleading prior to these statements being issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

223.   As senior corporate officers and/or directors of Silicon Motion, and as more fully described above, Defendants Kou and Lai had direct involvement in the

day-to-day operations of Silicon Motion. Defendant Lai signed Silicon Motion's SEC filings during the Class Period and was, together with Defendant Kou, directly involved in providing false information and certifying and approving the false statements disseminated by Silicon Motion during the Class Period. As a result of the foregoing, Defendants Kou and Lai as a group, and individually, were controlling persons of Silicon Motion within the meaning of Section 20(a) of the Exchange Act.

224. As set forth above, MaxLinear and Silicon Motion violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Amended Complaint.

225. By virtue of their controlling positions of Silicon Motion and as a result of their own aforementioned conduct, Defendants Kou and Lai are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Silicon Motion is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Silicon Motion ADSs. Moreover, as detailed above, each of the Silicon Motion Individual Defendants culpably participated in the material misstatements and omissions alleged herein.

226. As a direct and proximate result of the Silicon Motion Individual Defendants' and MaxLinear Individual Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Silicon Motion ADSs during the Class Period.

## XII. PRAYER FOR RELIEF

227. WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

a) Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Lead Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c) Awarding Lead Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as deemed appropriate by the Court.

## XIII. JURY DEMAND

228.  Lead Plaintiffs demand a trial by jury on all issues so triable.

DATED:  September 18, 2024       Respectfully submitted,

**SAXENA WHITE P.A.**

/s/ *David R. Kaplan*

David R. Kaplan (SBN 230144)
Emily Bishop (SBN 319383)
505 Lomas Santa Fe Drive, Suite 180
Solana Beach, CA 92075
Tel.: (858) 997-0860
Fax: (858) 369-0096
dkaplan@saxenawhite.com
ebishop@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice* forthcoming)
David J. Schwartz (*pro hac vice* forthcoming)
Joshua H. Saltzman (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ssinger@saxenawhite.com
dschwartz@saxenawhite.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

jsaltzman@saxenawhite.com

-and-

Joseph E. White, III (*pro hac vice* forthcoming)
Lester R. Hooker (SBN 241590)
Jonathan D. Lamet (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
jwhite@saxenawhite.com
lhooker@saxenawhite.com
jlamet@saxenawhite.com

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice*)
Andrew J. Entwistle (*pro hac vice*)
Robert N. Cappucci (*pro hac vice*)
Jonathan H. Beemer (*pro hac vice* forthcoming)
Jessica A. Margulis (*pro hac vice* forthcoming)
230 Park Avenue, 3rd Floor
New York, NY 10169
Tel.: (212) 894-7200
vcappucci@entwistle-law.com
aentwisstle@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com
jmargulis@entwistle-law.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*